# EXHIBIT B
# Part 2 of 2

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA, | | Case No.   A961451 |
| | Plaintiff | |
| | | |
| v. | | INFORMATION |
| | | |
| | | Arraignment Date: 10/25/ |
| | | Department: CEN 130 |
| LUIS HERNON CARDONA, | | |
| ELKIN JESUS GOMEZ, and | | |
| RAUL GALLEGOS | | FILED |
| | | |
| | Defendant(s) | OCT 2 5 1988 |

FRANK ZOLIN COUNTY CLERK

By S. FERRELL, DEPUTY

INFORMATION
SUMMARY

| Ct. No.   Charge | Charge Range | Defendant | Special Allegation | Alleg. Effect |
|---|---|---|---|---|
| 1   PC209(a) | LIFE | CARDONA, LUIS HERNON GOMEZ, ELKIN JESUS | PC12022(a) | +1 |
| PC12022(b) | +1 | | | |
| 2   PC182[1] | Check Code | CARDONA, LUIS HERNON GOMEZ, ELKIN JESUS | PC12022(a) | +1 |
| PC12022(b) | +1 | | | |
| | | GALLEGOS, RAUL | PC12022(a) | +1 |
| 3   PC211 | 2-3-5 | GOMEZ, ELKIN JESUS | | |
| PC12022(b) | +1 | | | |

The District Attorney of the County of Los Angeles, by this Information alleges that:

COUNT   1

On or about December 10, 1987, in the County of Los Angeles, the crime of KIDNAPPING FOR EXTORTION, in violation of PENAL CODE SECTION 209(a), a Felony, was committed by LUIS HERNON CARDONA and ELKIN JESUS GOMEZ, who did willfully and unlawfully seize, confine, abduct, conceal, kidnap, and carry away William

Page  1

Mikus with the intent to hold and detain, and who did hold and detain, the said William Mikus for extortion.    It is further alleged that the above offense is a serious felony within the meaning of Penal Code Section 1192.7(c)(20).

It is further alleged that in the commission and attempted commission of the above offense a principal in said offense was armed with a firearm(s), to wit, a firearm, said arming not being an element of the above offense, within the meaning of Penal Code Section 12022(a).

It is further alleged that in the commission and attempted commission of the above offense, the said defendant(s), ELKIN JESUS GOMEZ, personally used a deadly and dangerous weapon(s), to wit, a machine gun, said use not being an element of the above offense, within the meaning of Penal Code Section 12022(b) and also causing the above offense to be a serious felony within the meaning of Penal Code Section 1192.7(c)(23).

* * * * *

COUNT   2

On or about December 10, 1987, in the County of Los Angeles, the crime of CONSPIRACY TO COMMIT A CRIME, in violation of PENAL CODE SECTION 182[1], a Felony, was committed by LUIS HERNON CARDONA, ELKIN JESUS GOMEZ and RAUL GALLEGOS, who did willfully and unlawfully conspire together and with another person and persons whose identity is unknown to commit the crime of KIDNAPPING FOR EXTORTION, in violation of Section 209(a) of the Penal Code, a felony; that pursuant to and for the purpose of carrying out the objects and purposes of the aforesaid conspiracy, the said defendants committed the following overt act and acts at and in the County of Los Angeles : SEE ATTACHED.

It is further alleged that in the commission and attempted commission of the above offense a principal in said offense was armed with a firearm(s), to wit, a firearm, said arming not being an element of the above offense, within the meaning of Penal Code Section 12022(a).

It is further alleged that in the commission and attempted commission of the above offense, the said defendant(s), ELKIN JESUS GOMEZ, personally used a deadly and dangerous weapon(s), to wit, a machine gun, said use not being an element of the above offense, within the meaning of Penal Code Section 12022(b) and also causing the above offense to be a serious felony within the meaning of Penal Code Section 1192.7(c)(23).

\* \* \* \* \*

COUNT 2

On or about December 10, 1987, in the County of Los Angeles, the crime of 2ND DEGREE ROBBERY, in violation of PENAL CODE SECTION 211, a Felony, was committed by ELKIN JESUS GOMEZ, who did willfully, unlawfully, and by means of force and fear take personal property from the person, possession, and immediate presence of William Mikus.    It is further alleged that the above offense is a serious felony within the meaning of Penal Code Section 1192.7(c)(19).

It is further alleged that in the commission and attempted commission of the above offense, the said defendant(s), ELKIN JESUS GOMEZ, personally used a deadly and dangerous weapon(s), to wit, a machine gun, said use not being an element of the above offense, within the meaning of Penal Code Section 12022(b) and also causing the above offense to be a serious felony within the meaning of Penal Code Section 1192.7(c)(23).

\* \* \* \* \*

THIS INFORMATION CONSISTS OF 3 COUNT(S).

IRA REINER
DISTRICT ATTORNEY
County of Los Angeles,
State of California

BY: _~Robert Wallace_____
ROBERT WALLACE
DEPUTY DISTRICT ATTORNEY

Filed in Superior Court,
County of Los Angeles

DATED: _____

## OVERT ACTS AS TO COUNT II

### Overt Act No. 1

Between December 6, 1987, and December 10, 1987, defendants LUIS CARDONA, ELKIN GOMEZ, and RAUL GALLEGOS held discussions with each other and with JOSE LUJAN to formulate a plan to kidnap William Mikus.

### Overt Act No. 2

On or about December 10, 1987, LUIS CARDONA, ELKIN GOMEZ, and RAUL GALLEGOS each went to a parking lot across from the Rickshaw Restaurant. It was at this location that the kidnapping was to, and did, occur.

### Overt Act No. 3

On or about December 10, 1987, defendants CARDONA and GOMEZ forcibly entered a vehicle containing and belonging to William Mikus.

Ref:  CARDONAOA/group/10-24-88/vb

# Exhibit B

SUPERIOR COURT OF CALIF
COUNTY OF LOS ANGELES

PROBATION OFFICER'S REPORT

REPORT SEQUENCE NO.   1

| DEFENDANT'S NAME(S) | COURT | JUDGE | COURT CASE NO. |
|---|---|---|---|
| ELKIN GOMEZ<br><br>T/N: ELKIN JESUS GOMEZ (?) | 104 | CONNOR | A961451 |

| ADDRESS (PRESENT/RELEASE) | HEARING DATE | DEFENSE ATTY. | PROSECUTOR |
|---|---|---|---|
| UNKNOWN | 11-2-89 | NOTKOFF | WALLACE |

| BIRTHDATE | AGE | SEX | RACE | DPO | AREA OFFICE | PHONE NO. |
|---|---|---|---|---|---|---|
| 2-27-60  ? | 29  ? | MALE | HISPANIC | THOMAS | CAI | 974-3315 |

| CITIZENSHIP STATUS | DRIVER'S LICENSE/EXP. DATE |
|---|---|
| UNK | N9480800/UNK |

| PROBATION NO. | CII NO. | BOOKING NO. |
|---|---|---|
| X - 286352 | A06849376 | 9422055 |

| DAYS IN JAIL THIS CASE | CUSTODY STATUS/RELEASE DATE |
|---|---|
| ☐ ESTIMATED  ☒ VERIFIED<br>686  DYS | COUNTY JAIL |

TYPE REPORT

_X_ Probation and sentence
____ Pre-Conviction (131.3 CCP)
____ Post sentence
____ Diversion (Specify) _____

## PRESENT OFFENSE: LEGAL HISTORY

CHARGED with the crimes of (INCLUDE PRIORS, ENHANCEMENTS OR SPECIAL CIRCUMSTANCES)
CT 1:   209(A) PC (KIDNAPPING FOR EXTORTION);
ALLEGATIONS MADE OF 12022(A)(1), 1192.(C)(20), 12022.5, 1192.7(C)(8) PC
CT 2:   211 PC (ROBBERY/SECOND DEGREE);
ALLEGATIONS MADE OF 1192.7(C)(19) AND 1192.7(C)(8) PC.

DATE

CONVICTED of the crimes of (INCLUDE PRIORS, ENHANCEMENTS OR SPECIAL CIRCUMSTANCES)
CT 1:   209(A) PC, ALLEGATION OF 12022.5 PC FOUND TRUE
CT 2:   487.1 PC (GRAND THEFT/PERSON), ALLEGATION OF 12022.5 PC FOUND TRUE.

| CONVICTED BY | DATE OF CONVICTION/PLEA | COUNT(S) CONTINUED TO P & S FOR DISPOSITION |
|---|---|---|
| JURY | 10-5-89 | NONE |

| PROPOSED PLEA AGREEMENT | SOURCES OF INFORMATION |
|---|---|
| N/A | N/A |

| DATE(S) OF OFFENSE | TIME(S) |
|---|---|
| 12-10-87 | 9:30 PM |

DEFENDANT: ☒ N/A        ☐ SENTENCED TO STATE PRISON/COUNTY JAIL ON CASE _____    HOLD/WARR
(SEE PRIOR     ☐ ON PROBATION    ☐ PENDING PROBATION VIOLATION   ☐ PENDING NEW CASE
RECORD
SECTION)      ☐ ON PAROLE-REMAINING TIME _____         ☐ YES ☐

## RECOMMENDATION:

☐ PROBATION      ☒ DENIAL         ☐ DIAGNOSTIC STUDY    ☐ CYA      ☐ OTHER _____
                 ☐ COUNTY JAIL    ☐ 707.2 WIC
                 ☒ STATE PRISON   ☐ 1203.03 PC

76 P725 B—Prob. 19SC (Rev. 6/85) 12/88

| PRESENT OFFENSE:<br>(CONTINUED) | SOURCES OF INFORMATION (this page)<br>D.A. FILE, ARREST REPORT |
|---|---|

| ARREST DATE | TIME | BOOKED AS | OFFENSE | LOCATION OF ARREST | ARREST AGENCY |
|---|---|---|---|---|---|
| 12-18-87 | | ELKIN JESUS GOMEZ | 209(A) PC (KIDNAPPING FOR RANSOM), 182.1 PC (CONSPIRACY TO COMMIT CRIME), 11352 H&S (SALES OF* | | W. COV PD |

| CO-DEFENDANT(S) | CASE NO. | DISPOSITION |
|---|---|---|
| LUIS HERNAN CARDONA | A961451 | FOUND GUILTY BY JURY OF 209(A PC, 12022(A) PC FOUND TRUE. |
| CLAUDIA JANET BARON | A961451 | 3-4-88, D-123, SENTENCED TO 8 YRS SP, P/G TO 207 PC |

ELEMENTS AND RELEVANT CIRCUMSTANCES OF THE OFFENSE:
*NARCOTIC CONTROLLED SUBSTANCE/COCAINE)

RAUL GALLEGOS                    A961451          UNK

ON DECEMBER 10, 1987 THE DEFENDANTS KIDNAPPED WILLIAM MIKUS FOR THE PURPOSE OF EXTORTING FROM HIM $82,000.

WILLIAM MIKUS IS AN INFORMANT FOR THE FEDERAL BUREAU OF INVESTIGATION. ON DECEMBER 10, 1987 IT WOULD APPEAR THAT LUIS CARDONA, ELKIN GOMEZ, AND RAUL GALLEGOS WERE ACTING AT THE INSTRUCTIONS OF CLAUDIA JANET BARON, A MAJOR COCAINE SMUGGLER/DEALER/TRAFFICKER WHEN THEY KIDNAPPED MIKUS FROM A PARKING LOT, DRIVING OFF WITH HIM IN MIKUS' AUTOMOBILE. THE KIDNAPPING APPEARS TO HAVE BEEN RELATED TO A DRUG-RELATED DEBT TO BARON INCURRED BY MIKUS APPROXIMATELY ONE YEAR EARLIER. AT THE TIME OF THE KIDNAPPING MIKUS HAD AN ELECTRONIC DEVICE SECRETED ON HIS PERSON THAT TRANSMITTED THE ENSUING CONVERSATION BETWEEN HIM AND HIS KIDNAPPERS TO A SURVEILLING FEDERAL BUREAU OF INVESTIGATION AGENT. THE TRANSCRIPT CLEARLY SHOWS THAT

-2- (GOMEZ)

1    CARDONA WAS IN CONTROL OF THE TWO CODEFENDANTS, AND THAT GOMEZ

2    ACTED PRIMARILY AS A INTERPRETER BETWEEN MIKUS AND THE TWO

3    CODEFENDANTS, ALTHOUGH GOMEZ MADE STATEMENTS SHOWING INITIATIVE

4    AND FREEDOM OF ACTION.   CARDONA MADE SUCH STATEMENTS AS "OKAY,

5    OKAY.   NO...YOU...TELL HIM, THAT HE IS GOING TO PAY THE MONEY,

6    YES?...AND THAT WE'LL AVOID PROBLEMS.   YEAH?  BECAUSE OTHERWISE

7    HE'S GOING TO HAVE PROBLEMS; THAT WE WILL  TREAT HIM WELL.

8    YEAH?...BE MORE WATCHFUL, BROTHER, BE MORE WATCHFUL, HE WAS

9    GOING TO ESCAPE...TELL HIM NOT TO...EXCUSE ME, TELL HIM NOT

10   TO TRY ANYTHING, TO GET OUT, OR ANYTHING LIKE THAT, BECAUSE

11   I AM GOING TO TREAT HIM WELL.   YEAH?...TELL HIM THAT TITO'S

12   (CLAUDIO BARON) OWES ME, TELL HIM...TELL HIM THAT IF HE DOESN'T

13   WANT TO AVOID PROBLEMS OVER $82,000, THAT THEN WE'RE...WE'RE

14   GOING TO HAVE THEM, YOU UNDERSTAND?   YEAH?   TELL HIM...TELL

15   HIM TO AVOID PROBLEMS, THAT HIS LIFE IS WORTH MORE THAN 82.

16   TELL HIM...IT'S...IT'S...IT'S WORTH MORE...TELL HIM THAT WE'RE

17   NOT TAKING A BUCK FROM HIM, BECAUSE WE AREN'T, JUST WHAT IS

18   OURS, YEAH?...BECAUSE WE ARE NOT EXTORTING HIM NOR KIDNAPPING

19   HIM IN ORDER TO ROB HIM.   NO.   TELL HIM THAT IT'S 82, AND UNTIL

20   HE PAYS 82 HE WON'T LEAVE HERE...BEHAVE YOURSELF, YEAH? DON'T

21   OPEN THAT DOOR.   YEAH?...THINK ABOUT WHAT YOUR'E GOING TO DO.

22   THINK, TELL HIM TO THINK CALMLY.   THINK.   CALMLY.   CALMLY.

23   YEAH?"

-3- (GOMEZ)

1       AFTER A PURSUIT BY FEDERAL BUREAU OF INVESTIGATION

2 AGENT AARON SANCHEZ, MIKUS WAS ABLE TO ESCAPE FROM HIS VEHICLE,

3 LUJAN WAS ARRESTED, AND GOMEZ AND CARDONA FLED ON FOOT.  GOMEZ

4 AND CARDONA WERE ARRESTED ONE WEEK LATER BY OFFICERS OF THE

5 WEST COVINA POLICE DEPARTMENT.

6       GOMEZ TOLD OFFICERS THAT HE WAS RECRUITED BY

7 THE DEFENDANT (          ) TO ATTEMPT SEVERAL MONEY COLLECTIONS

8 FOR TITO ESPINOSA, HUSBAND OF CLAUDIA BARON.  HE WAS TO BE

9 WELL-PAID FOR HIS INVOLVEMENT, BUT DECLINED TO TELL THE POLICE

10 HOW MUCH.  HIS RESPONSIBILITY WAS TO ACT AS AN INTERPRETER

11 FOR THE OTHERS INVOLVED.  THE FIRST COLLECTION WAS TO BE FROM

12 WILLIAM MIKUS.  OTHER DEBTS TO BE COLLECTED INCLUDED $26,000

13 FROM A VIET NAM VETERAN KNOWN AS "THE JEW", OVER $3,000,000

14 FROM A BLACK MAN, APPROXIMATELY $192,000 FROM A COLUMBIAN NAMED

15 JAVIER, AND $31,000 FROM A COUSIN OF JAVIER.  WHEN THE THREE

16 DEFENDANTS WENT TO THE RESTAURANT PARKING LOT, THE THREE WERE

17 CARRYING WEAPONS TO EFFECT THE COLLECTIONS.  THE WEAPONS INCLUDED

18 A LUGER-TYPE MACHINE GUN, A SHOTGUN, AND A .357 MAGNUM HANDGUN.

19 WHEN MIKUS ESCAPED FROM THE VEHICLE, CARDONA TOLD THE OTHERS

20 TO THROW THEIR WEAPONS OUT OF THE VEHICLE.  CARDONA LATER RETURNED

21 TO THE AREA AND RECOVERED THE LUGER-TYPE MACHINE GUN, BUT WAS

22 UNABLE TO LOCATE THE HANDGUN.

23 *This testmy By* JOSE ANTONIO LUJAN TOLD OFFICERS THAT HE HAD

-4- (GOMEZ)

1   WORKED AS A SECURITY GUARD FOR SOME TIME BEFORE BEING HIRED

2   AS A BODYGUARD FOR HENRY PEREZ. IN THE COURSE OF HIS EMPLOYMENT

3   WITH PEREZ, HE MET NUMEROUS COLUMBIANS THAT INFORMED HIM THAT

4   THEY WERE DEALING IN LARGE SALES OF COCAINE. THROUGH A FRIEND,

5   HE LEARNED THAT CARDONA NEEDED SOME ASSISTANCE. CARDONA WAS

6   LOOKING FOR SEVERAL INDIVIDUALS TO ASSIST HIM IN THE COLLECTION

7   OF LARGE AMOUNTS OF MONEY FROM AN AMERICAN WHO OWED IT TO A

8   COLUMBIAN THAT WAS IN JAIL. HE MET WITH CARDONA ON DECEMBER 7,

9   1987. THE DETAILS OF THE JOB WERE GIVEN AT THAT TIME. THEY

10   MET WITH CLAUDIA BARON WHO TOLD THEM THAT THEY WERE TO MEET

11   MIKUS AND FORCE HIM TO HAND OVER TO THEM THE MONEY OWED TO

12   HER AND HER HUSBAND. THEY WERE TO TELL MIKUS THAT THE MERCHANDISE

13   HE HAD RECEIVED WAS THEIRS, AND THAT THEY WERE PRESSURING HIM

14   FOR THE MONEY IN VIEW THAT HER HUSBAND WAS NOT AROUND. CARDONA

15   WOULD BE IN CHARGE OF THE OPERATION. LUJAN WAS TO RECEIVE

16   $2000. ALTHOUGH IT HAD NEVER BEEN DISCUSSED, IT WAS LUJAN'S

17   UNDERSTANDING THAT THEY WERE MERELY TO SCARE MIKUS, OBTAIN

18   THE MONEY, AND NOT TO PHYSICALLY HURT HIM IN ANY MANNER. IT

19   WAS INITIALLY PLANNED TO GRAB MIKUS AND THROW HIM INTO THE

20   BACK OF A VAN AND DRIVE AWAY WITH HIM. WITH THAT IN MIND,

21   A VAN WAS OBTAINED AS WELL AS A SECOND VEHICLE THAT WAS TO

22   BE DRIVEN BY A FOURTH SUSPECT. IN ANOTHER MEETING WITH CLAUDIA

23   BARON, BARON ADVISED THEM THAT THE MEETING WITH MIKUS HAD BEEN

    -5- (GOMEZ)

1   SET FOR 6:30 P.M., AND THAT THEY WERE TO TAKE HIM, PUT HIM

2   IN A VAN, AND DRIVE HIM TO HIS HOME, WHERE HE KEPT HIS CASH.

3   LUJAN TOLD OFFICERS THAT HE HAD BEEN ARMED WITH A .44 CALIBER

4   WEAPON AND THAT GOMEZ HAD BEEN ARMED WITH AN UZI.

-6- (GOMEZ)

VICTIM:

**SOURCES OF INFORMATION (this page)**
D.A. FILE, POLICE RECORDS

NAME WILLIAM MIKUS

COUNT(S)
1 & 2

INJURY: PROPERTY LOSS (TYPE / COST / ETC.)
VICTIM OF KIDNAPPING FOR EXTORTION

INSURANCE COVERAGE
N/A

| LOSS: UNK ☐ YES ☐ NO | ESTIMATED LOSS UNK | RESTITUTION ALREADY MADE UNK | APPLIED FOR VICTIM RESTITUTION FUND ☒ UNK ☐ YES ☐ NO |
|---|---|---|---|

**VICTIM STATEMENT:**

FEDERAL BUREAU OF INVESTIGATION AGENT AARON SANCHEZ HAS AGREED TO CONTACT WILLIAM MIKUS, AND REQUEST HIM TO TELEPHONE THE PROBATION OFFICER. SHOULD A STATEMENT BE MADE IN TIME, IT WILL BE ATTACHED TO THIS REPORT.

| RESTITUTION | TOTAL NUMBER OF VICTIMS 1 | ESTIMATED LOSS TO ALL VICTIMS UNK | VICTIM(S) NOTIFIED OF P&S HEARING ☒ YES ☐ NO |
|---|---|---|---|
| DOES DEFENDANT HAVE INSURANCE TO COVER RESTITUTION: ☐ YES ☒ NO | | INSURANCE COMPANY NAME/ADDRESS/TELEPHONE NO. N/A | |

—7— (GOMEZ)

VICTIM LIST CONTINUES NEXT PAGE

76 P72 SB—Prob. 19 SC (Rev. 12/88) 12/88

1  PRIOR RECORD:

SOURCES OF INFORMATION (this page)
CII (10-11-89), LACO PROB DEPT RECORDS

3  AKA'S:  ELKEN DE JESUS CASTRO GOMEZ; ALVARO CASTRO GOMEZ; ALVARO
4          GOMEZ CASTRO; ELKINS GOMEZ; ELKIN GOMEZ; EUCLIDES GOMEZ; JESSIE
        CASTRO; ELKIN JESUS GOMEZ

5  DATES OF BIRTH:  2-27-60; 2-17-60; 2-26-60.

6  SOCIAL SECURITY NUMBERS;  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; 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.

7                    JUVENILE HISTORY:

8                    UNKNOWN.

9                    ADULT HISTORY:

10     9-26-80       SANTA ANA SO - 594 PC (MALICIOUS MISCHIEF/VANDALISM) -
11                   CASE 80CM08199 HEARD SANTA ANA MUNI COURT ON
                     10-10-80. CONVICTED AS CHARGED.

12     10-28-80      SANTA ANA SO -- 484 PC (PETTY THEFT) - CASE
13                   80CM09290 HEARD SANTA ANA MUNI COURT ON 11-12-80.
                     CONVICTED 484/488 PC (PETTY THEFT) - FINED.

14     3-11-83       SANTA ANA SO - WARRANT CHARGING 209(A) PC (KIDNAP
15                   FOR RANSOM), 245(A) PC (ASSAULT W/DEADLY WEAPON),
                     236 PC (FALSE IMPRISONMENT).   RE-ARRESTED ON
16                   3-12-83 BY SAN FRANCISCO PD, CASE 591162 HEARD IN
                     SAN FRANCISCO MUNI COURT ON 6-15-83.   CHARGE
17                   OF 211 PC (ROBBERY) DISM IN FURTHERANCE OF JUSTICE,
                     CASE 111102+05 HEARD SAN FRANCISCO SUPERIOR
18                   COURT ON 7-13-83. CONVICTED 2 CTS VIOLATION
                     236 PC (FALSE IMPRISONMENT); 28 MOS STATE PRISON
19                   1 CT; 16 MOS STATE PRISON SECOND CT; RECEIVED
                     AT CALIFORNIA STATE DEPARTMENT OF CORRECTIONS,
20                   ON 7-20-83 TO BEGIN TERMS FOR 236 PC (FALSE
                     IMPRISONMENT, ARMED WITH FIREARM) AND 236 PC
21                   (FALSE IMPRISONMENT).   PAROLED ON 8-16-84.
                     DISCHARGED ON 9-15-85.

22     7-23-87       CYPRESS PD - 148.9(A) PC (FALSE I.D. TO PEACE
23                   OFFICER), WARRANT CHARGING 488 PC (PETTY THEFT) -
                     CASE CYW 151903P0 HEARD WESTMINISTER MUNI COURT
24                   ON 10-26-87; 148.9 PC DISM; CONVICTED NONRETAINABLE
                     OFFENSE. PROBATION.

25

26

27

28     -8- (GOMEZ)

DEFENDANT'S STATEMENT:

ON OCTOBER 19, 1989 THE PROBATION OFFICER WENT TO INTERVIEW THE DEFENDANT IN THE ATTORNEY'S ROOM OF THE LOS ANGELES COUNTY CENTRAL JAIL AT 441 BAUCHET STREET IN THE CITY OF LOS ANGELES. HE WAS ADVISED BY THE ATTORNEY ROOM DEPUTY SHERIFF THAT THE DEFENDANT HAD STATED HE DID NOT WANT TO SPEAK TO THE PROBATION OFFICER. AFTER THE DEPUTY SHERIFF HAD SO ADVISED THE PROBATION OFFICER, THE DEFENDANT NODDED HIS HEAD IN AGREEMENT.

EVALUATION:

SURELY IT IS MORE THAN A COINCIDENCE THAT IN MARCH 1983 THE DEFENDANT WAS ARRESTED ON WARRANTS CHARGING HIM WITH VIOLATIONS OF SECTION 207(A) PENAL CODE (KIDNAPPING FOR RANSOM), 245(A) PENAL CODE (ASSAULT WITH DEADLY WEAPON), AND 236 PENAL CODE (FALSE IMPRISONMENT). THE COURT WILL RECALL THAT IN SAN FRANCISCO SUPERIOR COURT CASE 111102+05, THE DEFENDANT WAS SUBSEQUENTLY CONVICTED OF TWO CHARGES OF VIOLATION SECTION 236 PENAL CODE, WITH ONE OF THE COUNTS APPARENTLY REFERRING TO FALSE IMPRISONMENT WHILE THE DEFENDANT WAS ARMED WITH A FIREARM. IT MUST BE ASSUMED THAT THE DEFENDANT LEARNED NOTHING FROM HIS CRIMINAL JUSTICE SYSTEM EXPERIENCE. FOR THE PAST NINE YEARS THE DEFENDANT HAS REPEATEDLY COME TO THE LAW ENFORCEMENT AGENCIES THROUGHOUT OUR STATE, HAS BEEN IN JAIL AND STATE PRISON,

-12- (GOMEZ)

76C692G — PROB. 5A

HAS BEEN ON PROBATION AND PAROLE, AND YET HE CONTINUES TO INVOLVE HIMSELF IN VIOLENT CRIMES.   DUE TO THE OBVIOUS LEVEL OF DANGER HE POSES TO THE COMMUNITY, IT IS RECOMMENDED THAT HE BE SENTENCED TO STATE PRISON IN THIS MATTER.

SENTENCING CONSIDERATIONS:

DEFENDANT IS INELIGIBLE FOR PROBATION PURSUANT TO SECTION 120(E)(2) PENAL CODE UNLESS THE COURT DETERMINES THIS IS AN UNUSUAL CASE.

FACTORS IN AGGRAVATION:

1.   THE CRIME INVOLVED THE THREAT OF GREAT BODILY HARM.

2.   THE DEFENDANT HAS ILLEGALLY INTERFERED WITH THE JUDICIAL PROCESS BY GIVING FALSE NAMES AND FALSE DATES OF BIRTH WHEN ARRESTED.

3.   THE CRIME WAS PREMEDITATED.

4.   THE CRIME INVOLVED THE ATTEMPTED TAKING OF A LARGE SUM OF MONEY.

5.   HE HAS ENGAGED IN A PATTERN OF VIOLENT CONDUCT WHICH INDICATES A SERIOUS DANGER TO SOCIETY.

6.   HIS CONVICTIONS ARE NUMEROUS AND OF INCREASING SERIOUSNESS.

7.   HE HAS SERVED A PRIOR PRISON TERM.

FACTORS IN MITIGATION:

PROBATION OFFICER FINDS NO FACTORS IN MITIGATION.

IN VIEW OF THE AGGRAVATING FACTORS, IF PROBATION IS DENIED THE HIGH-BASE TERM WOULD BE APPLICABLE.   IF THE ENHANCEMENT

-13- (GOMEZ)

76C692G — PROB: 5A

1  IS FOUND TRUE, IT IS RECOMMENDED THAT THE PUNISHMENT FOR THE

2  ENHANCEMENT BE IMPOSED.

3  RECOMMENDATION:

4         IT IS RECOMMENDED THAT PROBATION BE DENIED AND

5  THAT DEFENDANT BE SENTENCED TO STATE PRISON WITH PREIMPRISONMENT

6  CREDIT OF 320 DAYS; THAT THE COURT ORDER THE DEFENDANT TO PAY

7  A RESTITUTION FINE OF $100 AS PROVIDED BY SUBDIVISION (A) OF

8  SECTION 13967 GOVERNMENT CODE, THE TOTAL AMOUNT TO INCLUDE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

    -14- (GOMEZ)

1   A SERVICE CHARGE AS PROVIDED BY SUBDIVISION (D) OF SECTION

2   13967 OF THE GOVERNMENT CODE.

3   RESPECTFULLY SUBMITTED,

4   BARRY J. NIDORF
    PROBATION OFFICER

5

6   BY _____

7   DALE R. THOMAS, DEPUTY
    CENTRAL ADULT INVESTIGATIONS

8   (213) 974-3315

9

    READ AND APPROVED:                      I HAVE READ AND CONSIDERED
10                                          THE FOREGOING REPORT OF THE
                                            PROBATION OFFICER.
11

12  WILLIAM C. NIENHUIS, SDPO

13  (SUBMITTED:  10-25-89)                  _____
    (TYPED:   10-27-89)                     JUDGE OF THE SUPERIOR COURT
14  DRT:ALW (6)

15          IF PROBATION IS GRANTED, IT IS RECOMMENDED THAT

16  THE COURT DETERMINE DEFENDANT'S ABILITY TO PAY COST OF PROBATION

17  SERVICES PURSUANT TO SECTION 1203.1B PENAL CODE.   COST OF

18  PRESENTENCE INVESTIGATION AND PRESENTENCE REPORT - $429.00.   COST

19  OF SUPERVISION - $28.00 PER MONTH.

20

21

22

23

    -15- (GOMEZ)

76C692G.— PROB. 5A

# Exhibit C

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PRISON TERMS

In the matter of the Life )
Term Parole Consideration )
Hearing of: )
)
ELKIN GOMEZ )
_____ )

CDC Number E-44776



CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

FEBRUARY 2, 2005

12:35 P.M.

PANEL PRESENT:

CAROL DALY, Presiding Commissioner
DENNIS SMITH, Deputy Commissioner

OTHERS PRESENT:

ELKIN GOMEZ, Inmate
MARY ANN TARDIFF, Attorney for Inmate
PATRICK SEQUEIRA, Deputy District Attorney
JOSE ZAVALA, Interpreter

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____  No          See Review of Hearing
_____  Yes         Transcript Memorandum

Cindy Walker              Capitol Electronic Reporting

65

1    CALIFORNIA BOARD OF PRISON TERMS

2    D E C I S I O N

3    DEPUTY COMMISSIONER SMITH:  We're on the

4    record.  Everyone previously identified is back in

5    the room.

6    PRESIDING COMMISSIONER DALY:  Okay.  The

7    Panel has reviewed all of the information received

8    from the public and relied on the following

9    circumstances in concluding the prisoner is not yet

10   suitable for parole and would pose an unreasonable

11   risk of danger to society or a threat to public

12   safety if released from prison.  You know, the

13   offense was carried out in an extremely callous

14   manner that no thought was given to this victim or

15   the subsequent victims that were targeted for

16   collection of their drugs as to the effect that

17   this was going to have on them, and several victims

18   aside from this one were targeted for collection of

19   drug debts and the prisoner was to be a part of

20   those.  The offense was carried out in a calculated

21   manner in that the prisoner went into this

22   arrangement with the full knowledge that these were

23   drug collections, and the motive for the crime was

24   extremely trivial in relation to the offense in

25   that the sole purpose for the prisoner becoming

26   involved in the collection of these drug debts was

27   ELKIN GOMEZ    E-44776    DECISION PAGE 1    2/2/05

66

1  just to make money.  These conclusions are drawn

2  from the Statement of Facts wherein the prisoner,

3  on 12/10 of '87, along with two other defendants,

4  met with the victim, William Mikus, for the purpose

5  of extorting 82,000 dollars from him relative to a

6  drug—related debt incurred by Mikus approximately a

7  year earlier, and the money was owed to a Claudia

8  Baron who was arranging for this drug collection.

9  She was a known cocaine smuggler and trafficker.

10  And the prisoner forced Mikus to drive them to his

11  home to obtain the money.  There were weapons that

12  were involved in this situation.  It just happened

13  that the victim was able to escape, and the FBI was

14  in hot pursuit and everybody had scattered and the

15  victim was picked up about a week later.  The

16  prisoner has a record of violence because of past

17  crimes.  He has an escalating pattern of criminal

18  conduct, and he failed to profit from society's

19  previous attempts to correct his criminality, and

20  those attempts included a prior prison term and

21  parole.  He has an unstable -- Actually, his

22  background as far as being raised in Colombia would

23  appear to have been stable.  He professes, and it

24  is apparently clear in the record, that he has

25  never used alcohol or drugs, but he does have prior

26  criminal behavior of Santa Ana Municipal Court,

27  ELKIN GOMEZ  E-44776    DECISION PAGE 2   2/2/05

67

1   malicious mischief and vandalism, which he was

2   convicted and then he had a petty theft he was

3   convicted of, and in San Francisco he has a

4   previous kidnapping for ransom, assault with a

5   deadly weapon, false imprisonment. The robbery was

6   dismissed and the final conviction was on two

7   counts of false imprisonment, and he was sentenced

8   to 44 months in state prison, and he was discharged

9   on September 15th of 1985. And then in 1987 he had

10  false identification to a peace officer. That was

11  dismissed. Then a petty theft conviction and then

12  in January of '90, convicted of the current

13  commitment offense, kidnapping with firearms. The

14  prisoner has actually been programming quite well,

15  has not been a disciplinary problem for the

16  institutional staff. It is noted that he has only

17  had two 128(a) counseling Chronos, one in 1990 and

18  one in 1993. And he's had two 115s, one in 1990,

19  inmate manufactured alcohol and one in February of

20  '98, for possession of unauthorized contraband, and

21  he was found guilty of both of those. The

22  Psychiatric/Psychological Report dated 10/19 of

23  '04, by Dr. Howlin, is just sort of an update

24  synopsis of a report. There's nothing negative in

25  the report. It does refer back to the '99 report

26  and that report also was positive. The prisoner's

27  ELKIN GOMEZ  E-44776    DECISION PAGE 3    2/2/05

68

1    Parole Plans, I think for both of the Panel members
2    what we want to see from your Parole Plans is that
3    we want very specifically as to what your job is
4    going to be, and how much money you're going to be
5    making at any of those job offers that you have
6    been given because certainly the reason you left
7    before when you had these really good jobs was to
8    come to the United States to make more money.  And
9    they don't really give us an idea at all as to, you
10   know, what your benefits are going to be, whether
11   they're going to be full-time, whether or not it's
12   going to be a livable wage for you, and especially
13   in light of the fact that you were deported before
14   and then you came back to the United States to make
15   money again when all these same job opportunities
16   were available to you.  Hearing Panel notes that
17   responses to 3042 Notices indicate an opposition to
18   a finding of parole suitability specifically from
19   the District Attorney of Los Angeles County who was
20   present at the hearing today.  You know, other
21   information bearing on suitability, I have to tell
22   you, Mr. Gomez, when I was working this up last
23   night I made a lot of notes and I was reading what
24   the counselors had to say and what the doctors had
25   to say, and I thought you are probably looking
26   pretty good for a parole date, and then you came in
27   ELKIN GOMEZ  E-44776    DECISION PAGE 4    2/2/05

69

1    today and I, quite frankly, was so confused by your
2    presentation.  I was dismayed at having to pull
3    information from you.  I do not feel you were
4    forthright.  I don't feel that you've been totally
5    honest with us here today, and when you look back
6    at the other hearing, the hearing Panel in '02,
7    Deputy Commissioner Filangeri said, I'm upset
8    because I don't think you're being completely
9    truthful with us.  And he's the first one that set
10   me off and it put me on not a matter of whether you
11   remember what was said in the hearing, when this
12   Panel and the other members ask you what happened
13   they expect you to be truthful and be truthful with
14   your recollection of what happened during the
15   incident and not to what you testified in court.
16   And then he goes on to say that you fully admitted
17   that you'd been hired to interpret for these
18   collections and they were clearly drug collections
19   and that you were going to be paid handsomely for
20   it, but as I asked you today how much money you
21   were going to get you didn't know.  So you took the
22   job and you didn't know how much money you were
23   going to get, and I'm looking at 1980 when you came
24   to the United States within a year you're involved
25   in collecting and running drugs.  So I don't know
26   whether you had been contacted in Colombia to come
27   **ELKIN GOMEZ   E-44776   DECISION PAGE 5   2/2/05**

70

1   and do this, but you get over here and you're

2   involved in a whole lot more than you're willing to

3   say to us, and for the type of drugs that these

4   people were collecting for, I mean this is major,

5   major drug dealing.  This isn't the kind of a drug

6   dealing that they just walk in on a street corner

7   and ask somebody to interpret for them.  I mean you

8   had known them from before, but I can only imagine

9   that there had to be a whole more history with

10  these people than what you're admitting to here

11  today.  I have a real difficult time even trying to

12  understand exactly why you got involved in this and

13  then when you said that it was for the money, okay,

14  you're going to go back to Colombia, you're going

15  to work in the same jobs that you worked, and I

16  asked you what would keep you from coming back and

17  you said you had a family now.  You had a five-year

18  old son at the time, the first time you went, and

19  you came back and you gave no thought to your

20  family at that time.  I have no reason to believe

21  that anything would be any different if you were to

22  be paroled at this time.  I do want to commend you

23  for the fact that you have, I have on here three

24  vocations that you've been doing a whole lot in

25  your computer data processing and computer repair,

26  and you do have your voc mill and cabinet.  You

27  ELKIN GOMEZ  E-44776   DECISION PAGE 6   2/2/05

71

1   received your high school diploma in January of

2   '99.  You have been in AA and NA.  You have 14

3   weeks of Impact.  You have a Parenting Program in

4   '98, Infectious Disease Group Training in 2000.

5   Fatherhood Group, 10—week in Entrepreneur

6   Development, and '97 Life Skills Group.  But

7   actually when I look at the fact that you've been

8   down almost 15 years that isn't a whole lot of

9   self—help that you have been doing a lot of

10   vocational stuff.  And I read through the reports

11   and the doctors say glowing things about you, the

12   counselor, and you can read in the Counselor's

13   Report that they very clearly believe that you have

14   a raw deal because you're still in prison.  And I

15   don't know if they've ever just sat down and tried

16   to understand from you your commitment offense.  I

17   don't know if you have an easier time explaining to

18   someone else than you do when you come before the

19   Board, but I know the Panels have not been

20   impressed.  And frankly, I have a tremendous amount

21   of problems.  The fact that, you know, I asked you

22   about the gun and you said, no, you didn't have a

23   gun.  And then all of a sudden there's three guns

24   in the car.  You had an UZI and you were seen with

25   an UZI.  I mean there are just so many conflicting

26   things so --

27   ELKIN GOMEZ   E-44776   DECISION PAGE 7   2/2/05

72

1     **DEPUTY COMMISSIONER SMITH:** Commissioner,

2     excuse me, I need to do the tape.

3          **PRESIDING COMMISSIONER DALY:** All right.

4          (Thereupon, the tape was turned over.)

5          **DEPUTY COMMISSIONER SMITH:** We're on the

6     record.

7          **PRESIDING COMMISSIONER DALY:** So in a

8     separate decision the hearing Panel finds that it

9     is not reasonable to expect that parole would be

10    granted at a hearing during the following two

11    years. And I know because of this the counselor

12    and everybody's going to say, you know, they're

13    looking at what you've been doing while you've been

14    in here and to me I need to look at the facts of

15    the crime. I need to look at your frankness with

16    us here. I meant, you have so much difficulty and

17    it shouldn't be that difficult to simply come in

18    and tell us what was it you did and own up to your

19    responsibility. And so I'm going to ask that when

20    you come for your next hearing in two years that

21    both the doctor and your counselor read through

22    this 2005 Board Report to understand where it is

23    we're coming in at and where it is that we want

24    them to look. The prisoner committed the offense

25    in a very selfish, calculated, and who knows what

26    would have happened if things went wrong manner

27    **ELKIN GOMEZ   E-44776   DECISION PAGE 8   2/2/05**

73

1   when he agreed to be a part of drug collections and

2   act as an interpreter, but the prisoner has

3   admitted to a number of times he was running drugs

4   in his car, indication of a prior record that he

5   admitted to selling drugs and so there's just a

6   whole lot of inconsistent information that would

7   never make it probably past a Board review if he

8   were to be given consideration at this time.  The

9   prisoner does have a prior record of violent

10  behavior.  Because of the prior kidnapping and

11  assault with a deadly weapon and false imprisonment

12  and the robbery, even though they were dismissed

13  the crimes were there.  And the prisoner has a

14  history of criminality and that's for malicious

15  mischief, petty theft, the kidnapping, assault with

16  a deadly weapon, false imprisonment, robbery, false

17  imprisonment, prior prison term, discharged on

18  parole in '85 and '87 he picks up a false

19  identification to a peace officer, which was

20  dismissed, and petty theft and the current

21  commitment offense.  And I think that it was very

22  telling also when the District Attorney noted you

23  aren't just an interpreter picked up off the

24  streets to help for this with all of the aliases,

25  the different birth dates, and the different Social

26  Security numbers.  You were very involved in a

27  ELKIN GOMEZ  E-44776    DECISION PAGE 9   2/2/05

74

1   criminal lifestyle. And I don't think that you

2   were honest with us at all here today. The Panel

3   then finds that a longer period of observation and

4   evaluation of the prisoner is required before the

5   Board should find the prisoner suitable for parole.

6   We're just asking that you remain disciplinary

7   free. If available, continue with whatever

8   vocational training that you have, whatever self-

9   help groups that are available, and we're asking

10  that you cooperate with clinicians in the

11  completion of a full clinical evaluation and asking

12  that both the doctor and your counselor review this

13  Board Report so they understand what our concerns

14  are and it can be addressed. Quite frankly I was

15  very disappointed and it really all has to come

16  down with your believability, your honesty here in

17  the hearing.

18          INMATE GOMEZ: Maybe it was my English.

19          PRESIDING COMMISSIONER DALY: No, it isn't

20  your English. It's your answers. And so anyway, I

21  wish you luck. We'll see you in two years. Do you

22  have any comments?

23          DEPUTY COMMISSIONER SMITH: Yeah, Mr. Gomez,

24  certainly it's not your English. You speak very

25  well. But you want us to believe that a friend

26  asked you to go with him and another person so that

27  ELKIN GOMEZ  E-44776    DECISION PAGE 10    2/2/05

75

1    you could translate between you and this fourth

2    party.  And you and the other two take a person

3    from a parking lot, force them into their own car,

4    all three of you are armed, you're there to collect

5    a drug debt of 82,000 dollars and there are other

6    debts to collect upwards of three million dollars.

7    I'm not -- I've never been involved in the cartel

8    but I've got to think that nobody is going to put

9    that kind of responsibility on anyone who just

10   happens to be bilingual.  I don't buy it and

11   neither does Commissioner Daly.  It has nothing to

12   do with your English, which is very, very good.  It

13   has to do with your truthfulness.  It has to do

14   with your reality.  And until you can address that,

15   whether it be the two of us or some other Panel,

16   you're not going to get a date.  It's just that

17   simple.  Good luck, sir.

18        PRESIDING COMMISSIONER DALY:  Okay.  That

19   concludes the hearing.  It is 1450 hours.

20                      --oOo--

21

22

23   PAROLE DENIED TWO YEARS

24   THIS DECISION WILL BE FINAL ON:_____JUN - 2 2005_____

25   YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT

26   DATE, THE DECISION IS MODIFIED.

27   ELKIN GOMEZ  E-44776   DECISION PAGE 11   2/2/05

76

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, CINDY WALKER, a duly designated transcriber, CAPITOL ELECTRONIC REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total two in number and cover a total of pages numbered 1 through 75, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY at SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of ELKIN GOMEZ, CDC No. E—44776, on FEBRUARY 2, 2005, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated February 15, 2005, at Sacramento County, California.

_____
Cindy Walker
Transcriber
CAPITOL ELECTRONIC REPORTING

# Exhibit D

44

1          CALIFORNIA BOARD OF PRISON TERMS

2                    D E C I S I O N

3          **DEPUTY COMMISSIONER BACHLOR:**  We're on the

4    record, Sir.

5          **PRESIDING COMMISSIONER MOORE:**  Thank you.

6    Let the record show that all interested parties

7    have returned to the room.  Elkin Gomez, CDC number

8    E- as in Edward 44776.  The Panel's reviewed all

9    information received from the public and relied on

10   the following circumstances in concluding that the

11   prisoner is not suitable for parole.  Mr. Gomez,

12   this is another one-year denial, sir -- and that

13   you would pose an unreasonable risk of danger to

14   society or a threat to public safety if released

15   from prison at this time.  The timing and the

16   gravity of the committing offense would be

17   paramount.  The offense was carried out in a manner

18   which demonstrates an exceptionally insensitive

19   disregard for human sufferings.  The prisoner and

20   his crime partners, along with his crime partners,

21   were hired to kidnap an individual, the victim,

22   Mr. William Mikus, spell capital-M-I-K-U-S, an

23   individual who owed some 82-thousand dollars worth

24   of drug debt.  However, the individual that was

25   kidnapped, Mr. Mikus, happened to be an informant

26   for the federal drug agents.  He was wired at the

27   **ELKIN GOMEZ    E-44776    DECISION PAGE 1    7/31/03**

D-1

45

1    time.  He was able or managed to escape from the

2    vehicle.  The vehicle was pursued by these federal

3    agents.  One of the individuals was apprehended and

4    identified the remainder of the crime partners.

5    The victim was not hurt.  Now, these conclusions

6    are drawn from the Statement of Facts, that the

7    prisoner and his crime partners kidnapped for

8    extortion the victim.  The prisoner has a previous

9    record, an escalating pattern of criminal conduct.

10   He's failed to profit from society's previous

11   attempts to correct his criminality, including

12   attempts -- or adult probation, parole, a prior

13   prison term which was quite interesting in that it

14   started out as a kidnap but ended up being two

15   counts of (indiscernible), two counts of false

16   imprisonment that the prisoner had his prior prison

17   term for.  Institutional behavior -- The prisoner

18   has not sufficiently participated at this time in

19   beneficial self-help.  Psychosocial report was

20   adequate.  Parole plans are adequate in his home

21   country of Columbia, of origin.  He has a US INS

22   hold.  3042 notices indicate opposition to a

23   finding of suitability, specifically the District

24   Attorney's office of Los Angeles County were

25   represented here today, was in opposition to a

26   finding of suitability.  Remarks, excuse me --

27   ELKIN GOMEZ      E-44776     DECISION PAGE 2     7/31/03

p. 2

46

1   Remarks to the prisoner -- The Panel makes the

2   following findings.  That the prisoner should be

3   commended.  He's received two 115s in his entire --

4   the last of those was in 1988 -- or 1998, excuse

5   me, and he's done some positive work in terms of AA

6   and NA since about '93, I believe, Parenting

7   classes, Path to Peace, the Life Skills group,

8   Impact, Inmate Peer Education Program.  He's got

9   about three different marketable skills: Carpentry,

10  Mill and Cabinet, just recently completed the

11  Electronic Data Processing.  He's taken some

12  college courses.  He educated himself in terms of

13  got his high school diploma while he was

14  incarcerated, and taken some business classes,

15  Business Marketing, Accounting one, two, and three,

16  as well as the Principles of Business.  However,

17  these positive aspects of his behavior don't

18  outweigh the factors of unsuitability.  As I said,

19  this is a one-year denial; another one, Mr. Gomez.

20  Recommendations to you are to continue to remain

21  disciplinary-free, if it's available to you to

22  participate in beneficial self-help programming,

23  whatever may be -- to better understand the

24  causative factors, whatever would cause you to have

25  somewhat of a lifestyle of cooperating and

26  participating in the kidnapping of others.

27  ELKIN GOMEZ   E-44776   DECISION PAGE 3   7/31/03

D-3

47

1    Commissioner, comments to the prisoner?

2              DEPUTY COMMISSIONER BACHLOR:  Good luck,

3    sir.

4              PRESIDING COMMISSIONER MOORE:  Good luck to

5    you there, Mr. Gomez.  Continue on the path that

6    you're on.  You're doing the right kinds of things.

7              INMATE GOMEZ:  Thank you.

8              PRESIDING COMMISSIONER MOORE:  The time is

9    1545 hours.

10                        --o0o--

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    PAROLE DENIED ONE YEAR

26    FINAL DATE OF DECISION    OCT 2 9 2003

27    ELKIN GOMEZ    E-44776    DECISION PAGE 4    7/31/03

D-4

# Exhibit E

BOARD OF PRISON TERMS                                    STATE OF CALIFORNIA
LIFE PRISONER HEARING DECIS[        FACE SHEET

[ ] PAROLE GRANTED - (YES)
    CDC: Do not release prisoner before
         Governor's review

[ ] PAROLE DENIED - (NO)

| Records Use Only |
| --- |
| Parole Release Date |
| YR    MO    DAY |
| Attach Prison Calculation Sheet |

[ ] AGREED UNSUITABLE (Attach 1001A Form) FOR:_____ YEAR(S)
[X] HEARING POSTPONED/REASON: _Request new psych eval_
_place on 9-28-04 calendar_

## PANEL RECOMMENDATIONS AND REQUESTS

**The Board Recommends:**

[ ] No more 115's or 128A's        [ ] Stay discipline free
[ ] Work to reduce custody level   [ ] Learn a trade*          [ ] Earn positive chronos
[ ] Get self-help*                 [ ] Get therapy*            [ ] Get a GED*

[ ] Recommend transfer to_____
[ ] Other_____
    *These programs are recommended if they are offered at your prison and you are eligible/able to participate.

| Penal Code 3042 Notices | [X] Sent  Date: *08/16/04* |
| --- | --- |

| Commitment Offense(s) | *PC 209 (A) W/ 12022.5* | *KIDNAP FOR EXTORTION W/ USE F'ARM* |
| --- | --- | --- |
| | Code(s) | Crime(s) |
| | *A961451* | *1* |
| | Case #(s) | Count #(s) |

| Date Inmate Came to CDC *2/5/90* | Date Life Term Began *SAME* | Minimum Eligible Parole Date *11/22/95* |
| --- | --- | --- |

[ ] Initial Hearing        [X] Subsequent (Hearing No.) 6        Date of Last Hearing 7/31/03

CDC Representative
Attorney for Prisoner                      Address
D.A. Representative                        County    LOS ANGELES

This form and the Board's decision at the end of the hearing is only proposed and NOT FINAL. It will not become final until it is reviewed.

Chair _____        Date _____
Panel Member _____  Date _____
Panel Member _____  Date _____

| NAME | CDC # | PRISON *CTF* | CALENDAR | DATE |
| --- | --- | --- | --- | --- |
| GOMEZ, ELKIN | E44776 | | OCT. 04 | 10/1/04 |

BPT 1001 (REV. 08/03)                                              1

BOARD OF PRISON TERMS
LIFE PRISONER HEARING – EXTRAORDINARY ACTION AND DECISION

STATE OF CALIFORNIA
BPT 1001A (Rev. 10/89)

☐ I certify to the best of my knowledge and information, the foregoing reasons as stated by the prisoner are accurate, and that the prisoner was capable of making a knowledgeable decision regarding his/her hearing.

The following information is submitted for the Board's consideration in making their decision:

_____

_____

_____

| C&PR Signature | Date |
|---|---|

FOR BOARD OF PRISON TERMS USE ONLY

## DECISION / ORDER

### WAIVER OF RIGHT TO ATTEND HEARING

1. ☐ Request is denied.

   ☐ Request is granted. Hearing will be conducted in absence of prisoner.

### POSTPONEMENT

2. ☐ Request is denied.

   ☒ Request is granted. Grant based on a finding of good cause. Place on _____ calendar.

### WAIVER OF HEARING AND STIPULATION TO UNSUITABILITY

3. ☐ Request is denied.

   ☐ Request is granted. The Board agrees to enter into the stipulation, on a finding of good cause, offered by the prisoner on the waiver of his/her Life Parole Consideration Hearing and orders a:

   ☐ One-year denial    ☐ Two-year denial*    ☐ Three-year denial**

   \*  The Board must find it unreasonable to expect that the prisoner would be eligible for parole during the second, or second and third year, and the Board must state the reasons for its finding.

   \*\*  In addition to the above (*), the prisoner must have been convicted of more than one offense which involves the taking of a life.

(The basis of the finding of good cause for postponement or multiple-year denial must be stated below.)

   ☐ Good cause based on the reasons given by the prisoner.

Other comments (if applicable):

_____

_____

_____

| Signature of BPT Commissioners | Date |
|---|---|
| 1. | |
| 2. | Date |

BPT Action Taken At:    ☐ BPT Headquarters    ☒ Institution

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| GOMEZ, ELKIN | E44776 | CTF - SOLEDAD | 7/2004 | |

E—2

LL_ PRISONER EVALUATION REPORT
SUBSEQUENT PAROLE CONSIDERATION HEARING
JULY 2004

GOMEZ, ELKIN                                                                 E44776

I.      **COMMITMENT FACTORS:**        15 yRS

A.      **LIFE CRIME**: Kidnapping for extortion with Use of Firearm PC 209(a), PC
        12022.5, Life with the possibility of parole, plus two years, case No. LA-A961451.
        Victim: William Mikus, age unknown. Arrived in CDC on 2-5-90. MEPD:
        11/25/95. Weapon: UZI (Machine Gun).

        1.      **Summary of Crime**: On 12-10-87, at approximately 1830 hours, Gomez and
                two other defendants met with the victim, William Mikus, for the purpose of
                extorting $82,000.00 from him relative to a drug related debt incurred by
                Mikus approximately a year earlier to Claudia Baron. Claudia Baron was a
                known cocaine smuggler and trafficker. Mikus was an informant for the
                Federal Bureau of Investigation. The defendant forced Mikus to drive them
                to his home to obtain the money. Although Gomez made statements showing
                initiative and freedom of action, he was enlisted primarily for the purpose of
                interpreting, as is reflected per transcripts from an electronic listening device
                on the person of Mr. Mikus. While enroute, Mikus escaped and Gomez fled
                on foot upon being pursued by an FBI agent in a surveillance vehicle. Gomez
                was arrested one week later by West Covina Police Department and charged
                with kidnapping.

        2.      **Prisoner's Version**: Gomez stated that the events concerning himself and
                the kidnapping of William Mikus are accurately worded in the Probation
                Officer's Report and has no information to add except to clarify that he was
                not in possession of a weapon and his role was to interpret.

        3.      **Aggravating/Mitigating Circumstances**:

                a.      **Aggravating Factors**:

                -       During the commission of the crime, the inmate had a clear
                        opportunity to cease, but instead continued.

                -       Use of weapon (UZI).

                b.      **Mitigating Factors**: The inmate had no apparent predisposition to
                        commit the crime but was induced by others to participate in its
                        commission.

COPY TO INMATE ON 8.31.04

GOMEZ, ELKIN                          E44776                     CTF- Soledad        FEB/2004

E3

LIFE PRISONER EVALUATON REP,
PAROLE CONSIDERATION HEARI
JULY/2004 CALENDAR

B.    **MULTIPLE CRIME(S):** None

**Summary of Crime:** N/A

**Prisoner's Version:** N/A

## II.    PRECONVICTION FACTORS:

A.    **Juvenile Record:**    None.

B.    **Adult Convictions:** 10-10-80- Santa Ana Municipal Court, Case No. 80CM08199, PC 591(A), Malicious Mischief/Vandalism- Convicted. 11-12-80- Santa Ana Municipal Court, Case No. 80CM09290, PC 484 Petty Theft- Convicted.

6-15-83- San Francisco Municipal Court, Case No. 591162, PC 209(a), Kidnapping for Ransom, PC 245(A), Assault with Deadly Weapon, PC 236, False Imprisonment, PC 211, Robbery- Dismissed. 7-13-83, San Francisco Superior Court, Case No. 591162- Convicted on two counts False Imprisonment PC 236- sentenced to 44 months state prison. Discharged 9-15-85 from parole.

10-26-87- West Minister Municipal Court Case No. 1519030PO, PC 148.9(A), False I.D. to Peace Officer- Dismissed. PC 488, Petty Theft- Convicted, non-retainable offense. 1-16-90- convicted of current commitment offense, PC 209(a), Kidnapping with Firearms.

C.    **Personal Factors:** Mr. Gomez is the youngest of six (6) children born to his mother, Clarisa Gomez, and father, Juan Gomez, both of Colombia. Gomez relates that he completed sixth grade in Colombia and obtained his High School diploma while incarcerated. Mr. Gomez stated he had prior employment as a mortgage loan representative and a dry cleaner. He indicated that as a child, his life was normal and stable. His family is very supportive and he maintains regular visitation and correspondence with them.

## III.    POSTCONVICTION FACTORS:

A.    **Special Accommodations/Disability:** None required.

B.    **Custody History:** Gomez was received into the California Department of Corrections on 2-5-90 and was transferred to Correctional Training Facility. His custody was established at Close B. On 6-7-93, his custody was reduced to Medium A. On 12-14-93, he was transferred to Centinella State Prison and his custody was raised to Close and on 9-1-94 his custody was reduced to Medium A. On 05-08-96,

he was transferred to Correctional Training Facility, where he remains and retains Medium Close A with a WG/PG at A1A since 4-18-90.

C.   **Therapy & Self-Help Activities:**  Gomez has participated in as many self-help groups as possible including, IMPACT, AA/NA, parenting, infectious disease program and fatherhood groups.

D.   **Disciplinary History:**

   CDC 128As Counseling Chronos

   8-16-90- Failure to Honor a Ducat.

   12-10-93 - Disobeying an Order.-

   CDC 115s Rules Violation Report

   3-24-90- Possession of Alcohol- Guilty/Assessed 90 days loss of credit.

   2-2-98- Unauthorized Contraband- Guilty/Assessed 30 days forfeiture of credits.

E.   **Other:**  Gomez attended his #5 Subsequent Parole Consideration Hearing on 07-31-03.  Parole was denied for one year.  The Board recommended that Gomez remain disciplinary free and continue to participate in self-help programs.  Gomez has complied with the Board's recommendation.


IV.   **FUTURE PLANS:**

A.   **Residence:**  Upon release, Mr. Gomez intends to live with his wife, Gloria Gomez and his two (2) children, Catherine (11) and Jonathan (20), currently at 6358 E. Gage Ave., Apt. 10, Bell Gardens, CA  90021.  Telephone No. (562) 927-4683, Work No. (323) 773-3256.  Gomez will be deported upon release.  Therefore, he and his family plan to relocate to Columbia to reside with his brother, Juan M. Gomez.

B.   **Employment:** If paroled, Gomez has been assured a viable position of employment with his family in the food distribution business.  As indicated in a support letter written by Marco Vergaria of Carnera 51D No. 67U-13, Telephone No. 233-8785, Gomez has been offered employment at OSAKA Imports in Colombia, a dealership for Japanese import vehicles.  Upon completion of his current data processing program, Gomez will have three (3) certified trades to utilize in the job market.

C.   **Assessment:**  In review of Gomez' parole plans, this counselor does not foresee any problems provided support letters are submitted prior to his hearing.


V.   **USINS STATUS:**  Active Immigration Hold No. A2637201 from Colombia.

## VI.    SUMMARY:

A.    Considering the commitment offense, prior prison record, and prison adjustment this writer believes Gomez would pose a low degree of risk to the public if released. Gomez has been incarcerated for over 15 years and during this time he has matured physically and mentally and has displayed responsibility in a controlled environment. Gomez has programmed in a positive manner and has kept himself in group sessions on a consistent basis. He has now completed a third trade in computer data processing. Having various trade abilities will assist Gomez in future jobs, if paroled. He received positive reports from a long work history within the department and continuous to maintain a good rapport with staff and peers. He does not have any substance abuse charges in his arrest history, which would help contribute to his ability to rehabilitate. He shows remorse for his life crime, which resulted in his incarceration and has expressed sorrow for his victims. Gomez is persistent on change and it appears he is not the same person he was in 1987. A combination of the above-factors as well as support letters from family and friends, point Gomez in the direction of a successful parole.

B.    Prior to release Gomez would benefit from:

1.    Continuing to be disciplinary free.

2.    Continuing to participate in therapy and self-help activities.

C.    This Board Report is based on a thorough review of Gomez' Central File and a one (1) hour interview with Gomez.

D.    Gomez was afforded an opportunity to review his Central File per the Olson Decision. (refer to the CDC-128-B located in the General Chrono Section)

E.    No accommodation was required per the Armstrong vs. Davis BPT Parole Proceedings Remedial Plan for effective communication.

GOMEZ, ELKIN                E44776                CTF- Soledad            FEB/2004

E- 6

LIFE PRISONER EVALUATON REI    T
PAROLE CONSIDERATION HEARI
JULY/2004 CALENDAR

_K. L. HEINLY,_    8·17-04
Correctional Counselor I (A)

_D. PHERIGO,_
Correctional Counselor II

_I. GUERRA,_
Facility Captain

_D.S. LEVORSE,_    8·24·04
Classification and Parole Representative

GOMEZ, ELKIN          E44776          CTF- Soledad    FEB/2004

BOARD OF PRISON TERMS    STATE OF CALIFORNIA

# LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

- [ ] DOCUMENTATION HEARING
- [x] PAROLE CONSIDERATION HEARING
- [ ] PROGRESS HEARING

## INSTRUCTIONS

TO CDC STAFF: DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT
TO BPT STAFF: FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
ESTABLISHED, ie., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 02-02-03 to 03-02-04 | | | **PLACEMENT:** Remained at CTF. **CUSTODY:** Remained Medium A. **VOC. TRAINING:** Continued in the Vocation Data Processing at Satisfactory with positive comments. **ACADEMICS:** None noted during this period. **WORK RECORD:** Assigned to F-Wing as a Porter. **GROUP ACTIVITIES:** Gomez continues his Alcoholic Anonymous participation and received Laudatory chronos dated 5-3-03 and 9-30-03. **PSYCH. TREATMENT:** None noted during this period **PRISON BEHAVIOR:** Gomez continues to remain disciplinary free and has a good rapport with both staff and inmates. **OTHER:** None. |

CORRECTIONAL COUNSELOR'S SIGNATURE

DATE  8-5-04

GOMEZ              E-44776              CTF-SOLEDAD              JULY/2004

BOARD OF PRISON TERMS                                    STATE OF CALIFORNIA

BPT 1004 (REV 7/86)

E 48

# PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
## (REVISED AUGUST 1998)
### PAROLE CONSIDERATION HEARING
### NOVEMBER 2004 LIFER CALENDAR

## CORRECTIONAL TRAINING FACILITY, SOLEDAD
### OCTOBER 19, 2004

This is an updated psychological evaluation for the Board of Prison Terms on inmate Elkin Gomez, CDC# E-44776. This report is based on a personal interview of this inmate on 10/19/04. Additionally, in preparation for this update, the central file, unit health record, and previous BPT reports were reviewed. The reader is specifically referred to the last complete and thorough psychological evaluation, completed in June 1999 by Dr. Reed. Today's clinical interview and the review of all pertinent documents were for the express purpose of preparing this report.

Inmate Gomez was informed of the nature and the purpose of the interview, and the lack of confidentiality inherent in the present assessment. He was also informed that a report for the Board of Prison Terms would be prepared. He understood this and agreed to participate.

Inmate Gomez speaks Spanish and English, with Spanish being his primary language. He was offered the use of a Spanish-speaking interpreter, which he declined. His English-speaking skills appeared to be adequate for the purposes of this evaluation.

Inmate Gomez is a 44-year-old, married, Hispanic/Colombian male. His date of birth is 02/27/60. He explained that he is a Colombian citizen. He reported that his religious affiliation is Catholic. He presented with no unusual physical characteristics, and denied the use of nicknames or aliases.

During the clinical interview, inmate Gomez discussed the circumstances surrounding the commitment offense. His description was similar to that in his central file and in past psychological reports. He accepted full responsibility for his actions. He is serving a life-with-possibility-of-parole sentence for kidnapping with extortion, he stated, and has been incarcerated within CDC since 1990 (for about 14 years).

The reader is referred to the 1999 psychological evaluation for a complete social history. There have been several minor changes since his last psychological evaluation.

Inmate Gomez explained that his parents moved from Colombia to Monrovia, by Los Angeles, about five years ago. He explained that his father developed prostate cancer, for which he had surgery, but is now doing okay. Inmate Gomez continues to communicate with his family on a regular basis, and described a close relationship with family members. He explained that his wife and children "are still waiting," and explained the frustrations that go along with his family waiting for him to parole one day.

Inmate Gomez's parole plans remain essentially unchanged. He expects to be deported to Colombia. He has job offers there. His father had a family business, which his brother now runs, dealing with the selling of fruits and vegetables. Ideally, he would like to work in this business, and would return with his wife and children. If paroled to Colombia, it

GOMEZ      E-44776      CTF-CENTRAL      10/19/04      gmj      E-9

GOMEZ, ELKIN
CDC NUMBER: E-44776
BPT PSYCHOLOGICAL EVALUATION
PAGE TWO

appears that he has good plans in place, as well as family support. His prognosis for community living, therefore, is very good.

Since his last psychological evaluation in 1999, he has had several jobs, in which he has received laudatory chronos. He worked in R&R as a porter and clerk until 2001. After that, he stated he worked in the kitchen as a clerk. This was followed by completing a vocation in data processing. Currently, he is working as a porter in his wing.

Inmate Gomez denies a history of the abuse of drugs or alcohol. There is no documentation to support such a history. However, he has been involved, and continues to be involved, in Alcoholics Anonymous and Narcotics Anonymous, and said about these programs, "They are the only therapy we have here, and it has been helpful." He has also, since his last psychological evaluation, completed the Entrepreneur Development Class through the Muslim chapel, and is currently enrolled in an anger management program, also through the chapel.

Inmate Gomez has had no CDC-115s or CDC-128s since 1998. None of his disciplinary history is of a violent nature.

In summary, there are no mental health, alcohol, or drug issues, and inmate Gomez has a strong family support system and job opportunities upon release. During his years of incarceration, he has sought to improve self through involvement in self-help opportunities, as well as to make the best of opportunities such as AA and NA, even though he does not have a history of the abuse of substances.

For conclusions about the assessment of dangerousness and recommendations, the reader is referred to Dr. Reed's 1999 psychological evaluation.

Jeff Howlin, Ed.D.
Staff Psychologist
Correctional Training Facility, Soledad

B. Zika, Ph.D.
Senior Supervising Psychologist
Correctional Training Facility, Soledad

JH/gmj

D: 10/19/04
T: 10/27/04

*D:\Word Files\BPT - 2004\GOMEZ, ELKIN   E-44776   11-04   HOWLIN.doc*

GOMEZ        E-44776        CTF-CENTRAL        10/19/04        gmj        E-10

# Exhibit F

CALIFORNIA STATE ARCHIVE
SECRETARY OF STATE



# CALIFORNIA VOTERS PAMPHLET



# GENERAL ELECTION NOVEMBER 7, 1978

COMPILED BY MARCH FONG EU · SECRETARY OF STATE

ANALYSES BY WILLIAM G. HAMM · LEGISLATIVE ANALYST

**AVISO**

Una traducción al español de este folleto del votante puede obtenerse si completa y nos envía la tarjeta con porte pagado que encontrará entre las páginas 24 y 25. Escriba su nombre y dirección en la tarjeta en LETRA DE MOLDE y regrésela a más tardar el 27 de octubre de 1978.

**NOTICE**

A Spanish translation of this ballot pamphlet may be obtained by completing and returning the postage-paid card which you will find between pages 24 and 25. Please PRINT your name and mailing address on the card and return it no later than October 27, 1978.

Ex A

# TABLE OF CONTENTS

Proposition                                                                                    Page

BOND ACT

1   Veterans Bond Act of 1978.................................................................. 8–11, 38

LEGISLATIVE CONSTITUTIONAL AMENDMENTS

2   Public Utilities Commission.............................................................. 12–15

3   State Surplus Coastal Property ......................................................... 16–19

LEGISLATIVE INITIATIVE AMENDMENT

4   Chiropractic School Accreditation and
    License Revocation ................................................................ 20–23, 38–39

INITIATIVE STATUTES

5   Regulation of Smoking ............................................................. 24–27, 39–41

6   School Employees—Homosexuality ........................................ 28–31, 41

7   Murder—Penalty ...................................................................... 32–35, 41–46

LEGISLATIVE CONSTITUTIONAL AMENDMENT

8   Property Taxation....................................................................... 36–37

Ex - A



# Secretary of State

### SACRAMENTO 95814

Dear Californians:

This is the English version of the California ballot pamphlet for the November, 1978, General Election. It contains the ballot title, short summary, the Legislative Analyst's analysis, the pro and con arguments and rebuttals, and the complete text of each proposition; also it contains the legislative vote cast for and against any measure proposed by the Legislature.

If you wish to receive a Spanish language ballot pamphlet simply fill out and mail the card enclosed between pages 24 and 25.  No postage is needed.

Read carefully each of the measures and the information about them contained in this pamphlet. Legislative propositions and citizen-sponsored initiatives are designed specifically to give you, the electorate, the opportunity to influence the laws which regulate us all.

Take advantage of this opportunity and vote on November 7, 1978.

                                    SECRETARY OF STATE

Ex-A

#  7 Murder. Penalty—Initiative Statute

## Argument in Favor of Proposition 7

CHARLES MANSON, SIRHAN SIRHAN, THE ZODIAC KILLER, THE SKID-ROW SLASHER, THE HILLSIDE STRANGLER.

These infamous names have become far too familiar to every Californian. They represent only a small portion of the deadly plague of violent crime which terrorizes law-abiding citizens.

Since 1972, the people have been demanding a tough, effective death penalty law to protect our families from ruthless killers. But, every effort to enact such a law has been thwarted by powerful anti-death penalty politicians in the State Legislature.

In August of 1977, when the public outcry for a capital punishment law became too loud to ignore, the anti-death penalty politicians used their influence to make sure that the death penalty law passed by the State Legislature was as weak and ineffective as possible.

That is why 470,000 concerned citizens signed petitions to give you the opportunity to vote on this new, tough death penalty law.

Even if the President of the United States were assassinated in California, his killer would not receive the death penalty in some circumstances. Why? Because the Legislature's weak death penalty law does not apply. Proposition 7 would.

If Charles Manson were to order his family of drug-crazed killers to slaughter your family, Manson would not receive the death penalty. Why? Because the Legislature's death penalty law does not apply to the master mind of a murder such as Manson. Proposition 7 would.

And, if you were to be killed on your way home tonight simply because the murderer was high on dope and wanted the thrill, that criminal would not receive the death penalty. Why? Because the Legislature's weak death penalty law does not apply to every murderer. Proposition 7 would.

Proposition 7 would also apply to the killer of a judge, a prosecutor, or a fireman. It would apply to a killer who murders a citizen in cold blood because of his race or religion or nationality. And, it would apply to all situations which are covered by our current death penalty law.

In short, your YES vote on Proposition 7 will give every Californian the protection of the nation's toughest, most effective death penalty law.

A long and distinguished list of judges and law enforcement officials have agreed that Proposition 7 will provide them with a powerful weapon of deterrence in their war on violent crime.

Your YES vote on Proposition 7 will help law enforcement officials to stop violent crime—NOW.

**JOHN V. BRIGGS**
*Senator, State of California*
*35th District*

**DONALD H. HELLER**
*Attorney at Law*
*Former Federal Prosecutor*

**DUANE LOWE**
*President, California Sheriffs' Association*
*Sheriff of Sacramento County*

## Rebuttal to Argument in Favor of Proposition 7

The argument for Proposition 7 is strictly false advertising.

- It would not affect the Charles Manson and Sirhan Sirhan cases. They were sentenced under an old law, thrown out by the courts because it was improperly written.
- As for the "zodiac killer", "hillside strangler" and "skid-row slasher", *they were never caught*. Even the nation's "toughest" death penalty law cannot substitute for the law enforcement work necessary to apprehend suspects still on the loose.

But you already know that.

Regardless of the proponents' claim, no death penalty law—neither Proposition 7 nor the current California law—can guarantee the *automatic* execution of all convicted murderers, let alone suspects not yet apprehended.

California has a strong death penalty law. Two-thirds of the Legislature approved it in August, 1977, after months of careful drafting and persuasive lobbying by law enforcement officials and other death penalty advocates.

The present law is *not* "weak and ineffective" as claimed by Proposition 7 proponents. It applies to murder cases like the ones cited.

Whether or not you believe that a death penalty law is necessary to our system of justice, you should vote NO on Proposition 7. It is so confusing that the courts may well throw it out. Your vote on the murder penalty initiative will not be a vote on the death penalty; it will be a vote on a carelessly drafted, dangerously vague and possibly invalid statute.

Don't be fooled by false advertising. READ Proposition 7. VOTE NO.

**MAXINE SINGER**
*President, California Probation, Parole*
*and Correctional Association*

**NATHANIEL S. COLLEY**
*Board Member, National Association for the*
*Advancement of Colored People*

**JOHN PAIRMAN BROWN**
*Board Member, California Church Council*

Arguments printed on this page are the opinions of the authors and have not been

Ex - A

## Argument Against Proposition 7

**DON'T BE FOOLED BY FALSE ADVERTISING.** The question you are voting on is NOT whether California should have the death penalty. California ALREADY has the death penalty.

The question is NOT whether California should have a tough, effective death penalty. California ALREADY has the death penalty for more different kinds of crimes than any other State in the country.

The question you are voting on is whether to repeal California's present death-penalty law and replace it with a new one. Don't be fooled by false advertising. If somebody tried to sell you a new car, you'd compare it with your present automobile before paying a higher price for a worse machine.

Whether or not you agree with California's present law, it was written carefully by people who believed in the death penalty and wanted to see it used effectively. It was supported by law enforcement officials familiar with criminal law.

The new law proposed by Proposition 7 is written carelessly and creates problems instead of solving them. For example, it does not even say what happens to people charged with murder under the present law if the new one goes into effect.

As another example, it first says that "aggravating circumstances" must outweigh "mitigating circumstances" to support a death sentence. Then it says that "mitigating circumstances" must outweigh "aggravating circumstances" to support a life sentence. This leaves the burden of proof unclear. As a result, court processes would become even more complicated.

Proposition 7 does allow the death penalty in more cases than present law. But what cases?

Under Proposition 7, a man or woman could be sentenced to die for lending another person a screwdriver to use in a burglary, if the other person accidentally killed someone during the burglary. Even if the man or woman was not present during the burglary, had no intention that anyone be killed or hurt, in fact urged the burglar not to take a weapon along, they could still be sentenced to die.

This is the kind of law that wastes taxpayers' money by putting counties to the expense of capital trials in many cases where the death penalty is completely inappropriate. To add to the waste, Proposition 7 requires two or more jury trials in some cases where present law requires only one.

Don't let yourself be fooled by claims that Proposition 7 will give California a more effective penalty for murder. It won't. DON'T BE FOOLED BY FALSE ADVERTISING. Vote NO on Proposition 7.

**MAXINE SINGER**
*President, California Probation, Parole and Correctional Association*

**NATHANIEL S. COLLEY**
*Board Member, National Association for the Advancement of Colored People*

**JOHN PAIRMAN BROWN**
*Board Member, California Church Council*

## Rebuttal to Argument Against Proposition 7

**ALRIGHT, LET'S TALK ABOUT FALSE ADVERTISING.**

The opposition maintains if someone were to lend a screwdriver to his neighbor and the neighbor used it to commit a murder, the poor lender could get the death penalty, even though "he had NO INTENTION that anyone be killed."

Please turn back and read Section 6b of the Proposition 7. It says that the person must have INTENTIONALLY aided in the commission of a murder to be subject to the death penalty under this initiative.

They say that Proposition 7 doesn't specify what happens to those who have been charged with murder under the old law. Any first-year law student could have told them Proposition 7 will not be applied retroactively. Anyone arrested under an *old* law will be tried and sentenced under the *old* law.

The opposition can't understand why we included the aggravating vs. mitigating circumstances provision in Proposition 7. Well, that same first-year law student could have told them this provision is required by the U.S. Supreme Court. The old law does not meet this requirement and might be declared unconstitutional, leaving us with no death penalty at all!

If we are to turn back the rising tide of violent crime that threatens each and every one of us, we must act NOW.

This citizen's initiative will give your family the protection of the strongest, most effective death penalty law in the nation.

**JOHN V. BRIGGS**
*Senator, State of California*
*35th District*

**DONALD H. HELLER**
*Attorney at Law*
*Former Federal Prosecutor*

**DUANE LOWE**
*President, California Sheriffs' Association*
*Sheriff of Sacramento County*

*Ex- A*

# 7 Murder. Penalty—Initiative Statute § 960ℓ

Official Title and Summary Prepared by the Attorney General

§ 9002 –                                                        9004

**MURDER. PENALTY. INITIATIVE STATUTE.**   Changes and expands categories of first degree murder for which penalties of death or confinement without possibility of parole may be imposed. Changes minimum sentence for first degree murder from life to 25 years to life. Increases penalty for second degree murder. Prohibits parole of convicted murderers before service of 25 or 15 year terms, subject to good-time credit. During punishment stage of cases in which death penalty is authorized: permits consideration of all felony convictions of defendant; requires court to impanel new jury if first jury is unable to reach a unanimous verdict on punishment. Financial impact: Indeterminable future increase in state costs.

## Analysis by Legislative Analyst

**Background:**

Under existing law, a person convicted of *first degree murder* can be punished in one of three ways: (1) by death, (2) by a sentence of life in prison without the possibility of parole, or (3) by a life sentence with the possibility of parole, in which case the individual would become eligible for parole after serving seven years. A person convicted of *second degree murder* can be sentenced to 5, 6, or 7 years in prison. Up to one-third of a prison sentence may be reduced through good behavior. Thus, a person sentenced to 6 years in prison may be eligible for parole after serving 4 years.

Generally speaking, the law requires a sentence of death *or* life without the possibility of parole when an individual is convicted of first degree murder under one or more of the following special circumstances: (1) the murderer was hired to commit the murder; (2) the murder was committed with explosive devices; (3) the murder involved the killing of a specified peace officer or witness; (4) the murder was committed during the commission or attempted commission of a robbery, kidnapping, forceable rape, a lewd or lascivious act with a child, or first degree burglary; (5) the murder involved the torture of the victim; or (6) the murderer has been convicted of more than one offense of murder in the first or second degree. If any of these special circumstances is found to exist, the judge or jury must "take into account and be guided by" aggravating or mitigating factors in sentencing the convicted person to either death or life in prison without the possibility of parole. "Aggravating" factors, which might warrant a death sentence, include brutal treatment of the murder victim. "Mitigating" factors, which might warrant life imprisonment, include extreme mental or emotional disturbance when the murder occurred.

**Proposal:**

This proposition would: (1) increase the penalties for first and second degree murder; (2) expand the list of special circumstances requiring a sentence of either death or life imprisonment without the possibility of parole, and (3) revise existing law relating to mitigating or aggravating circumstances.

The measure provides that individuals convicted of first degree murder and sentenced to life imprisonment shall serve a minimum of 25 years, less whatever credit for good behavior they have earned, before they can be eligible for parole. Accordingly, anyone sentenced to life imprisonment would have to serve at least 16 years and eight months. The penalty for second degree murder would be increased to 15 years to life imprisonment. A person sentenced to 15 years would have to serve at least 10 years before becoming eligible for parole.

The proposition would also expand and modify the list of special circumstances which require either the death penalty or life without the possibility of parole. As revised by the measure, the list of special circumstances would, generally speaking, include the following: (1) murder for any financial gain; (2) murder involving concealed explosives or explosives that are mailed or delivered; (3) murder committed for purposes of preventing arrest or aiding escape from custody; (4) murder of any peace officer, federal law enforcement officer, fireman, witness, prosecutor, judge, or elected or appointed official with respect to the performance of such person's duties; (5) murder involving particularly heinous, atrocious, or cruel actions; (6) killing a victim while lying in wait; (7) murder committed during or while fleeing from the commission or attempted commission of robbery, kidnapping, specified sex crimes (including those sex crimes that now represent "special circumstances"), burglary, arson, and trainwrecking; (8) murder in which the victim is tortured or poisoned; (9) murder based on the victim's race, religion, nationality, or country of origin; or (10) the murderer has been convicted of more than one offense of murder in the first or second degree.

Also, this proposition would specifically make persons involved in the crime other than the actual murderer subject to the death penalty or life imprisonment without possibility of parole under specified circumstances.

Finally, the proposition would make the death sentence *mandatory* if the judge or jury determines that the aggravating circumstances surrounding the crime *outweigh* the mitigating circumstances. If aggravating circumstances are found *not* to outweigh mitigating circumstances, the proposition would require a life sentence without the possibility of parole. Prior to weighing the aggravating and mitigating factors, the jury

Ex-A

would have to be informed that life without the possibility of parole might at a later date be subject to commutation or modification, thereby allowing parole.

Fiscal Effect:    *9000*    *Gov. Code § 12172*

We estimate that, over time, this measure would increase the number of persons in California prisons, and thereby increase the cost to the state of operating the prison system.

The increase in the prison population would result from:

- the longer prison sentences required for first degree murder (a minimum period of imprisonment equal to 16 years, eight months, rather than seven years);
- the longer prison sentences required for second degree murder (a minimum of ten years, rather than four years); and

- an increase in the number of persons sentenced to life without the possibility of parole.

There could also be an increase in the number of executions as a result of this proposition, offsetting part of the increase in the prison population. However, the number of persons executed as a result of this measure would be significantly less than the number required to serve longer terms.

The Department of Corrections states that a small number of inmates can be added to the prison system at a cost of $2,575 per inmate per year. The additional costs resulting from this measure would not begin until 1983. This is because the longer terms would only apply to crimes committed after the proposition became effective, and it would be four years before any person served the minimum period of imprisonment required of second degree murderers under existing law.

---

## Text of Proposed Law

This initiative measure proposes to repeal and add sections of the Penal Code; therefore, existing provisions proposed to be deleted are printed in ~~strikeout type~~ and new provisions proposed to be added are printed in *italic type* to indicate that they are new.

## PROPOSED LAW

Section 1. Section 190 of the Penal Code is repealed.

~~190. Every person guilty of murder in the first degree shall suffer death, confinement in state prison for life without possibility of parole, or confinement in state prison for life. The penalty to be applied shall be determined as provided in Sections 190.1, 190.2, 190.3, 190.4, and 190.5. Every person guilty of murder in the second degree is punishable by imprisonment in the state prison for five, six, or seven years.~~

Sec. 2. Section 190 is added to the Penal Code, to read:

*190. Every person guilty of murder in the first degree shall suffer death, confinement in state prison for life without possibility of parole, or confinement in the state prison for a term of 25 years to life. The penalty to be applied shall be determined as provided in Sections 190.1, 190.2, 190.3, 190.4, and 190.5.*

*Every person guilty of murder in the second degree shall suffer confinement in the state prison for a term of 15 years to life.*

*The provisions of Article 2.5 (commencing with Section 2930) of Chapter 7 of Title 1 of Part 3 of the Penal Code shall apply to reduce any minimum term of 25 or 15 years in a state prison imposed pursuant to this section, but such person shall not otherwise be released on parole prior to such time.*

Sec. 3. Section 190.1 of the Penal Code is repealed.

~~190.1. A case in which the death penalty may be imposed pursuant to this chapter shall be tried in separate phases as follows:~~

~~(a) The defendant's guilt shall first be determined. If the trier of fact finds the defendant guilty of first degree murder, it shall at the same time determine the truth of all special circumstances charged as enumerated in Section 190.2, except for a special circumstance charged pursuant to paragraph (2) of subdivision (c) of Section 190.2 where it is alleged that the defendant had been convicted in a prior proceeding of the offense of murder of the first or second degree.~~

~~(b) If the defendant is found guilty of first degree murder and one of the special circumstances is charged pursuant to paragraph (2) of subdivision (c) of Section 190.2 which charges that the defendant had been convicted in a prior proceeding of the offense of murder of the first or second degree, there shall thereupon be further proceedings on the question of the truth of such special circumstances.~~

~~(c) If the defendant is found guilty of first degree murder and one or more special circumstances as enumerated in Section 190.2 has been charged and found to be true, his sanity on any plea of not guilty by reason of insanity under Section 1026 shall be determined as provided in Section 190.4. If he is found to be sane, there shall thereupon be further proceedings on the question of the penalty to be imposed. Such proceedings shall be conducted in accordance with the provisions of Sections 190.3 and 190.4.~~

Sec. 4. Section 190.1 is added to the Penal Code, to read:

*190.1. A case in which the death penalty may be imposed pursuant to this chapter shall be tried in separate phases as follows:*

*(a) The question of the defendant's guilt shall be first determined. If the trier of fact finds the defendant guilty of first degree murder, it shall at the same time determine the truth of all special circumstances charged as enumerated in Section 190.2 except for a special circumstance charged pursuant to paragraph (2) of subdivision (a) of Section 190.2 where it is alleged that the defendant had been convicted in a prior proceeding of the offense of murder in the first or second degree.*

*(b) If the defendant is found guilty of first degree murder and one of the special circumstances is charged pursuant to paragraph (2) of subdivision (a) of Section 190.2 which charges that the defendant had been convicted in a prior proceeding of the offense of murder of the first or second degree, there shall thereupon be further proceedings on the question of the truth of such special circumstance.*

*(c) If the defendant is found guilty of first degree murder and one or more special circumstances as enumerated in Section 190.2 has been charged and found to be true, his sanity on any plea of not guilty by reason of insanity under Section 1026 shall be determined as provided in Section 190.4. If he is*

*Ex-A*

Continued on page 41

~~cally aided or committed such act or acts causing death, and the murder was willful, deliberate, and premeditated, and was perpetrated by means of a destructive device or explosive.~~

~~(c) The defendant was personally present during the commission of the act or acts causing death, and with intent to cause death physically aided or committed such act or acts causing death and any of the following additional circumstances exists.~~

~~(1) The victim is a peace officer as defined in Section 830.1, subdivision (a) or (b) of Section 830.2, subdivision (a) or (b) of Section 830.3, or subdivision (b) of Section 830.5, who, while engaged in the performance of his duty was intentionally killed, and the defendant knew or reasonably should have known that such victim was a peace officer engaged in the performance of his duties.~~

~~(2) The murder was willful, deliberate, and premeditated, the victim was a witness to a crime who was intentionally killed for the purpose of preventing his testimony in any criminal proceeding, and the killing was not committed during the commission or attempted commission of the crime to which he was a witness.~~

~~(3) The murder was willful, deliberate, and premeditated and was committed during the commission or attempted commission of any of the following crimes:~~

~~(i) Robbery in violation of Section 211.~~

~~(ii) Kidnapping in violation of Section 207 or 209. Brief movements of a victim which are merely incidental to the commission of another offense and which do not substantially increase the victim's risk of harm over that necessarily inherent in the other offense do not constitute a violation of Section 209 within the meaning of this paragraph.~~

~~(iii) Rape by force or violence in violation of subdivision (2) of Section 261; or by threat of great and immediate bodily harm in violation of subdivision (3) of Section 261.~~

~~(iv) The performance of a lewd or lascivious act upon the person of a child under the age of 14 years in violation of Section 288.~~

~~(v) Burglary in violation of subdivision (1) of Section 460 of an inhabited dwelling house with an intent to commit grand or petit larceny or rape.~~

~~(4) The murder was willful, deliberate, and premeditated, and involved the infliction of torture. For purposes of this section, torture requires proof of an intent to inflict extreme and prolonged pain.~~

~~(5) The defendant has in this proceeding been convicted of more than one offense of murder of the first or second degree, or has been convicted in a prior proceeding of the offense of murder of the first or second degree. For the purpose of this paragraph an offense committed in another jurisdiction which if committed in California would be punishable as first or second degree murder shall be deemed to be murder in the first or second degree.~~

~~(d) For the purposes of subdivision (c), the defendant shall be deemed to have physically aided in the act or acts causing death only if it is proved beyond a reasonable doubt that his conduct constitutes an assault or a battery upon the victim or if by word or conduct he orders, initiates, or coerces the actual killing of the victim.~~

Sec. 6.   Section 190.2 is added to the Penal Code, to read:

190.2.   (a)  The penalty for a defendant found guilty of murder in the first degree shall be death or confinement in state prison for a term of life without the possibility of parole in any case in which one or more of the following special circumstances has been charged and specially found under Section 190.4 to be true:

(1)  The murder was intentional and carried out for financial gain.

(2)  The defendant was previously convicted of murder in

the first degree or second degree. For the purpose of this paragraph an offense committed in another jurisdiction which if committed in California would be punishable as first or second degree murder shall be deemed murder in the first or second degree.

(3)  The defendant has in this proceeding been convicted of more than one offense of murder in the first or second degree.

(4)  The murder was committed by means of a destructive device, bomb, or explosive planted, hidden or concealed in any place, area, dwelling, building or structure, and the defendant knew or reasonably should have known that his act or acts would create a great risk of death to a human being or human beings.

(5)  The murder was committed for the purpose of avoiding or preventing a lawful arrest or to perfect, or attempt to perfect an escape from lawful custody.

(6)  The murder was committed by means of a destructive device, bomb, or explosive that the defendant mailed or delivered, attempted to mail or deliver, or cause to be mailed or delivered and the defendant knew or reasonably should have known that his act or acts would create a great risk of death to a human being or human beings.

(7)  The victim was a peace officer as defined in Section 830.1, 830.2, 830.3, 830.31, 830.35, 830.36, 830.4, 830.5, 830.5a, 830.6, 830.10, 830.11 or 830.12, who, while engaged in the course of the performance of his duties was intentionally killed, and such defendant knew or reasonably should have known that such victim was a peace officer engaged in the performance of his duties; or the victim was a peace officer as defined in the above enumerated sections of the Penal Code, or a former peace officer under any of such sections, and was intentionally killed in retaliation for the performance of his official duties.

(8)  The victim was a federal law enforcement officer or agent, who, while engaged in the course of the performance of his duties was intentionally killed, and such defendant knew or reasonably should have known that such victim was a federal law enforcement officer or agent, engaged in the performance of his duties; or the victim was a federal law enforcement officer or agent, and was intentionally killed in retaliation for the performance of his official duties.

(9)  The victim was a fireman as defined in Section 245.1, who while engaged in the course of the performance of his duties was intentionally killed, and such defendant knew or reasonably should have known that such victim was a fireman engaged in the performance of his duties.

(10)  The victim was a witness to a crime who was intentionally killed for the purpose of preventing his testimony in any criminal proceeding, and the killing was not committed during the commission, or attempted commission of the crime to which he was a witness; or the victim was a witness to a crime and was intentionally killed in retaliation for his testimony in any criminal proceeding.

(11)  The victim was a prosecutor or assistant prosecutor or a former prosecutor or assistant prosecutor of any local or state prosecutor's office in this state or any other state, or a federal prosecutor's office and the murder was carried out in retaliation for or to prevent the performance of the victim's official duties.

(12)  The victim was a judge or former judge of any court of record in the local, state or federal system in the State of California or in any other state of the United States and the murder was carried out in retaliation for or to prevent the performance of the victim's official duties.

(13)  The victim was an elected or appointed official or former official of the Federal Government, a local or State government of California, or of any local or state government of any other state in the United States and the killing was

12

Ex - A

*intentionally carried out in retaliation for or to prevent the performance of the victim's official duties.*

*(14) The murder was especially heinous, atrocious, or cruel, manifesting exceptional depravity, as utilized in this sec-on, the phrase especially heinous, atrocious or cruel mani-ting exceptional depravity means a conscienceless, or pitiless crime which is unnecessarily torturous to the victim.*

*(15) The defendant intentionally killed the victim while lying in wait.*

*(16) The victim was intentionally killed because of his race, color, religion, nationality or country of origin.*

*(17) The murder was committed while the defendant was engaged in or was an accomplice in the commission of, attempted commission of, or the immediate flight after committing or attempting to commit the following felonies:*

*(i) Robbery in violation of Section 211. и и d 2.12.* ⸨handwritten⸩

*(ii) Kidnapping in violation of Sections 207 and 209.*

*(iii) Rape in violation of Section 261.*

*(iv) Sodomy in violation of Section 286.*

*(v) The performance of a lewd or lascivious act upon person of a child under the age of 14 in violation of Section 288.*

*(vi) Oral copulation in violation of Section 288a.*

*(vii) Burglary in the first or second degree in violation of Section 460.* ⸨handwritten: subdivision (6)⸩

*(viii) Arson in violation of Section 447 451* ⸨handwritten⸩

*(ix) Train wrecking in violation of Section 219.*

*(18) The murder was intentional and involved the infliction of torture. For the purpose of this section torture requires proof of the infliction of extreme physical pain no matter how long its duration.*

*(19) The defendant intentionally killed the victim by the administration of poison.*

*(b) Every person whether or not the actual killer found guilty of intentionally aiding, abetting, counseling, commanding, inducing, soliciting, requesting, or assisting any actor in ..e commission of murder in the first degree shall suffer death .r confinement in state prison for a term of life without the possibility of parole, in any case in which one or more of the special circumstances enumerated in paragraphs (1), (3), (4), (5), (6), (7), (8), (9), (10), (11), (12), (13), (14), (15), (16), (17), (18), or (19) of subdivision (a) of this section has been charged and specially found under Section 190.4 to be true.*

*The penalty shall be determined as provided in Sections 190.1, 190.2, 190.3, 190.4, and 190.5.*

Sec. 7. Section 190.3 of the Penal Code is repealed.

~~190.3. If the defendant has been found guilty of murder in the first degree, and a special circumstance has been charged and found to be true, or if the defendant may be subject to the death penalty after having been found guilty of violating subdivision (a) of Section 1672 of the Military and Veterans Code, or Section 37, 128, 219 or 4500 of this code, the trier of fact shall determine whether the penalty shall be death or life imprisonment without possibility of parole. In the proceedings on the question of penalty, evidence may be presented by both the people and the defendant as to any matter relevant to aggravation, mitigation and sentence, including, but not limited to, the nature and circumstances of the present offense, the presence or absence of other criminal activity by the defendant which involved the use or attempted use of force or violence or which involved the expressed or implied threat to use force or violence, and the defendant's character, background, history, mental condition and physical condition.~~

~~However, no evidence shall be admitted regarding other criminal activity by the defendant which did not involve the use or attempted use of force or violence or which did not involve the expressed or implied threat to use force or violence. As used in this section, criminal activity does not require a conviction.~~

~~However, in no event shall evidence of prior criminal activity~~

~~ity be admitted for an offense for which the defendant was prosecuted and was acquitted. The restriction on the use of this evidence is intended to apply only to proceedings conducted pursuant to this section and is not intended to affect statutory or decisional law allowing such evidence to be used in other proceedings.~~

~~Except for evidence in proof of the offense or special circumstances which subject a defendant to the death penalty, no evidence may be presented by the prosecution in aggravation unless notice of the evidence to be introduced has been given to the defendant within a reasonable period of time; as determined by the court, prior to the trial. Evidence may be introduced without such notice in rebuttal to evidence introduced by the defendant in mitigation.~~

~~In determining the penalty the trier of fact shall take into account any of the following factors if relevant:~~

~~(a) The circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true pursuant to Section 190.1.~~

~~(b) The presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the expressed or implied threat to use force or violence.~~

~~(c) Whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance.~~

~~(d) Whether or not the victim was a participant in the defendant's homicidal conduct or consented to the homicidal act.~~

~~(e) Whether or not the offense was committed under circumstances which the defendant reasonably believed to be a moral justification or extenuation for his conduct.~~

~~(f) Whether or not the defendant acted under extreme duress or under the substantial domination of another person.~~

~~(g) Whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or the affects of intoxication.~~

~~(h) The age of the defendant at the time of the crime.~~

~~(i) Whether or not the defendant was an accomplice to the offense and his participation in the commission of the offense was relatively minor.~~

~~(j) Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime.~~

~~After having heard and received all of the evidence, the trier of fact shall consider, take into account and be guided by the aggravating and mitigating circumstances referred to in this section, and shall determine whether the penalty shall be death or life imprisonment without the possibility of parole.~~

Sec. 8. Section 190.3 is added to the Penal Code, to read:

*190.3. If the defendant has been found guilty of murder in the first degree, and a special circumstance has been charged and found to be true, or if the defendant may be subject to the death penalty after having been found guilty of violating subdivision (a) of Section 1672 of the Military and Veterans Code or Sections 37, 128, 219, or 4500 of this code, the trier of fact shall determine whether the penalty shall be death or confinement in state prison for a term of life without the possibility of parole. In the proceedings on the question of penalty, evidence may be presented by both the people and the defendant as to any matter relevant to aggravation, mitigation, and sentence including, but not limited to, the nature and circumstances of the present offense, any prior felony conviction or convictions whether or not such conviction or convictions involved a crime of violence, the presence or absence of other criminal activity by the defendant which involved the use or attempted use of force or violence or which involved*

⸨handwritten bottom right: Ex. A⸩

the express or implied threat to use force or violence, and the defendant's character, background, history, mental condition and physical condition.

However, no evidence shall be admitted regarding other criminal activity by the defendant which did not involve the use or attempted use of force or violence or which did not involve the express or implied threat to use force or violence. As used in this section, criminal activity does not require a conviction.

However, in no event shall evidence of prior criminal activity be admitted for an offense for which the defendant was prosecuted and acquitted. The restriction on the use of this evidence is intended to apply only to proceedings pursuant to this section and is not intended to affect statutory or decisional law allowing such evidence to be used in any other proceedings.

Except for evidence in proof of the offense or special circumstances which subject a defendant to the death penalty, no evidence may be presented by the prosecution in aggravation unless notice of the evidence to be introduced has been given to the defendant within a reasonable period of time as determined by the court, prior to trial. Evidence may be introduced without such notice in rebuttal to evidence introduced by the defendant in mitigation.

The trier of fact shall be instructed that a sentence of confinement to state prison for a term of life without the possibility of parole may in future after sentence is imposed, be commuted or modified to a sentence that includes the possibility of parole by the Governor of the State of California.

In determining the penalty, the trier of fact shall take into account any of the following factors if relevant:

(a) The circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true pursuant to Section 190.1.

(b) The presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence.

(c) The presence or absence of any prior felony conviction.

(d) Whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance.

(e) Whether or not the victim was a participant in the defendant's homicidal conduct or consented to the homicidal act.

(f) Whether or not the offense was committed under circumstances which the defendant reasonably believed to be a moral justification or extenuation for his conduct.

(g) Whether or not defendant acted under extreme duress or under the substantial domination of another person.

(h) Whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect, or the affects of intoxication.

(i) The age of the defendant at the time of the crime.

(j) Whether or not the defendant was an accomplice to the offense and his participation in the commission of the offense was relatively minor.

(k) Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime.

After having heard and received all of the evidence, and after having heard and considered the arguments of counsel, the trier of fact shall consider, take into account and be guided by the aggravating and mitigating circumstances referred to in this section, and shall impose a sentence of death if the trier of fact concludes that the aggravating circumstances outweigh the mitigating circumstances. If the trier of fact deter-

mines that the mitigating circumstances outweigh the aggravating circumstances the trier of fact shall impose a sentence of confinement in state prison for a term of life without the possibility of parole.

Sec. 9. Section 190.4 of the Penal Code is repealed.

~~190.4. (a) Whenever special circumstances as enumerated in Section 190.2 are alleged and the trier of fact finds the defendant guilty of first degree murder, the trier of fact shall also make a special finding on the truth of each alleged special circumstance. The determination of the truth of any or all of the special circumstances shall be made by the trier of fact on the evidence presented at the trial or at the hearing held pursuant to subdivision (b) of Section 190.1.~~

~~In case of a reasonable doubt as to whether a special circumstance is true, the defendant is entitled to a finding that it is not true. The trier of fact shall make a special finding that each special circumstance charged is either true or not true. Wherever a special circumstance requires proof of the commission or attempted commission of a crime, such crime shall be charged and proved pursuant to the general law applying to the trial and conviction of the crime.~~

~~If the defendant was convicted by the court sitting without a jury, the trier of fact shall be a jury unless a jury is waived by the defendant and by the people, in which case the trier of fact shall be the court. If the defendant was convicted by a plea of guilty the trier of fact shall be a jury unless a jury is waived by the defendant and by the people.~~

~~If the trier of fact finds that any one or more of the special circumstances enumerated in Section 190.2 as charged is true, there shall be a separate penalty hearing, and neither the finding that any of the remaining special circumstances charged is not true, nor if the trier of fact is a jury, the inability of the jury to agree on the issue of the truth or untruth of any of the remaining special circumstances charged, shall prevent the holding of the separate penalty hearing.~~

~~In any case in which the defendant has been found guilty by a jury, and the jury has been unable to reach a unanimous verdict that one or more of the special circumstances charged are true, and does not reach a unanimous verdict that all special circumstances charged are not true, the court shall dismiss the jury and order a new jury impaneled to try the issues, but the issue of guilt shall not be tried by such jury, nor shall such jury retry the issue of the truth of any of the special circumstances which were found by a unanimous verdict of the previous jury to be untrue. If such new jury is unable to reach the unanimous verdict that one or more of the special circumstances it is trying are true, the court shall dismiss the jury and impose a punishment of confinement in state prison for life.~~

~~(b) If defendant was convicted by the court sitting without a jury, the trier of fact at the penalty hearing shall be a jury unless a jury is waived by the defendant and the people, in which case the trier of fact shall be the court. If the defendant was convicted by a plea of guilty, the trier of fact shall be a jury unless a jury is waived by the defendant and the people.~~

~~If the trier of fact is a jury and has been unable to reach a unanimous verdict as to what the penalty shall be, the court shall dismiss the jury and impose a punishment of confinement in state prison for life without possibility of parole.~~

~~(c) If the trier of fact which convicted the defendant of a crime for which he may be subjected to the death penalty was a jury, the same jury shall consider any plea of not guilty by reason of insanity pursuant to Section 1026, the truth of any special circumstances which may be alleged, and the penalty to be applied, unless for good cause shown the court shall discharge that jury in which case a new jury shall be drawn. The court shall state facts in support of the finding of good cause upon the record and cause them to be entered into the minutes.~~

44

Ex. A

~~(d) In any case in which the ~~ ~~adunt may be subjected~~
~~to the death penalty, evidence presented at any prior phase~~
~~of the trial, including any proceeding upon a plea of not guilty~~
~~by reason of insanity pursuant to Section 1026, shall be consid-~~
~~ered at any subsequent phase of the trial, if the trier of fact~~
~~the prior phase is the same trier of fact at the subsequent~~
~~phase.~~

~~(e) In every case in which the trier of fact has returned a~~
~~verdict or finding imposing the death penalty, the defendant~~
~~shall be deemed to have made an application for modification~~
~~of such verdict or finding pursuant to subdivision (7) of Sec-~~
~~tion 1181. In ruling on the application the judge shall review~~
~~the evidence, consider, take into account, and be guided by~~
~~the aggravating and mitigating circumstances referred to in~~
~~Section 190.3, and shall make an independent determination~~
~~as to whether the weight of the evidence supports the jury's~~
~~findings and verdicts. He shall state on the record the reason~~
~~for his findings.~~

~~The judge shall set forth the reasons for his ruling on the~~
~~application and direct that they be entered on the Clerk's~~
~~minutes.~~

~~The denial of the modification of a death penalty verdict~~
~~pursuant to subdivision (7) of Section 1181 shall be reviewed~~
~~on the defendant's automatic appeal pursuant to subdivision~~
~~(b) of Section 1239. The granting of the application shall be~~
~~reviewed on the peoples appeal pursuant to paragraph (6) of~~
~~subdivision (a) of Section 1238.~~

~~The proceedings provided for in this subdivision are in ad-~~
~~dition to any other proceedings on a defendant's application~~
~~for a new trial.~~

Sec. 10. Section 190.4 is added to the Penal Code, to read:

190.4. (a) Whenever special circumstances as enumer-
ated in Section 190.2 are alleged and the trier of fact finds the
defendant guilty of first degree murder, the trier of fact shall
also make a special finding on the truth of each alleged special
circumstance. The determination of the truth of any or all of
the special circumstances shall be made by the trier of fact on
the evidence presented at the trial or at the hearing held
pursuant to Subdivision (b) of Section 190.1.

In case of a reasonable doubt as to whether a special circum-
stance is true, the defendant is entitled to a finding that is not
true. The trier of fact shall make a special finding that each
special circumstance charged is either true or not true. When-
ever a special circumstance requires proof of the commission
or attempted commission of a crime, such crime shall be
charged and proved pursuant to the general law applying to
the trial and conviction of the crime.

If the defendant was convicted by the court sitting without
a jury, the trier of fact shall be a jury unless a jury is waived
by the defendant and by the people, in which case the trier
of fact shall be the court. If the defendant was convicted by
a plea of guilty, the trier of fact shall be a jury unless a jury
is waived by the defendant and by the people.

If the trier of fact finds that any one or more of the special
circumstances enumerated in Section 190.2 as charged is true,
there shall be a separate penalty hearing, and neither the
finding that any of the remaining special circumstances
charged is not true, nor if the trier of fact is a jury, the inability
of the jury to agree on the issue of the truth or untruth of any
of the remaining special circumstances charged, shall prevent
the holding of a separate penalty hearing.

In any case in which the defendant has been found guilty
by a jury, and the jury has been unable to reach a unanimous
verdict that one or more of the special circumstances charged
are true, and does not reach a unanimous verdict that all the
special circumstances charged are not true, the court shall
dismiss the jury and shall order a new jury impaneled to try
the issues, but the issue of guilt shall not be tried by such jury,
nor shall such jury retry the issue of the truth of any of the

special circumstances which were found by an unanimous
verdict of the previous jury to be untrue. If such new jury is
unable to reach the unanimous verdict that one or more of the
special circumstances it is trying are true, the court shall dis-
miss the jury and in the court's discretion shall either order
a new jury impaneled to try the issues the previous jury was
unable to reach the unanimous verdict on, or impose a punish-
ment of confinement in state prison for a term of 25 years.

(b) If defendant was convicted by the court sitting without
a jury the trier of fact at the penalty hearing shall be a jury
unless a jury is waived by the defendant and the people, in
which case the trier of fact shall be the court. If the defendant
was convicted by a plea of guilty, the trier of fact shall be a
jury unless a jury is waived by the defendant and the people.

If the trier of fact is a jury and has been unable to reach
unanimous verdict as to what the penalty shall be, the court
shall dismiss the jury and shall order a new jury impaneled to
try the issue as to what the penalty shall be. If such new jury
is unable to reach a unanimous verdict as to what the penalty
shall be, the court in its discretion shall either order a new jury
or impose a punishment of confinement in state prison for
term of life without the possibility of parole.

(c) If the trier of fact which convicted the defendant or a
crime for which he may be subject to the death penalty was
a jury, the same jury shall consider any plea of not guilty by
reason of insanity pursuant to Section 1026, the truth of an
special circumstances which may be alleged, and the penalty
to be applied, unless for good cause shown the court dis-
charges that jury in which case a new jury shall be drawn. The
court shall state facts in support of the finding of good cause
upon the record and cause them to be entered into the min-
utes.

(d) In any case in which the defendant may be subject to
the death penalty, evidence presented at any prior phase of
the trial, including any proceeding under a plea of not guilty
by reason of insanity pursuant to Section 1026 shall be consid-
ered in any subsequent phase of the trial, if the trier of fact
of the prior phase is the same trier of fact at the subsequent
phase.

(e) In every case in which the trier of fact has returned a
verdict or finding imposing the death penalty, the defendant
shall be deemed to have made an application for modification
of such verdict or finding pursuant to Subdivision 7 of Section
11. In ruling on the application, the judge shall review the
evidence, consider, take into account, and be guided by the
aggravating and mitigating circumstances referred to in Sec-
tion 190.3, and shall make a determination as to whether the
jury's findings and verdicts that the aggravating circum-
stances outweigh the mitigating circumstances are contrary
to law or the evidence presented. The judge shall state on the
record the reasons for his findings.

The judge shall set forth the reasons for his ruling on the
application and direct that they be entered on the Clerk's
minutes. The denial of the modification of the death penalty
verdict pursuant to subdivision (7) of Section 1181 shall be
reviewed on the defendant's automatic appeal pursuant to
subdivision (b) of Section 1239. The granting of the applica-
tion shall be reviewed on the People's appeal pursuant to
paragraph (6).

Sec. 11. Section 190.5 of the Penal Code is repealed.

~~190.5. (a) Notwithstanding any other provision of law,~~
~~the death penalty shall not be imposed upon any person who~~
~~is under the age of 18 years at the time of commission of the~~
~~crime. The burden of proof as to the age of such person shall~~
~~be upon the defendant.~~

~~(b) Except when the trier of fact finds that a murder was~~
~~committed pursuant to an agreement as defined in subdivi-~~
~~sion (a) of Section 190.2, or when a person is convicted of a~~
~~violation of subdivision (a) of Section 1672 of the Military and~~

Ex. A

~~Veterans Code, or Section 37, 128, 1500, c.   Subdivision (b) of Section 190.2 of this code, the death penalty shall not be imposed upon any person who was a principal in the commission of a capital offense unless he was personally present during the commission of the act or acts causing death, and intentionally physically aided or committed such act or acts causing death.~~

~~(c)  For the purposes of subdivision (b), the defendant shall be deemed to have physically aided in the act or acts causing death only if it is proved beyond a reasonable doubt that his conduct constitutes an assault or a battery upon the victim or if by word or conduct he orders, initiates, or coerces the actual killing of the victim.~~

Sec. 12.   Section 190.5 is added to the Penal Code, to read:

*190.5.   Notwithstanding any other provision of law, the death penalty shall not be imposed upon any person who is under the age of 18 at the time of the commission of the crime. The burden of proof as to the age of such person shall be upon the defendant.*

Sec. 13.   If any word, phrase, clause, or sentence in any section amended or added by this initiative, or any section or provision of this initiative, or application thereof to any person or circumstance, is held invalid, such invalidity shall not affect any other word, phrase, clause, or sentence in any section amended or added by this initiative, or any other section, provisions or application of this initiative, which can he given effect without the invalid word, phrase, clause, sentence, section, provision or application and to this end the provisions of this initiative are declared to be severable.

Sec. 14.   If any word, phrase, clause, or sentence in any section amended or added by this initiative or any section or provision of this initiative, or application thereof to any person or circumstance is held invalid, and a result thereof, a defendant who has been sentenced to death under the provisions of this initiative will instead be sentenced to life imprisonment, such life imprisonment shall be without the possibility of parole.

If any word, phrase, clause, or sentence in any section amended or added by this initiative or any section or provision of this initiative, or application thereof to any person or circumstance is held invalid, and a result thereof, a defendant who has been sentenced to confinement in the state prison for life without the possibility of parole under the provisions of this initiative shall instead be sentenced to a term of 25 years to life in a state prison.

*Ex. A*

# Exhibit G

All Criminal Deputies

Date: August 22, 1979

File No.:

Telephone: ATSS (    )
                  (    )

Office of the Attorney General

Recent (Relatively) Sentencing
Law Changes

Proposition 7 (effective 11/7/78) and SB 709 (effective 1/1/79) have worked some substantial changes in the sentencing consequences of murder convictions.

Specifically, we have taken the position that the new 15 years to life and 25 years to life sentences under new Penal Code section 190 are "life" sentences with 15 and 25 year minimum eligible parole dates. This conclusion has side effects relating to eligibility for CYA under Welfare and Institutions Code section 173.5 and the number of peremptory challenges under Penal Code section 1070. This conclusion (as it effects CYA eligibility) is at issue in the Fifth District Court of Appeal in In re Dewester (5 Crim. 4543).

Furthermore, the venerable concept of merger of life sentences (Pen. Code, § 669) passed into history, seemingly allowing for consecutive 25 to life sentences limited only by the number of victims.

The attached memo reflects the Morrissey 8's conclusions on these (and many more) topics. It has been approved by Arnie Overoye and Bob Philibosian and more fully sets out the Attorney General's position statewide.

Michael D. Wellington
Deputy Attorney General

MDW:nl
Attachment

EX
E 1

Arnold Overoye                          Date:      July 26, 1979
Assistant Attorney General
Sacramento                              File No.:

                                        Telephone: ATSS ( 631 ) 7666
                                                   (      )


Office of the Attorney General

Michael D. Wellington – San Diego

Morrissey 8
Meeting of July 9, 1979


On July 9, 1979, the Morrissey 8 met at our office in
Sacramento. The progress of the CRB's disparate sentence
review project was discussed in detail, as was People v:
Herrera, the CRB's first motion for recall under the dis-
parate sentence review mandate of Penal Code section 1170,
subdivision (f). The group also discussed the status of
pending litigation concerning the DSL. Finally, there was
an extensive discussion and analysis of the legal nature of
prison sentences for first and second degree murder under
Penal Code section 190 as amended by Proposition 7. A number
of legal conclusions were reached on this point, which conclu-
sions will be outlined in this memo.

                    "Life" Sentences Under New
                       Penal Code Section 190

Penal Code section 190 provides punishment of death, life
without possibility of parole, or "confinement in the state
prison for a term of 25 years to life" for first degree
murder. The prescribed punishment for second degree murder
is "confinement in the state prison for a term of 15 years
to life." Our discussion focused only on the 15 or 25
years to life sentences. It was our conclusion that these
sentences are not directly comparable to either the "indeter-
minate life" or "express life" sentences that existed under
the Indeterminate Sentence Law prior to July 1, 1977.
Rather, we concluded that these sentences should be administered
in the same fashion all "life" sentences are currently admin-
istered under the Determinate Sentence Law except that their
feature 15 or 25 year minimum eligible parole dates, instead
of the general 7 year MEPD prescribed by Penal Code section
3046.

"Indeterminate Life" sentences under the old Indeterminate
Sentence Law (for example five to life for robbery) contemplated

EX

E-2

Arnold Overoye                       -2-                    July 26, 1979

the parole board setting a "term" somewhere between five years and life.  In addition, the parole board was obligated to consider a parole release date sometime prior to the expiration of the "term."  The paroling decision was, by its nature, a tentative one with the prisoner subject to revocation and the service of the remainder of his term.  The primary features of this whole scheme passed into history on July 1, 1977, with the coming of DSL.  The parole board's power to fix terms was withdrawn by the repeal of Penal Code section 2940 et seq., and nothing in the current Penal Code evidences an intent to reestablish those powers for first or second degree murder.  Although the parole board currently does have the power to grant parole (Pen. Code, § 3040 et seq.) that power too is substantially different since July 1, 1977.  Not only is the length of parole statutorily set (Pen. Code, § 3000 et seq.) but reincarceration on revocation of parole is statutorily limited to one year (Pen. Code, § 3057).

"Express life" sentences under the ISL precluded the establishment of a "term" since the prisoner was never to be discharged.  Although such prisoners could be paroled, they could at any time be retaken to serve the remainder of their life sentences.  Under the DSL, however, all life prisoners discharge automatically within a few years of their release on parole no matter what their conduct during the parole.  (Pen. Code, § 3000 et seq.)  As indicated above, any confinement on revocation of parole is limited to one year.

Thus, since much of the administrative power underlying the old concepts of "indeterminate life" and "express life" have been abolished, it was concluded that the new prison sentences under Proposition 7 were not intended to fit either of these old models.  The language of new Penal Code section 190 (15 years to life, 25 years to life) implies that someone must make a choice where the prisoner falls between the two ends of the spectrum.  Since the sentence is clearly one under Penal Code section 1168, subdivision (b), the trial judge cannot make the choice.  This leaves the Community Release Board.  Since the Community Release Board's only remaining power in this regard is the power to grant parole (Pen. Code, § 3040) it was concluded that the new sentences require the CRB to fix a parole date somewhere within the appropriate range.  As a result, the new sentences appear to be "life" sentences which are analogous to all other "life" sentences under the DSL except that Penal Code section 190 provides specific (15 or 25 years) minimum eligible parole dates which prevail over the general "life" MEPD of seven years found in Penal Code section 3046.  The "life" sentences of Penal Code section 190 appear slightly different

EX

E-3

from other life sentences under the DSL in the additional
respect that good time credits (Pen. Code, § 2930 et seq.)
are made expressly applicable to the MEPD. Such credits
are not otherwise applicable to anyone sentenced under
Penal Code section 1168, subdivision (b). (Pen. Code, §
2930, subd. (a).)

Two consequences of characterizing section 190 sentences as
"life" sentences are both significant and consistent with
the thrust of Proposition 7. First, "life" cases entitle
both parties to the trial to 26 peremptory challenges.
(Pen. Code, § 1070.) Second, a "life" sentence precludes
commitment to the Youth Authority following a superior court
trial.

## In re Rodriguez

In re Rodriguez (1975) 14 Cal 3d 639, also appears to have
been rendered obsolete by the changed structure of life
sentences. In Rodriguez, the California Supreme Court
placed the burden on the parole board to set a prisoner's
"primary term" quickly and without regard to any post-
conviction behavior. This "primary term" established
the outer limit of the prison system's jurisdiction over the
prisoner. The basis for the Rodriguez decision lay in the
judicial branch's obligation to examine terms, as fixed by
the parole board, to determine whether they were cruel
or unusual. In light of the fact the CRB has no term fixing
power, it was the unanimous conclusion of all members present
that Rodriguez is no longer applicable.

## Merger of New Life Sentences

Merger of life sentences was also discussed at the meeting.
Penal Code sections 669 and 3046 were both amended as of
January 1, 1979, to expressly provide that determinate enhance-
ments may run consecutively to life sentences, and that multiple
life sentences can run consecutively to each other. In the
case of consecutive life sentences, section 3046 requires
the defendant be imprisoned "until he has served at least seven
calendar years on each of the life sentences . . . ." The
question was raised whether the apparent 15 to 25 year MEPDs
under Penal Code section 190 is inconsistent with the language
of section 3046. The conclusion was that there is no inconsistence.
It was noted that section 3046 is a generalized section provid-
ing MEPDs for all life terms, while section 190 is a much
more specific section which applies directly to first and
second degree murders. Furthermore, section 3046 merely
requires the service of "at least" seven years for each
sentence. Thus, the 15 and the 25 year designation in section
190 are not at all inconsistent with the specific language
of section 3046. It was noted that Penal Code section
4500 has for years provided just such a specific exception
to section 3046 by providing a nine year MEPD for certain
kinds of assaults by life prisoners. Finally, it should

EX

E-4

be noted that SB 709 which effectuated the amendment to
sections 669 and 3046 was filed September 6, 1978, while the
more specific language of Penal Code section 190 was added
by initiative on November 7, 1978. Thus, the specific
MEPDs in section 190 appear to be the latest expression of
the sovereign.

Another merger problem revolves around the fact that although
SB 709 was filed in September 1978, it did not become
effective until January 1, 1979. Thus, its abolition of the
merger doctrine did not go into effect until approximately
seven weeks after the November 7, 1978, effective date of
Proposition 7. (Pen. Code, § 190 et seq.) In light of this,
the group concluded that any first or second degree murders
committed between November 7, 1978, and January 1, 1979,
would be subject to the 15 or 25 year MEPDs but that no
consecutive sentencing would be possible. The abolishing of
the merger doctrine clearly works to increase punishment.
Therefore, imposition of consecutive life sentences for
crimes committed before January 1, 1979, would seem to be
unavoidably ex post facto.

### Retroactive Calculation of ISL
### Second Degree Murder Cases

The final question addressed was what term the CRB is to be
guided by when retroactively calculating an ISL prisoner's
second degree murder sentence under Penal Code section 1170.2
Subdivision (a) of that section requires the CRB to determine
whether a prisoner would have been sentenced under Penal
Code section 1170 had his crime been committed after July 1,
1977, and if so, what his sentence would have been. The
difficulty is that for second degree murder the sentence has
seemed to be many things at many different times after
July 1, 1977. The initial DSL "price tag" for second degree
murder was five, six or seven years. In September of 1978,
the Legislature passed SB 709 which (effective January 1, 1979)
changed this to five, seven or eleven years. However, before
that could ever take effect, on November 7, 1978, Proposition 7
was passed changing second degree murder from a determinate
term (to be sentenced under Penal Code section 1170) to a
"life" term (to be sentenced under Penal Code section 1168,
subdivision (b)). We concluded that SB 709 need not be
considered since its second degree murder penalty was
superseded before it ever went to effect by Proposition 7.
The CRB could not retroactively apply Proposition 7's 15
to life for two reasons. First, it would be an ex post
facto increase from the five to life sentence in effect

EX

E-5