# EXHIBIT C
# Part 2 of 4

1  cases, the court did not have full knowledge of the contemporaneous decision
2  of Jeanice D., supra, 28 C.3d 210 at p. 220; that said sentences could not and
3  would not be moderated within the bounds of the DSL's scheme. Thus, the state
4  courts cannot say the Legislature had merely hoped that uniform release dates
5  would be typical or common, as this is an absurb result for Ex. "F" Dannenberg
6  and Sass line of cases, which is completely at odds Ex. "G" with ISL's "Life
7  Prisoners/Straight Life Sentences" of the DSL and its 1994 Three Strike Law.

8     The Legislates created incorporation of incorporated statutes, as 1170.1,
9  Judicial Council Rules, establish a presumption of release within the subject
10 statute 30419a) reference by 1170(a)(1)(b)(2) provisions pursuant to the man-
11 dates of 1170.2(a) uniform terms for offense of similar gravity and magnitude.
12 supra, 60 Ops. Att. Gen. 143.

13    Thus, the Boards discreation 3041.5$^{1/}$ does not give an understanding as
14 3041(a) creates a presumption for four (4) of six (6) different lines of cases
15 pursuant to harmonized statutes. Thus, the public policy of achieving uniform-
16 ity of terms serve federal due process consideration, by placing the burden
17 for the continued loss of liberty on the confining authority. As presumption
18 affects burden of proof in furtherance of public policy, the presumption en-
19 sures a failure to set any release date pursuant to uniformity/porportational-
20 ity in sentences. Violating Cal. Evid. Code § 605, as presumption is establish
21 ed to implement some public policy other than to facilitate the determination
22 in which, the presumption applied. Clearly, the U.S. Supreme Court authority
23 requires state to adopt certain procedures for hearings of any person involved
24 being entitled to the benefit of those procedures. Evitts v. Lucy, In re 91985
25 469 U.S. 387, 393; Griffin v. Illinois 351 U.S. 12, 20 91956).

26 Fn. 1: The amendment to § 3041.5 of the P.C. made by this act shall be made applicable to off-
   enses committed before July 1, 1977, on or after January 1, 1991, Stats. 1990 Ch. 1053 § 2; De-
27 mond, In re, (1985) 165 C.A.3d 932, 211 C.R. 680, at p. 935; In enacting 3041.7, the Legislature
   was refering "only" to parole release hearing pursuant to the provisions of the DSL's P.C.'s, in
28 referancing 3041.5, and its enumerating procedures & time limits granting hearings under the DSL'
   s scheme.

1    Hence, the stated first step, 1170.1(a), 3041(a), specifically directs the

2  Board to set a date at the initial hearing, absent 1170(b) factually supported

3  findings of 1170.2(b) mandates referenced from 3041(c), that the inmates 3041

4  (b) currently presents an unreasonable risk of danger to the public if relea-

5  sed. McQuillion I, 306 F.3d at p. 905; In re, Cal. Code Regs., tit. 15 §§ 2281

6  (a) & 2402(a); People v. McDowell (1988) 46 C.3d 551, 571; People v. Fudge 7

7  Cal. 4th 1117 (1994). Thus, the state is not free to apply whatever procedure

8  they choose to the legislative directive 3041. As 3041.5 confines the Board

9  within the parameters  of the matrix § 2403 release dates. As noted; the court

10  decision of Dannenberg realized the matrix was mandatory on the Board, due to

11  the legislative directive of 60 Ops. Att. Gen. 143 & 1170.1, to ensure uniform

12  terms. Stanworth In re, 33 C.3d 180 at p. 184; Dannenberg 34 C. 4th 1079 Ftn. 7

13    Thus, the court analysis ended, with the "some evidence" doctrine Hill, In

14  re, 472 U.S. 455, without looking to why a low level review was imposed. As

15  Admininistrative review is only a vehicle for court review, it is not a stan-

16  dard for the Board. Where, the initial decision to deny parole required fact-

17  ual evidence the inmate poses an "unreasonable risk" of danger to the public.

18  In re, Cal. Code Regs. tit. 15 §§ 2402(a) & 2281(a); People v. Bean (1988) 46

19  C.3d 919, 951; In re Powell 45 C.3d 894.

20    Thus, the "some evidence" standard evolved from Hill, supra, In re 472 U.

21  S. 455, established a standard of proof of guilt in disciplinary proceedings,

22  and subsequent 'court' review of that decision. Where the Constitutional gua-

23  rantee of due process required 'some evidence' to support its determination.

24  Thus, state courts have applied Hill's "some evidence", without analysis up-

25  holding Board findings for denying parole. As Powell, In re 45 C.3d 894, pet-

26  itioners P.C. 209 kidnap, any or all Ex. "F" line of cases, is based on a fail

27  ure to analyze the issue that led to Hill, and the assumption by the court of

28  no evidentiary standard of parole hearings, requiring the Boards regulatory

1  prescription scheme. This, assumption however, is flawed.

2      Unlike Hill, the legislates have determined an inmates liberty interest in

3  a disciplinary hearing. As a finding of guilt supported by preponderance of

4  evidence. The provision of tit. 15 § 3320, "Hearing procedures & Time Limita-

5  tions", read in relevant part as follows:

6      "The inmate may present documentary evidence in defense or mitigation
       of the charge. Any finding of guilt shall be based upon determination
7      of official(s) conducting the disciplinary hearing that a preponder-
       ance of evidence submitted substantiate the charge." Id. 3320(1).)
8

9    Thus, CDC reiterated the importance of "preponderance" standard in its pro-

10  mulgated rules of guilt & imposition of credit loss on offenders for illegal

11  substance violation. Tit. 15 § 3290, in relevant part as follows:

12      "(g) When evidence after a field test or resulting from a field test is
        not suitable or sufficient for submission as laboratory   confirmation
13      may, be considered in a disciplinary hearing. Under such circumstances
        a finding of guilt shall be based upon the preponderance of all eviden-
14      ce presented at the hearing."

15      (h) "Field" or "laboratory" test is not required if other evidence cor-
        roborates use. Cedit loss & other authorized disciplinary action   may
16      be taken based on a preponderance of evidence & testimony." (Emphases).

17  The above distinguishes California from massachusetts procedures. While

18  Hill had no standard of proof defined, California does, impose a "preponder-

19  ance of evidence" upon any fact finding before denial of a right. As Hill is

20  based solely upon reasoning the state imposed no standard of proof in discip-

21  linary hearing.

22      In the Boards regulations, there is no specific standard of proof in par-

23  ole hearing process. However, California is explicit as to what proof is in

24  any proceeding when no specific standard is defined. As Cal. Evid. Code § 115

25  provides a standard of proof not specified, the standard used by tier of facts

26  is preponderance of evidence. The note worthy issue is when the Board extends

27  an offender's incarceration, as they follow strict guidelines. Cal. Code Regs.

28  tit. 15, § 2450 provides as follows:

"The ISL parole date of an ISL prisoner or the parole date of a life or non-life 1168 prisoner may be postponed or recinded for good cause at a rescission hearing." Emphases added.

The term "good cause" is specific, legally defined standard for Boards regulations:

"Good Cause. A finding by the Board based upon preponderance of evidence that there is factual basis & good reason for the decision made." Cal. Code Regs., tit. 15 § 3000, emphasis added.

Even tit. 15 § 2451, provides that delay or rescision of release by the Board can be imposed if found guilty of disciplinary action. Thus, any of the finding of guilt in any disciplinary hearing requires support by a "preponderance of evidence", In re P.C.'s §§ 3050-3065 DSL's scheme.

Thus, the above is required by California law, because neither Prop. 7's, 190, 190.1-190.5, nor any other initiative amending Dannenbergs line of cases, has allowed for Cal. Code of Regs., tit. 15, Div. 2, to directly prescribe a standard of review for parole hearings. As the standard is applicable under Evid. Code § 115, preponderance of evidence, as in the disciplinary context. Thus, for violation of parole, or for rescission or delay, the principle of due process, equal protection & fundamental fairness dictate the same standard apply in parole hearings, pursuant to the direct language of Evid. Code § 115. As the action extends incarceration of a prisoner in the same class as petitioner. Where, a denial or even a reversal extends incarceration for an indefinite period, or delays release for the rest of inmates life. i.e. 3041. As such, traditional 'substantial evidence" review should be utilized. However, the review under Dannenberg violates these principles, being contrary to clearly established 60 Ops. Att. Genr 143, and U.S. Supreme Court Law.

B. The Dannenberg decision Is Contrary To Clearly Established Supreme Court Law As It Relies On Vague Language.

The standard used in Dannenebrg fails to pass muster. A statute or regulation is void for vagueness "if it fails to give fair notice to people of com-

1  mon intelligence Ex. "G" being made to guess at the meaning of Ex. "F", if it

2  invites arbitrary & discriminatory enforcement." United States v. Doremas, In

3  re, 888 F.2d 630, 634 (9th Cir. 1989). As here, the vice of vagueness challe

4  enge, is whether to scrutinize Ex. "F" statute 190 for intolerable vagueness

5  on its face or whether to do so only as the statute is applied. As here, 209(b

6  kidnap is vague when only 3041 is applied. Schwartzmiller v. Gardner, In re

7  752 F.2d 1341, 1346 (9th Cir. 1989). As herein, the factors set forth in Cal.

8  Code Reg., tit. 15, SSS 2281 & 2402(c) the Board determines whether the crime

9  was commited in an "especially heinous, atrocious or cruel manner", as applied

10  to petitioner kidnap, are purely subjective & unconstitutionally vague. As

11  such, in cases involving death penalty or life without possibility of parole,

12  the Board has manifest petitioner kidnap into an exceptional depravity, thats

13  unconstitutionally vague & violates due process. Superior Court of Santa Clara

14  v. Engert 31 C.3d 797, 805 (1982).

15  Thus, these factors are not understood or explained, and do not give adqu-

16  ate notice they would apply. Thus, as in Rosenkrantz V, decision employed con-

17  ditional language as if the crime would be considered more aggravated or vio-

18  lent to sustain a conviction. Where in, Dannenberg this standard is completely

19  unreviewable. As the languae itself is unconstitutionally vague, and that dec-

20  ision, did state clear directive that sole reliance on the commitment offense

21  will violate due process rights pursuant to 3041(a), where, the offense could

22  not be considered more aggravated or violent to sustain the offense.

23  However, the Dannenberg decision confused the issue by changing the stand-

24  ard set forth in Rosenkrantz V, allowing the Board denial based on the crime,

25  as "more than minimally necessary to convict of the offense for which confin-

26  ed." In re, Dannenberg, supra, 34 C. 4th at 1095. As the result is a defini-

27  tion, or standard, that constantly changes shapes, is never consistent & is in

28  capable of being defined or pinned down. As now, every kidnap & second degree,

1   fits a murder category of first, the facts are so arbitray and depends on per-
2   sonal opinion of the Board, A.G's., D.A. and Governor.

3       As explained, there is nothing in the language or description alone to im-
4   ply any inherent restrain on arbitrary & capricious infliction of denial of
5   parole suitability. Godfrey v. State of Georgia, In re 446 U.S. 420 (1980);ex-
6   plained "person of sensibility could fairly characterize almost every Kidnap &
7   Murder as 'execeptionally heinous, artocious, cruel or callous'." Id. at 429.

8       However, this creates a loop-hole in which if not corrected, the Board and
9   courts are allowed to apply unconstitutionally vague terms to Ex. "F" sentence
10  that effectively turns petitioners Kidnap, any or all second degree murder sen
11  tences into Life With Out Possibility of Parole by repeatedly using the crime
12  to deny release, as in this case. Shell v. Mississippi 486 U.S. 1, 3 (1990);
13  Godfrey v. Georgia 446 U.S. 420 (1980). Thus, Dannenberg, confusses the situ-
14  ation, as the crime only needs minimum for conviction. This, has the Board ul-
15  itizing any Kidnap & murder (i.e even as here, kidnap with no bodily injury)
16  to be used as a basis for denial of release to parole, rendering the standard
17  as unconstitutionally vague.

18      Thus, the constitutional right to due process, and the right to a jury
19  trial, requires each & every fact used to increase a penalty, must be alleged
20  and found true by tier of facts, be it by jury or inmates own admission of
21  facts. Thus, as here, in Apprendi v. New Jersey 530 U.S. 466 (2000); Blakely v
22  Washington 542 U.S. 296. These findings bar the Boards findings that take in-
23  mates outside the normal kidnap sentencing scheme of the matrix, as the Boards
24  findings that support denial acts as both a literal & effective change in the
25  crime originally charged or convicted of. As such, a change is a constructive
26  amendment and is pre-judicial per se. Jones v. Smith 231 F.3d 1227, 1232-33
27  (9th Cir. 20001). Where the Supreme Court in Stirone v. United States 361 U.S.
28  212, 218 (1960), a defendant is convicted of a crime and the grand jury never

24

1  charged  petitioner with the essential element of the crime, a constructive

2  amendment has occurred & reversal is warranted. Since this ruling in Apprendi,

3  supra, the Court has made clear that any fact that increases the penalty be-

4  yond the prescribed statutory maximum or its matrix must be submitted to  a

5  jury & proved beyond a reasonable doubt. As such, Apprendi expands the range

6  of discrepancies that will amount to constructive amendments. Id. at 490.

7      Accordingly, some courts & prosecutors believed simply meant that the sen-

8  tence could not exceed the maximum possible penalty under the statute violated

9  , rather than a sentence that merely exceeds the presumptive sentencing range.

10  While in Blakely, supra, 542 U.S. 296, Justice Scalia, explained the trial

11  Court's imposition of the greater than "standard" term was impremissibly ex-

12  cessive:

13      "In this case, 'the defendant' was sentenced to more than 3 years above
    the 53-month statutory maximum of the standard range because  be  acted
14      with deliberate cruelty." The facts of the finding were not admitted to,
    nor found by the jury. The state nevertheless contend there was no App-
15      rendi violation because the 'statutory maximum' is not 53-months, but 10
    years maximum for a B felonies..Thus, the exceptional sentence may no
16      exceed that limit. (Citation). However, that "the statutory maximum" for
    Appendi purposes is the maximum sentence a judge may impose solely  cn
17      the basis of the fact reflected in the jury verdict or admitted by." In
    re, Blakely v. Washington, supra, 542 U.S. 296.

18      To ensure no misunderstanding the High Court was saying, Justice Scalia

19  reiterated:
    "In other words, the relevant 'statutory maximum' is not the maximum
20      sentence a judge may impose after a finding of additional facts, but
    the maximum he may impose without any additional findings.  When  a
21      judge inflicts punishment that a jury's verdict does not allow,  the
    jury has not found all the facts 'which the law makes essential  to
22      the punishment,' the judge exceeds his proper authority."

23      Accordingly, it is clear that a punishment greater than justified by a

24  jury's findings, or judge's findings, with no further expansion of those fin-

25  dings, they cannot be imposed.  Thus, if a sentencing scheme provides a tri-

26  paritiate structure, as the matrix § 2282(c) does pursuant to the DSL's intent

27  of 3041(a)(b) incorporated by cross reference scheme of pari materia harmon-

28  ized statutes structures. That the Board must set release to parole dates con-

1  sistent with the statutory terms of three prescribed terms, absent a finding

2  made at the time of conviction. As the Board has gone outside the matrix.

3      The Board, however, consistently refuses to set release to parole dates

4  consistent with the matrix, and justifies their action by unilaterally making

5  'findings' about the commitment offense thats out of the matrix. As these un-

6  ilateral findings, <u>are not</u> made by jury or judge as to petitioners 209 kidnap,

7  violating the due process premise set forth in <u>Apprendi</u> & <u>Blakely</u>.

8      Thus, petitioner is aware of recent decision of <u>People v. Black</u> 35 C. 4th

9  1238 (2005). Just as here, petitioner had a jury trial on the aggravating fac-

10  tors that justified the upper term. Here, petitioner <u>is not</u> contending that

11  <u>Apprendi</u> & <u>Blakely</u> rule applies to 3 term selection, as petitioner has already

12  pasted said maximum. Instead, it is contended the Board <u>cannot</u> fix or make a

13  finding regarding the crime altogether as it is now <u>outside</u> the prescribed

14  matrix § 2282(c), which, applies based on facts already determined by jury or

15  judge at sentencing.

16      Thus, as already noted <u>Jeanice D., supra, In re</u> (1980) 28 C.3d 210 at pp.

17  216-220, the <u>Sass</u>, <u>Dannenberg</u> & <u>Rosenkrantz</u> line of cases, <u>were not</u> drafted as

18  part of the DSL's uniformity/porporationality of punishment scheme In re, Ex.

19  "G" & "F". Thus, the above line of cases, the violation occurs every time the

20  Board or A.G. & Governor makes findings about the crime being "exceptionally

21  callous", or "especially heinous, atrocious and cruel", or "dispassionate and

22  calculated", or as having a "trivial or insignificant" motive, since these

23  facts underlying the claimed circumstances <u>were not</u> tied to the jury at the

24  time of conviction or admitted to. Such findings result in the Board acting as

25  jury, with  findings of various alleged circumstance or additional crimes, as

26  here, thats completely outside the matrix. Thus, the ruling in <u>Dannenberg</u> al-

27  lows the Board and A.G., even the Governor to violate clearly established

28  United States Supreme Court precedent.

1   Thus, the decision in Sass has relied on the premise of interpretation of

2   Dannenberg that it can be applied. As explained supra, the United States Sup-

3   reme Court has prescribed principles of due process that plainly govern 209(b)

4   kidnap of petitioner claims. Greenholtz, supra, 442 U.S. at 7; Allen, supra,

5   482 U.S. 369; also McQuillion I, supra, 306 F.3d at 901.

6   That even the recent U.S. Supreme Court case of Kansas v. Crane, No. 00957

7   2002 DJDAR, held, in cases of sex offenders being confined civilly beyond

8   their original criminal sentence, the state must prove both mental disorder

9   and a serios difficulty in controlling their behavior before they can be im-

10  prisoned beyond their time. The key message here is that the Board has to show

11  proof of something more than just a psychiatric report that may not be 'total-

12  ly suportive of release' in order for the report to constitute a denial of re-

13  lease to parole.

14  As noted, California parole scheme creates a liberty interest in parole by

15  its mandatory language. Moody v. Daggett, In re 429 U.S. 78, 50 L.Ed.2d 326,

16  97 S.Ct. 274 (1976). A parole liberty interest involves protection by the due

17  process clauses of the Fifth and Fourteenth Amendments. Perveler v. Estelle

18  (9th Cir. 1992) 974 F.2d 1132, 1134; Bergen v. Spaulding (9th Cir. 1989) 881

19  F.2d 719, 721 (Citing, Greenholtz & Allen). In re, Powell v. Gomez 33 F.3d 39,

20  40 (9th Cir. 1994), under the "clearly established" framework of Greenholtz &

21  Allen, California parole scheme gives rise to cognizable liberty interest in

22  release to parole. The scheme creates a presumption. Allen 484 U.S. at 378.

23  As the Ninth Circuit in McQuillion & Biggs recognized California parole

24  scheme creates a liberty interest. The Boards authority is limited in that it

25  must grant parole, must do so at the initial hearing, and only has the author-

26  ity to deny in "particular egregious" cases, or the gravest of murders, not in

27  kidnaps with no bodily injury. Ramirez, In re, 94 C.A. 4th 549, 560 (2002);

28  Rosenkrantz V, supra, 29 Cal. 4th 616, "parole applicants in this state have

1   an expectation they will be granted parole unless the Board finds, in their
2   excerise of discreation, petitioners are unsuitable in light of the circum-
3   stances specified by statute and regulations. " Id. at 654.  It is these prin-
4   ciples that are violated by the Board in this case. Thus, based on the fore-
5   going, it is clear that the Sass decision does not dispose of the due process
6   right of parole. As set forth in this petition, Petitioner is both eligible &
7   suitable for release, and the continuous denial of parole on the same factors
8   amount to a deprivation of Elkin Gomez, constitutional and statutory rights.
9   It is respectfully requested that this court issue a writ of habeas corpus,
10  and order immediate release with deportation as the Board does not have juris-
11  diction as petitioner has served beyond the matrix maximum in violation of the
12  federal constitution of the 6th Amendment of the maximum created by regulation

13                                CONCLUSION

14      The above  yields a conclusion, by the incorporated by cross reference,
15  the asset of any one interpretive framework has addressed the libilities of
16  incorporation by cross reference of harmonized statutes in pari materia with
17  other statutes the Board has failed with a disturbing inter-connection of in-
18  terpretation. That the contradiction is unimaginable that any 'patch-work' re-
19  sulting to borrow a little from "this" and take a little from "that" could
20  produce a defensible and coherent theory for the Board to follow of Penal Code
21  Statutory and Constitutional interpretation of law.

22      Under pages 1-29 of this petition Petitioner contends that: The Board is
23  required to support its conclusions with correct standards of evidence; there
24  must be factual underpinning to suport its determination. The Board has create
25  arbitrary & capricious absue in its discreation. The Board has failed to fix
26  uniform/porporationate punishment pursuant to the DSL's scheme of incorporayed
27  by cross reference harmonized pari materia statutes. The Board violates the
28  equal protection clause under Both California and Federal Constitution of the

1  5th, 8th and 14th Amendments.

2      Thus, the Board has no authority to fix petitioner term as petitioner has

3  now served beyond the regulations statutory maximum established by the matrix

4  in violation of the federal constitution of the 6th amendment.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19                              **DECLARATION**

20

21      I declare under penalty of perjury that the foregoing is true and correct.

22  Excuted this _____, day of _____, 2006, at CTF-Central, Soledad, Cal.

23

24

25                    _____

26                         ELKIN GOMEZ, In Pro Se.

27

28

29

PRAYER FOR RELIEF

1. Issue an Order to Show Cause on an expedited basis directing a filing pursuant to California Rules of Court;

2. Issue a Writ of Habeas Corpus;

3. Order that will provide Petitioner with reasonable discovery;

4. Conduct an evidentiary hearing declaring the rights of parties;

5. Take jurisdiction by this Court, set actual release date and to be deportated at the earliest possible time;

6. Take notice of matrix statutory scheme being violated pursuant the (6) sixth Amendment of the Federal Constitution as terms exceeds the maximum;

7. Take notice of the violations of equal protection and due process as established within this Habeas Corpus;

8. Grant any or all relief necessary to promote justice.

Dated: 3/2/06

Elkin Gomez

30

PROOF OF SERVICE BY MAIL
(C.C.P. 1013(a), 2015.5)

I, Elkin Gomez, declare that I am 18 years of age and that I am the pro per Petitioner to the herein attached cause of action.

My complete mailing address is: Elkin Gomez, E-44776, P.O. Box 689, F-205L CTF Central, Soledad, CA. 93960-0689.

I further declare that I have deposited true and complete copy's of the attached; PETITION FOR WRIT OF HABEAS CORPUS, addressed to the following list below, in sealed envelope(s) with postage fully pre-paid, and disposited said documents in the U.S. Mail Box (Prison Mail Box) at CTF Central, California State Prison, Soledad, CA.  93960-0689.

1-copy  L.A. Superior Court
        210 W. Temple Street
        Los Angeles, CA. 90012

1-copy  Attorney General
        110 West A Street, Suite 1100
        P.O. Box 85266
        San Diego, CA.  92186-5266

I declare under penalty of perjury that the foregoing is true and correct, excuted this ___7___, day of MARCh, 2006 at California State Prison, Soledad, California.

_____
Elkin Gomez
Declardant

31

EXHIBIT    A

JANUARY   1   90     SUPERIOR COURT OF CALIFORNIA, COUNTY OF L.A.    DEPT. 102

| HONORABLE: JACQUELINE A. CONNOR | JUDGE | B DEVENUTO | Deputy Clerk |
|---|---|---|---|
| 302 | J TKACH | Deputy Sheriff | D BENNETT | Reporter |

CASE NO.    A961451-03

(Parties and counsel checked if present)

PEOPLE OF THE STATE OF CALIFORNIA

VS

03 GOMEZ ELKIN

Counsel for People:
DEPUTY DISTRICT ATTY: R. Wallace ✓

Counsel for Defendant: NOTKOFF ✓

CHARGE    209 A  01CTS    211487.1 01CTS

(BOX CHECKED IF ORDER APPLICABLE) X

NATURE OF PROCEEDINGS

**71** ☒ Ann Mc Fain X286352 PLG SWORN AS THE ENGLISH Spanish 10-25-88 INTERPRETER
☐ PUBLIC DEFENDER APPOINTED, D.P.D. _____ OATH FILED PER SECTION 68560 GOVERNMENT CODE.
☐ DUE TO CONFLICT OF INTERESTS, PUBLIC DEFENDER RELIEVED. PURSUANT TO PENAL CODE SECTION 987.2/GOVERNMENT CODE SECTION 31000 ALTERNATE DEFENSE COUNSEL _____ IS APPOINTED.

**72** ☐ CRIMINAL PROCEEDINGS ADJOURNED/RESUMED.

**73** ☐ DEFENDANT ORDERED DELIVERED TO DEPARTMENT OF CORRECTIONS PER SECTION 1203.03 PENAL CODE.

**74** ☐ ___ ON _____ MOTION, PROBATION AND SENTENCE HEARING/FURTHER PROCEEDINGS CONTINUED TO _____
AT ___ A.M. IN DEPT _____ ☐ SUPPLEMENTAL PROBATION REPORT/PROGRESS REPORT ORDERED

**75** ☐ DEFENDANT PERSONALLY AND ALL COUNSEL WAIVE TIME FOR SENTENCING. ☐ DEFENDANT ORDERED TO RETURN.

**76** ☒ PROBATION DENIED / PROCEEDINGS SUSPENDED / SENTENCE IMPOSED AS FOLLOWS:
☐ IMPRISONED IN STATE PRISON FOR ☐ TERM PRESCRIBED BY LAW ☒ TOTAL OF LIFE Plus 2 years YEARS MONTHS
☒ COURT SELECTS THE _____ TERM OF LIFE YEARS FOR THE BASE TERM AS TO COUNT 1
☐ PLUS 2 YEAR(S) PURSUANT TO PENAL CODE SECTION 2015
☐ PLUS ___ AS INDICATED IN BOX 86 BELOW # With possibility of parole.
☐ COMMITTED TO CALIFORNIA YOUTH AUTHORITY, THE TERM OF IMPRISONMENT TO WHICH THE DEFENDANT WOULD HAVE BEEN SENTENCED PURSUANT TO SECTION 1170 PENAL CODE IS _____ YEARS
☐ IMPRISONED IN LOS ANGELES COUNTY JAIL FOR TERM OF _____ DAYS
☐ FINED IN SUM OF $ _____ PLUS ADDITIONAL FINE OF $ _____ (11372.5 HEALTH & SAFETY CODE) FOR A
TOTAL FINE OF $ _____ PLUS $ _____ ASSESSMENT AND SURCHARGE (1464 PC & 76000GC), TO
BE PAID TO COUNTY CLERK. ☐ PAY RESTITUTION FINE IN SUM OF $ _____ PURSUANT TO SECTION 13967(a)
☐ GOVERNMENT CODE PAYABLE TO RESTITUTION FUND

**77** ☐ SENTENCE IS SUSPENDED.

**78** ☐ PROBATION GRANTED FOR A PERIOD OF _____ YEARS ☐ ___ PROBATION TO BE WITHOUT FORMAL SUPERVISION.
  **1** ☐ ___ SPEND FIRST _____ DAYS IN COUNTY JAIL ☐ ROAD CAMP OR HONOR FARM RECOMMENDED.
     ☐ WORK FURLOUGH PROGRAM RECOMMENDED. ☐ NOT TO BE ELIGIBLE FOR COUNTY PAROLE
  **2** ☐ FINED IN SUM OF $ _____ PLUS ADDITIONAL FINE OF $ _____ (11375.5 HEALTH & SAFETY CODE) FOR A
TOTAL FINE OF $ _____ PLUS $ _____ ASSESSMENT AND SURCHARGE (1464 PC & 76000GC), TO
BE PAID TO PROBATION OFFICER IN SUCH MANNER AS HE SHALL PRESCRIBE.
  **3** ☐ MAKE RESTITUTION OF $ _____ TO THE VICTIM/RESTITUTION FUND PURSUANT TO SECTION 1203.04
PENAL CODE IN SUCH MANNER AS THE PROBATION OFFICER SHALL PRESCRIBE. ☐ TOTAL AMOUNT OF RESTITUTION TO
INCLUDE ___ % SERVICE CHARGE AS AUTHORIZED BY SECTION 1203.1 P.C
☐ PAY RESTITUTION FINE IN SUM OF $ _____ PURSUANT TO SECTION 13967(a) GOVERNMENT CODE PAYBLE TO
PROBATION DEPARTMENT IN SUCH MANNER AS THEY PRESCRIBE. ☐ SAID FINE TO BE STAYED WHILE DEFENDANT PAYS RESTITUTION
AND IF RESTITUTION IS PAID IN FULL, STAY SHALL BE PERMANENT.
  **4** ☐ ___ MINIMUM PAYMENT OF FINE/RESTITUTION TO BE $ _____
  **5** ☐ NOT DRINK ANY ALCOHOLIC BEVERAGE AND STAY OUT OF PLACES WHERE THEY ARE THE CHIEF ITEM OF SALE.
  **6** ☐ NOT USE OR POSSESS ANY NARCOTICS, DANGEROUS OR RESTRICTED DRUGS OR ASSOCIATED PARAPHERNALIA, EXCEPT WITH VALID
PRESCRIPTION, AND STAY AWAY FROM PLACES WHERE USERS CONGREGATE.
  **7** ☐ NOT ASSOCIATE WITH PERSONS KNOWN BY YOU TO BE NARCOTIC OR DRUG USERS OR SELLERS.
  **8** ☐ SUBMIT TO PERIODIC ANTI-NARCOTIC TESTS AS DIRECTED BY THE PROBATION OFFICER, SUCH TESTING TO BE SUSPENDED WHILE THE
DEFENDANT IS IN CUSTODY, IS HOSPITALIZED, OR IS IN A RESIDENTIAL DRUG TREATMENT PROGRAM APPROVED BY PROBATION
OFFICER.
  **9** ☐ HAVE NO BLANK CHECKS IN POSSESSION. NOT WRITE ANY PORTION OF ANY CHECKS. NOT HAVE BANK ACCOUNT UPON WHICH YOU
MAY DRAW CHECKS.
  **10** ☐ NOT GAMBLE OR ENGAGE IN BOOKMAKING ACTIVITIES OR HAVE PARAPHERNALIA THEREOF IN POSSESSION, AND NOT BE PRESENT IN
PLACES WHERE GAMBLING OR BOOKMAKING IS CONDUCTED.
  **11** ☐ NOT ASSOCIATE WITH _____
  **12** ☐ COOPERATE WITH PROBATION OFFICER IN A PLAN FOR _____
  **13** ☐ SUPPORT DEPENDENTS AS DIRECTED BY PROBATION OFFICER.
  **14** ☐ SEEK AND MAINTAIN TRAINING, SCHOOLING OR EMPLOYMENT AS APPROVED BY PROBATION OFFICER.
  **15** ☐ MAINTAIN RESIDENCE AS APPROVED BY PROBATION OFFICER _____
  **16** ☐ SURRENDER DRIVER'S LICENSE TO CLERK OF COURT TO BE RETURNED TO DEPARTMENT OF MOTOR VEHICLES.
  **17** ☐ NOT DRIVE A MOTOR VEHICLE UNLESS LAWFULLY LICENSED AND INSURED.
  **18** ☐ NOT OWN, USE OR POSSESS ANY DANGEROUS OR DEADLY WEAPONS.
  **19** ☐ SUBMIT PERSON AND PROPERTY TO SEARCH OR SEIZURE AT ANY TIME OF THE DAY OR NIGHT BY ANY LAW ENFORCEMENT OFFICER
WITH OR WITHOUT A WARRANT.
  **20** ☐ OBEY ALL LAWS, ORDERS, RULES AND REGULATIONS OF THE PROBATION DEPARTMENT AND OF THE COURT.

**79** ☒ DEFENDANT GIVEN TOTAL CREDIT OF 225 DAYS IN CUSTODY. ( 196 DAYS ACTUAL CUSTODY AND 28 DAYS GOOD TIME/WORK TIME)

**80** ☐ SENTENCE/COUNTS TO RUN CONSECUTIVELY TO/CONCURRENTLY WITH _____

**81** ☐ STAY OF EXECUTION OF _____ GRANTED TO _____

**82** ☐ ON MOTION OF PEOPLE, COUNTS _____ DISMISSED IN FURTHERANCE OF JUSTICE.

**83** ☒ COURT ADVISES DEFENDANT OF HIS APPEAL/PAROLE RIGHTS.

**84** ☐ "NOTICE RE CERTIFICATE OF REHABILITATION AND PARDON" GIVEN TO DEFENDANT.

**85** ☐ DEFENDANT TO PAY COSTS OF PROBATION SERVICES IN AMOUNT OF $ _____

**86** ☐ COURT FINDS THAT DEFENDANT DOES NOT HAVE THE PRESENT ABILITY TO PAY COSTS OF INCARCERATION/LEGAL SERVICES RENDERED/
PROBATION SERVICES RENDERED.

**87** ☐ DEFENDANT IS REFERRED TO TREASURER/TAX COLLECTOR FOR FINANCIAL EVALUATION.

**88** ☒ FURTHER ORDER AS FOLLOWS/ADDITIONAL CONDITIONS OF PROBATION: Motion for continuance is denied.
Motion for new trial denied. Motion to reduce Principal charge to lesser imprisonment is denied. On count 2, the court imposed and presently stays 16 months in county jail.

**89** ☐ SHERIFF IS ORDERED TO ALLOW DEFENDANT _____ PHONE CALLS AT DEFENDANT'S OWN EXPENSE

**90** ☐ DEFENDANT FAILS TO APPEAR WITH/WITHOUT SUFFICIENT EXCUSE.

**91** ☐ BAIL, IF POSTED, FORFEITED/O.R. REVOKED. BENCH WARRANT ORDERED ISSUED/REISSUED/AND HELD UNTIL _____
☐ NO BAIL/BAIL FIXED AT $ _____

**92** ☐ DEFENDANT APPEARING BENCH WARRANT ORDERED RECALLED/QUASHED. ☐ RECALL NO. _____ ☐ WRITTEN ☐ ABSTRACT FILED

| ☒ REMANDED | ☐ BAIL | ☐ BAIL EXON: | ☐ BOND NO. ___ | MINUTES ENTERED |
|---|---|---|---|---|
| ☐ RELEASED | ☐ O.R. | ☐ O.R. DISCHARGED | ☐ ON PROBATION | COUNTY CLERK |
| | ☐ BENCH WARRANT | | ☐ IN CUSTODY OTHER MATTER | 3 P&S |

76C778 (REV.5-87) 7-89    MINUTE ORDER

SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

| Date: | January 16, 1990 | | | | DEPT. 102 |
|---|---|---|---|---|---|
| HONORABLE: | JACQUELINE CONNOR | JUDGE | D DEVENUTO | | , Deputy |
| | J TKACH | Deputy Sheriff | D BENNETT | | , Reporter |

(Parties and counsel checked if present)

| A961451 | PEOPLE OF THE STATE OF CALIFORNIA | Counsel for Plaintiff | IRA REINER , DISTRICT ATTY. BY |
| | VS | | X R WALLACE DEPUTY |
| X | GOMEZ, ELKIN   X286352 | Counsel for Defendant | PUBLIC DEFENDER |
| | | | X   G NOTKOFF   DEPUTY |

NATURE OF PROCEEDINGS  PROBATION AND SENTENCE

(Boxes checked if order applicable)

Court advises defendant of his appeal/parole rights. Motion for continuance is denied. Motion for New Trial is denied. Motion to reduce kidnapping charge to false imprisonment is denied.

PROBATION DENIED. SENTENCE AS INDICATED BELOW.

Whereas the said defendant having......been......duly......found

guilty in this court of the crime of KIDNAPPING FOR EXTORTION (Sec 209(a) PC), as charged in Count 1 of the information and further find that the defendant used a deadly and dangerous weapon, within the meaning of Penal Code Section 12022.5, at the time of the commission of the offense; the Court finds used allegation pursuant to Section 12022.5 Penal Code true; Count 2 having been stayed

It is Therefore Ordered, Adjudged and Decreed that the said defendant be punished by imprisonment in the State Prison. for Life with possibility of parole, plus 2 years for the used allegation.

☑ Defendant is given credit for....1152....................days in custody (includes...384...days good time/work time).

It is further Ordered that the defendant be remanded into the custody of the Sheriff of the County of Los Angeles and delivered by him into the custody of the Director of Corrections at the California State Institution

☑ for Men at Chino, California
☐ for Women at Frontera, California
☐ ........................................................

ENTERED

1-16-90

FRANK S. ZOLI
COUNTY CLERK
AND CLERK OF THE
SUPERIOR COURT

☐ Remaining count(s) dismissed in interests of justice.
☐ Bail exonerated.

2   7EJ805A (REV. 7-82) 7-82
       C-109

JUDGMENT

PINK ORIGINAL TO FILE
WHITE COPY TO MICROFILM
YELLOW COPY TO STATEWIDE DISTRIBUTION
GREEN COPY TO PROBATION EXPEDITER

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA,<br><br>　　　　　　　　　　　　　　　Plaintiff<br><br>　　　　　　　　v.<br><br><br><br>LUIS HERNON CARDONA,<br>ELKIN JESUS GOMEZ, ~~and~~<br>RAUL GALLEGOS<br><br>　　　　　　　　　　　　　　Defendant(s) | Case No.   A961451<br><br>I N F O R M A T I O N<br><br>Arraignment Date: 10/25/8<br>Department: CEN 130<br><br>F I L E D<br><br>OCT 2 5 1988<br><br>FRANK S. ZOLIN COUNTY CLERK<br><br>By S. FERRELL, DEPUTY |

I N F O R M A T I O N
S U M M A R Y

| Ct. No. | Charge | Charge Range | Defendant | Special Allegation | Alleg. Effect |
|---|---|---|---|---|---|
| 1 | PC209(a)<br>PC12022(b) | LIFE<br>+1 | CARDONA, LUIS HERNON<br>GOMEZ, ELKIN JESUS | PC12022(a) | +1 |
| 2 | PC182[1]<br>PC12022(b)<br>GALLEGOS, RAUL | Check Code<br>+1<br>PC12022(a) | CARDONA, LUIS HERNON<br>GOMEZ, ELKIN JESUS | PC12022(a)<br><br>+1 | +1 |
| 3 | PC211<br>PC12022(b) | 2-3-5<br>+1 | GOMEZ, ELKIN JESUS | | |

The District Attorney of the County of Los Angeles, by this Information alleges that:

COUNT  1

On or about December 10, 1987, in the County of Los Angeles, the crime of KIDNAPPING FOR EXTORTION, in violation of PENAL CODE SECTION 209(a), a Felony, was committed by LUIS HERNON CARDONA and ELKIN JESUS GOMEZ, who did willfully and unlawfully seize, confine, abduct, conceal, kidnap, and carry away William

Mikus with the intent to hold and detain, and who did hold and detain, the said William Mikus for extortion.    It is further alleged that the above offense is a serious felony within the meaning of Penal Code Section 1192.7(c)(20).

It is further alleged that in the commission and attempted commission of the above offense a principal in said offense was armed with a firearm(s), to wit, a firearm, said arming not being an element of the above offense, within the meaning of Penal Code Section 12022(a).

It is further alleged that in the commission and attempted commission of the above offense, the said defendant(s), ELKIN JESUS GOMEZ, personally used a deadly and dangerous weapon(s), to wit, a machine gun, said use not being an element of the above offense, within the meaning of Penal Code Section 12022(b) and also causing the above offense to be a serious felony within the meaning of Penal Code Section 1192.7(c)(23).

* * * * *

COUNT  2

On or about December 10, 1987, in the County of Los Angeles, the crime of CONSPIRACY TO COMMIT A CRIME, in violation of PENAL CODE SECTION 182[1], a Felony, was committed by LUIS HERNON CARDONA, ELKIN JESUS GOMEZ and RAUL GALLEGOS, who did willfully and unlawfully conspire together and with another person and persons whose identity is unknown to commit the crime of KIDNAPPING FOR EXTORTION, in violation of Section 209(a) of the Penal Code, a felony; that pursuant to and for the purpose of carrying out the objects and purposes of the aforesaid conspiracy, the said defendants committed the following overt act and acts at and in the County of Los Angeles : SEE ATTACHED.

It is further alleged that in the commission and attempted commission of the above offense a principal in said offense was armed with a firearm(s), to wit, a firearm, said arming not being an element of the above offense, within the meaning of Penal Code Section 12022(a).

It is further alleged that in the commission and attempted commission of the above offense, the said defendant(s), ELKIN JESUS GOMEZ, personally used a deadly and dangerous weapon(s), to wit, a machine gun, said use not being an element of the above offense, within the meaning of Penal Code Section 12022(b) and also causing the above offense to be a serious felony within the meaning of Penal Code Section 1192.7(c)(23).

\* \* \* \* \*

COUNT 2

On or about December 10, 1987, in the County of Los Angeles, the crime of 2ND DEGREE ROBBERY, in violation of PENAL CODE SECTION 211, a Felony, was committed by ELKIN JESUS GOMEZ, who did willfully, unlawfully, and by means of force and fear take personal property from the person, possession, and immediate presence of William Mikus.   It is further alleged that the above offense is a serious felony within the meaning of Penal Code Section 1192.7(c)(19).

It is further alleged that in the commission and attempted commission of the above offense, the said defendant(s), ELKIN JESUS GOMEZ, personally used a deadly and dangerous weapon(s), to wit, a machine gun, said use not being an element of the above offense, within the meaning of Penal Code Section 12022(b) and also causing the above offense to be a serious felony within the meaning of Penal Code Section 1192.7(c)(23).

\* \* \* \* \*

Page  3

THIS INFORMATION CONSISTS OF 3 COUNT(S).

IRA REINER
DISTRICT ATTORNEY
County of Los Angeles,
State of California

BY: _____
ROBERT WALLACE
DEPUTY DISTRICT ATTORNEY

Filed in Superior Court,
County of Los Angeles

DATED: _____

## OVERT ACTS AS TO COUNT II

### Overt Act No. 1

Between December 6, 1987, and December 10, 1987, defendants LUIS CARDONA, ELKIN GOMEZ, and RAUL GALLEGOS held discussions with each other and with JOSE LUJAN to formulate a plan to kidnap William Mikus.

### Overt Act No. 2

On or about December 10, 1987, LUIS CARDONA, ELKIN GOMEZ, and RAUL GALLEGOS each went to a parking lot across from the Rickshaw Restaurant. It was at this location that the kidnapping was to, and did, occur.

### Overt Act No. 3

On or about December 10, 1987, defendants CORDONA and GOMEZ forcibly entered a vehicle containing and belonging to William Mikus.

Ref:  CARDONAOA/group/10-24-88/vb

EXHIBIT  B

SUPERIOR COURT OF CALIF
COUNTY OF LOS ANGELES

PROBATION OFFICER'S REPORT

REPORT SEQUENCE NO.   1

| DEFENDANT'S NAME(S) | COURT | JUDGE | COURT CASE NO. |
|---|---|---|---|
| ELKIN GOMEZ<br><br>T/N: ELKIN JESUS GOMEZ (?) | 104 | CONNOR | A961451 |

| ADDRESS (PRESENT/RELEASE) | HEARING DATE | DEFENSE ATTY. | PROSECUTOR |
|---|---|---|---|
| UNKNOWN | 11-2-89 | NOTKOFF | WALLACE |

| BIRTHDATE | AGE | SEX | RACE | DPO | AREA OFFICE | PHONE NO. |
|---|---|---|---|---|---|---|
| 2-27-60 ? | 29 ? | MALE | HISPANIC | THOMAS | CAI | 974-3315 |

| CITIZENSHIP STATUS | DRIVER'S LICENSE; EXP. DATE |
|---|---|
| UNK | N9480800/UNK |

| PROBATION NO. | CII NO. | BOOKING NO. | TYPE REPORT |
|---|---|---|---|
| x-286352 | A06849376 | 9422055 | X Probation and sentence |

| DAYS IN JAIL THIS CASE | CUSTODY STATUS/RELEASE DATE |
|---|---|
| ☐ ESTIMATED  ☒ VERIFIED   686 DYS | COUNTY JAIL |

TYPE REPORT
X Probation and sentence
___ Pre-Conviction (131.3 CCP)
___ Post sentence
___ Diversion (Specify) _____

## PRESENT OFFENSE: LEGAL HISTORY

CHARGED with the crimes of (INCLUDE PRIORS, ENHANCEMENTS OR SPECIAL CIRCUMSTANCES)
CT 1:   209(A) PC (KIDNAPPING FOR EXTORTION);
ALLEGATIONS MADE OF 12022(A)(1), 1192.(C)(20), 12022.5, 1192.7(C)(8) PC
CT 2:   211 PC (ROBBERY/SECOND DEGREE);
ALLEGATIONS MADE OF 1192.7(C)(19) AND 1192.7(C)(8) PC.

DATE

CONVICTED of the crimes of (INCLUDE PRIORS, ENHANCEMENTS OR SPECIAL CIRCUMSTANCES)
CT 1:   209(A) PC, ALLEGATION OF 12022.5 PC FOUND TRUE
CT 2:   487.1 PC (GRAND THEFT/PERSON), ALLEGATION OF 12022.5 PC FOUND TRUE.

| CONVICTED BY | DATE OF CONVICTION/~~REVERSAL~~ | COUNT(S) CONTINUED TO P & S FOR DISPOSITION |
|---|---|---|
| JURY | 10-5-89 | NONE |

| PROPOSED PLEA AGREEMENT | SOURCES OF INFORMATION |
|---|---|
| N/A | N/A |

| DATE(S) OF OFFENSE | TIME(S) |
|---|---|
| 12-10-87 | 9:30 PM |

DEFENDANT: ☒ N/A          ☐ SENTENCED TO STATE PRISON/COUNTY JAIL ON CASE _____          HOLD/WARRANT
(SEE PRIOR   ☐ ON PROBATION   ☐ PENDING PROBATION VIOLATION   ☐ PENDING NEW CASE          ☐ YES ☐
RECORD
SECTION)   ☐ ON PAROLE-REMAINING TIME _____

RECOMMENDATION:

☐ PROBATION   ☒ DENIAL          ☐ DIAGNOSTIC STUDY   ☐ CYA   ☐ OTHER _____
              ☐ COUNTY JAIL      ☐ 707.2 WIC
              ☒ STATE PRISON     ☐ 1203.03 PC

76P72SB—Prob. 19SC (Rev. 6/85) 12/88

PRESENT OFFENSE:
(CONTINUED)

SOURCES OF INFORMATION (this page)
D.A. FILE, ARREST REPORT

| ARREST DATE | TIME | BOOKED AS | OFFENSE | LOCATION OF ARREST | ARRESTING AGENCY |
|---|---|---|---|---|---|
| 12-18-87 | | ELKIN JESUS GOMEZ | 209(A) PC (KIDNAPPING FOR RANSOM), 182.1 PC (CONSPIRACY TO COMMIT CRIME), 11352 H&S (SALES OF✕ | | W. COV PD |

| CO-DEFENDANT(S) | CASE NO. | DISPOSITION |
|---|---|---|
| LUIS HERNAN CARDONA | A961451 | FOUND GUILTY BY JURY OF 209(A) PC, 12022(A) PC FOUND TRUE. |
| CLAUDIA JANET BARON | A961451 | 3-4-88, D-123; SENTENCED TO 8 YRS SP, P/G TO 207 PC |

ELEMENTS AND RELEVANT CIRCUMSTANCES OF THE OFFENSE:
✕NARCOTIC CONTROLLED SUBSTANCE/COCAINE)

RAUL GALLEGOS            A961451        UNK

ON DECEMBER 10, 1987 THE DEFENDANTS KIDNAPPED WILLIAM MIKUS FOR THE PURPOSE OF EXTORTING FROM HIM $82,000.

WILLIAM MIKUS IS AN INFORMANT FOR THE FEDERAL BUREAU OF INVESTIGATION. ON DECEMBER 10, 1987 IT WOULD APPEAR THAT LUIS CARDONA, ELKIN GOMEZ, AND RAUL GALLEGOS WERE ACTING AT THE INSTRUCTIONS OF CLAUDIA JANET BARON, A MAJOR COCAINE SMUGGLER/DEALER/TRAFFICKER WHEN THEY KIDNAPPED MIKUS FROM A PARKING LOT, DRIVING OFF WITH HIM IN MIKUS' AUTOMOBILE. THE KIDNAPPING APPEARS TO HAVE BEEN RELATED TO A DRUG-RELATED DEBT TO BARON INCURRED BY MIKUS APPROXIMATELY ONE YEAR EARLIER. AT THE TIME OF THE KIDNAPPING MIKUS HAD AN ELECTRONIC DEVICE SECRETED ON HIS PERSON THAT TRANSMITED THE ENSUING CONVERSATION BETWEEN HIM AND HIS KIDNAPPERS TO A SURVEILLING FEDERAL BUREAU OF INVESTIGATION AGENT. THE TRANSCRIPT CLEARLY SHOWS THAT -2- (GOMEZ)

CARDONA WAS IN CONTROL OF THE TWO CODEFENDANTS, AND THAT GOMEZ ACTED PRIMARILY AS A INTERPRETER BETWEEN MIKUS AND THE TWO CODEFENDANTS, ALTHOUGH GOMEZ MADE STATEMENTS SHOWING INITIATIVE AND FREEDOM OF ACTION. CARDONA MADE SUCH STATEMENTS AS "OKAY, OKAY. NO...YOU...TELL HIM, THAT HE IS GOING TO PAY THE MONEY, YES?...AND THAT WE'LL AVOID PROBLEMS. YEAH? BECAUSE OTHERWISE HE'S GOING TO HAVE PROBLEMS; THAT WE WILL TREAT HIM WELL. YEAH?...BE MORE WATCHFUL, BROTHER, BE MORE WATCHFUL, HE WAS GOING TO ESCAPE...TELL HIM NOT TO...EXCUSE ME, TELL HIM NOT TO TRY ANYTHING, TO GET OUT, OR ANYTHING LIKE THAT, BECAUSE I AM GOING TO TREAT HIM WELL. YEAH?...TELL HIM THAT TITO'S (CLAUDIO BARON) OWES ME, TELL HIM...TELL HIM THAT IF HE DOESN'T WANT TO AVOID PROBLEMS OVER $82,000, THAT THEN WE'RE...WE'RE GOING TO HAVE THEM, YOU UNDERSTAND? YEAH? TELL HIM...TELL HIM TO AVOID PROBLEMS, THAT HIS LIFE IS WORTH MORE THAN 82. TELL HIM...IT'S...IT'S...IT'S WORTH MORE...TELL HIM THAT WE'RE NOT TAKING A BUCK FROM HIM, BECAUSE WE AREN'T, JUST WHAT IS OURS, YEAH?...BECAUSE WE ARE NOT EXTORTING HIM NOR KIDNAPPING HIM IN ORDER TO ROB HIM. NO. TELL HIM THAT IT'S 82, AND UNTIL HE PAYS 82 HE WON'T LEAVE HERE...BEHAVE YOURSELF, YEAH? DON'T OPEN THAT DOOR. YEAH?...THINK ABOUT WHAT YOUR'E GOING TO DO. THINK, TELL HIM TO THINK CALMLY. THINK. CALMLY. CALMLY. YEAH?"

-3- (GOMEZ)

1    AFTER A PURSUIT BY FEDERAL BUREAU OF INVESTIGATION

2    AGENT AARON SANCHEZ, MIKUS WAS ABLE TO ESCAPE FROM HIS VEHICLE,

3    LUJAN WAS ARRESTED, AND GOMEZ AND CARDONA FLED ON FOOT.    GOMEZ

4    AND CARDONA WERE ARRESTED ONE WEEK LATER BY OFFICERS OF THE

5    WEST COVINA POLICE DEPARTMENT.

6    GOMEZ TOLD OFFICERS THAT HE WAS RECRUITED BY

7    THE DEFENDANT (                    ) TO ATTEMPT SEVERAL MONEY COLLECTIONS

8    FOR TITO ESPINOSA, HUSBAND OF CLAUDIA BARON.    HE WAS TO BE

9    WELL-PAID FOR HIS INVOLVEMENT, BUT DECLINED TO TELL THE POLICE

10   HOW MUCH.    HIS RESPONSIBILITY WAS TO ACT AS AN INTERPRETER

11   FOR THE OTHERS INVOLVED.    THE FIRST COLLECTION WAS TO BE FROM

12   WILLIAM MIKUS.    OTHER DEBTS TO BE COLLECTED INCLUDED $26,000

13   FROM A VIET NAM VETERAN KNOWN AS "THE JEW", OVER $3,000,000

14   FROM A BLACK MAN, APPROXIMATELY $192,000 FROM A COLUMBIAN NAMED

15   JAVIER, AND $31,000 FROM A COUSIN OF JAVIER.    WHEN THE THREE

16   DEFENDANTS WENT TO THE RESTAURANT PARKING LOT, THE THREE WERE

17   CARRYING WEAPONS TO EFFECT THE COLLECTIONS.    THE WEAPONS INCLUDED

18   A LUGER-TYPE MACHINE GUN, A SHOTGUN, AND A .357 MAGNUM HANDGUN.

19   WHEN MIKUS ESCAPED FROM THE VEHICLE, CARDONA TOLD THE OTHERS

20   TO THROW THEIR WEAPONS OUT OF THE VEHICLE.    CARDONA LATER RETURNED

21   TO THE AREA AND RECOVERED THE LUGER-TYPE MACHINE GUN, BUT WAS

22   UNABLE TO LOCATE THE HANDGUN.

23   This testomy BY JOSE ANTONIO LUJAN TOLD OFFICERS THAT HE HAD

-4- (GOMEZ)

76C692G – PROB. 5A

1  WORKED AS A SECURITY GUARD FOR SOME TIME BEFORE BEING HIRED

2  AS A BODYGUARD FOR HENRY PEREZ. IN THE COURSE OF HIS EMPLOYMENT

3  WITH PEREZ, HE MET NUMEROUS COLUMBIANS THAT INFORMED HIM THAT

4  THEY WERE DEALING IN LARGE SALES OF COCAINE. THROUGH A FRIEND,

5  HE LEARNED THAT CARDONA NEEDED SOME ASSISTANCE. CARDONA WAS

6  LOOKING FOR SEVERAL INDIVIDUALS TO ASSIST HIM IN THE COLLECTION

7  OF LARGE AMOUNTS OF MONEY FROM AN AMERICAN WHO OWED IT TO A

8  COLUMBIAN THAT WAS IN JAIL. HE MET WITH CARDONA ON DECEMBER 7,

9  1987. THE DETAILS OF THE JOB WERE GIVEN AT THAT TIME. THEY

10 MET WITH CLAUDIA BARON WHO TOLD THEM THAT THEY WERE TO MEET

11 MIKUS AND FORCE HIM TO HAND OVER TO THEM THE MONEY OWED TO

12 HER AND HER HUSBAND. THEY WERE TO TELL MIKUS THAT THE MERCHANDISE

13 HE HAD RECEIVED WAS THEIRS, AND THAT THEY WERE PRESSURING HIM

14 FOR THE MONEY IN VIEW THAT HER HUSBAND WAS NOT AROUND. CARDONA

15 WOULD BE IN CHARGE OF THE OPERATION. LUJAN WAS TO RECEIVE

16 $2000. ALTHOUGH IT HAD NEVER BEEN DISCUSSED, IT WAS LUJAN'S

17 UNDERSTANDING THAT THEY WERE MERELY TO SCARE MIKUS, OBTAIN

18 THE MONEY, AND NOT TO PHYSICALLY HURT HIM IN ANY MANNER. IT

19 WAS INITIALLY PLANNED TO GRAB MIKUS AND THROW HIM INTO THE

20 BACK OF A VAN AND DRIVE AWAY WITH HIM. WITH THAT IN MIND,

21 A VAN WAS OBTAINED AS WELL AS A SECOND VEHICLE THAT WAS TO

22 BE DRIVEN BY A FOURTH SUSPECT. IN ANOTHER MEETING WITH CLAUDIA

23 BARON, BARON ADVISED THEM THAT THE MEETING WITH MIKUS HAD BEEN

-5- (GOMEZ)

1  SET FOR 6:30 P.M., AND THAT THEY WERE TO TAKE HIM, PUT HIM

2  IN A VAN, AND DRIVE HIM TO HIS HOME, WHERE HE KEPT HIS CASH.

3  LUJAN TOLD OFFICERS THAT HE HAD BEEN ARMED WITH A .44 CALIBER

4  WEAPON AND THAT GOMEZ HAD BEEN ARMED WITH AN UZI.

5

6

7

8

9

10

11

12

13

14

15                                           —

16

17

18

19

20

21

22

23

            —6— (GOMEZ)

| VICTIM: | SOURCES OF INFORMATION (this page) |
|---|---|
| | D.A. FILE, POLICE RECORDS |

| NAME WILLIAM MIKUS | COUNT(S) 1 & 2 |
|---|---|

INJURY: PROPERTY LOSS (TYPE / COST / ETC.)
VICTIM OF KIDNAPPING FOR EXTORTION

INSURANCE COVERAGE
N/A

| LOSS: UNK ☐ YES ☐ NO | ESTIMATED LOSS UNK | RESTITUTION ALREADY MADE UNK | APPLIED FOR VICTIM RESTITUTION FUND ☒ UNK ☐ YES ☐ NO |
|---|---|---|---|

VICTIM STATEMENT:

FEDERAL BUREAU OF INVESTIGATION AGENT AARON SANCHEZ HAS AGREED TO CONTACT WILLIAM MIKUS, AND REQUEST HIM TO TELEPHONE THE PROBATION OFFICER. SHOULD A STATEMENT BE MADE IN TIME, IT WILL BE ATTACHED TO THIS REPORT.

| RESTITUTION | TOTAL NUMBER OF VICTIMS 1 | ESTIMATED LOSS TO ALL VICTIMS UNK | VICTIM(S) NOTIFIED OF P&S HEARING ☒ YES ☐ NO |
|---|---|---|---|
| DOES DEFENDANT HAVE INSURANCE TO COVER RESTITUTION: ☐ YES ☒ NO | | INSURANCE COMPANY NAME/ADDRESS/TELEPHONE NO. N/A | |

-7- (GOMEZ)

VICTIM LIST CONTINUES NEXT PAGE

76 P72SB—Prob. 19SC (Rev. 12/88) 12/88

1  PRIOR RECORD:

SOURCES OF INFORMATION (this page)
CII (10-11-89), LACO PROB DEPT RECORDS

2

3  AKA'S:   ELKEN  DE  JESUS  CASTRO  GOMEZ;  ALVARO  CASTRO  GOMEZ;  ALVARO
         GOMEZ CASTRO; ELKINS GOMEZ; ELKIN GOMEZ; EUCLIDES GOMEZ; JESSIE
4        CASTRO; ELKIN JESUS GOMEZ

5  DATES OF BIRTH:  2-27-60; 2-17-60; 2-26-60.

6  SOCIAL SECURITY NUMBERS;  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; 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.

7                  JUVENILE HISTORY:

8                  UNKNOWN.

9                  ADULT HISTORY:

10   9-26-80          SANTA ANA SO - 594 PC (MALICIOUS MISCHIEF/VANDALISM) -
11                    CASE  80CM08199  HEARD  SANTA  ANA  MUNI  COURT  ON
                      10-10-80.  CONVICTED AS CHARGED.

12   10-28-80         SANTA  ANA  SO -- 484  PC  (PETTY THEFT)  - CASE
13                    80CM09290 HEARD SANTA ANA MUNI COURT ON 11-12-80.
                      CONVICTED  484/488  PC  (PETTY  THEFT)  -  FINED.

14   3-11-83          SANTA ANA SO - WARRANT CHARGING 209(A) PC (KIDNAP
15                    FOR RANSOM), 245(A) PC (ASSAULT W/DEADLY WEAPON),
                      236  PC  (FALSE  IMPRISONMENT).    RE-ARRESTED  ON
16                    3-12-83 BY SAN FRANCISCO PD, CASE 591162 HEARD IN
                      SAN  FRANCISCO  MUNI  COURT  ON  6-15-83.    CHARGE
17                    OF 211 PC (ROBBERY) DISM IN FURTHERANCE OF JUSTICE
                      CASE  111102+05  HEARD  SAN  FRANCISCO  SUPERIOR
18                    COURT ON 7-13-83.  CONVICTED 2 CTS VIOLATION
                      236 PC (FALSE IMPRISONMENT); 28 MOS STATE PRISON
19                    1 CT;  16 MOS STATE PRISON SECOND CT;  RECEIVED
                      AT  CALIFORNIA  STATE  DEPARTMENT  OF  CORRECTIONS,
20                    ON 7-20-83 TO BEGIN TERMS FOR 236 PC (FALSE
                      IMPRISONMENT,  ARMED  WITH  FIREARM)  AND  236  PC
21                    (FALSE  IMPRISONMENT).    PAROLED  ON  8-16-84.
                      DISCHARGED ON 9-15-85.

22   7-23-87          CYPRESS  PD - 148.9(A) PC (FALSE I.D. TO PEACE
23                    OFFICER), WARRANT CHARGING 488 PC (PETTY THEFT) -
                      CASE CYW 151903P0 HEARD WESTMINISTER MUNI COURT
24                    ON 10-26-87; 148.9 PC DISM; CONVICTED NONRETAINABLE
                      OFFENSE.  PROBATION.

25

26

27

28   -8- (GOMEZ)

DEFENDANT'S STATEMENT:

ON OCTOBER 19, 1989 THE PROBATION OFFICER WENT TO INTERVIEW THE DEFENDANT IN THE ATTORNEY'S ROOM OF THE LOS ANGELES COUNTY CENTRAL JAIL AT 441 BAUCHET STREET IN THE CITY OF LOS ANGELES. HE WAS ADVISED BY THE ATTORNEY ROOM DEPUTY SHERIFF THAT THE DEFENDANT HAD STATED HE DID NOT WANT TO SPEAK TO THE PROBATION OFFICER. AFTER THE DEPUTY SHERIFF HAD SO ADVISED THE PROBATION OFFICER, THE DEFENDANT NODDED HIS HEAD IN AGREEMENT.

EVALUATION:

SURELY IT IS MORE THAN A COINCIDENCE THAT IN MARCH 1983 THE DEFENDANT WAS ARRESTED ON WARRANTS CHARGING HIM WITH VIOLATIONS OF SECTION 207(A) PENAL CODE (KIDNAPPING FOR RANSOM), 245(A) PENAL CODE (ASSAULT WITH DEADLY WEAPON), AND 236 PENAL CODE (FALSE IMPRISONMENT). THE COURT WILL RECALL THAT IN SAN FRANCISCO SUPERIOR COURT CASE 111102+05, THE DEFENDANT WAS SUBSEQUENTLY CONVICTED OF TWO CHARGES OF VIOLATION SECTION 236 PENAL CODE, WITH ONE OF THE COUNTS APPARENTLY REFERRING TO FALSE IMPRISONMENT WHILE THE DEFENDANT WAS ARMED WITH A FIREARM. IT MUST BE ASSUMED THAT THE DEFENDANT LEARNED NOTHING FROM HIS CRIMINAL JUSTICE SYSTEM EXPERIENCE. FOR THE PAST NINE YEARS THE DEFENDANT HAS REPEATEDLY COME TO THE LAW ENFORCEMENT AGENCIES THROUGHOUT OUR STATE, HAS BEEN IN JAIL AND STATE PRISON,

-12- (GOMEZ)

76C692G — PROB. 5A

1  HAS BEEN ON PROBATION AND PAROLE, AND YET HE CONTINUES TO INVOLVE

2  HIMSELF IN VIOLENT CRIMES. DUE TO THE OBVIOUS LEVEL OF DANGER

3  HE POSES TO THE COMMUNITY, IT IS RECOMMENDED THAT HE BE SENTENCED

4  TO STATE PRISON IN THIS MATTER.

5          SENTENCING CONSIDERATIONS:

6          DEFENDANT IS INELIGIBLE FOR PROBATION PURSUANT

7  TO SECTION 120(E)(2) PENAL CODE UNLESS THE COURT DETERMINES

8  THIS IS AN UNUSUAL CASE.

9          FACTORS IN AGGRAVATION:

10      1.  THE CRIME INVOLVED THE THREAT OF GREAT BODILY
            HARM.

11

12      2.  THE DEFENDANT HAS ILLEGALLY INTERFERED WITH THE
            JUDICIAL PROCESS BY GIVING FALSE NAMES AND
            FALSE DATES OF BIRTH WHEN ARRESTED.

13

14      3.  THE CRIME WAS PREMEDITATED.

15      4.  THE CRIME INVOLVED THE ATTEMPTED TAKING OF A
            LARGE SUM OF MONEY.    —

16      5.  HE HAS ENGAGED IN A PATTERN OF VIOLENT CONDUCT
            WHICH INDICATES A SERIOUS DANGER TO SOCIETY.

17

18      6.  HIS CONVICTIONS ARE NUMEROUS AND OF INCREASING
            SERIOUSNESS.

19      7.  HE HAS SERVED A PRIOR PRISON TERM.

20      FACTORS IN MITIGATION:

21      PROBATION OFFICER FINDS NO FACTORS IN MITIGATION.

22      IN VIEW OF THE AGGRAVATING FACTORS, IF PROBATION

23  IS DENIED THE HIGH-BASE TERM WOULD BE APPLICABLE. IF THE ENHANCEMENT

    -13- (GOMEZ)

1   IS FOUND TRUE, IT IS RECOMMENDED THAT THE PUNISHMENT FOR THE

2   ENHANCEMENT BE IMPOSED.

3   RECOMMENDATION:

4          IT IS RECOMMENDED THAT PROBATION BE DENIED AND

5   THAT DEFENDANT BE SENTENCED TO STATE PRISON WITH PREIMPRISONMENT

6   CREDIT OF 320 DAYS; THAT THE COURT ORDER THE DEFENDANT TO PAY

7   A RESTITUTION FINE OF $100 AS PROVIDED BY SUBDIVISION (A) OF

8   SECTION 13967 GOVERNMENT CODE, THE TOTAL AMOUNT TO INCLUDE

-14- (GOMEZ)

76C692G — PROB. 5A

1  A SERVICE CHARGE AS PROVIDED BY SUBDIVISION (D) OF SECTION

2  13967 OF THE GOVERNMENT CODE.

3  RESPECTFULLY SUBMITTED,

4  BARRY J. NIDORF
   PROBATION OFFICER

5

6  BY _____

7     DALE R. THOMAS, DEPUTY
      CENTRAL ADULT INVESTIGATIONS

8     (213) 974-3315

9
   READ AND APPROVED:                    I HAVE READ AND CONSIDERED

10                                        THE FOREGOING REPORT OF THE
                                          PROBATION OFFICER.

11

12  WILLIAM C. NIENHUIS, SDPO

13  (SUBMITTED:  10-25-89)               _____
    (TYPED:   10-27-89)                  JUDGE OF THE SUPERIOR COURT

14  DRT:ALW (6)

15       IF PROBATION IS GRANTED, IT IS RECOMMENDED THAT

16  THE COURT DETERMINE DEFENDANT'S ABILITY TO PAY COST OF PROBATION

17  SERVICES PURSUANT TO SECTION 1203.9B PENAL CODE.  COST OF

18  PRESENTENCE INVESTIGATION AND PRESENTENCE REPORT - $429.00.  COST

19  OF SUPERVISION - $28.00 PER MONTH.

20

21

22

23

    -15- (GOMEZ)

76C692G.— PROB. 5A

EXHIBIT  C

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PRISON TERMS



In the matter of the Life )
Term Parole Consideration )        CDC Number E—44776
Hearing of:              )
                         )
ELKIN GOMEZ              )
―――――――――――――――――――――――――― )

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

FEBRUARY 2, 2005

12:35 P.M.

PANEL PRESENT:

CAROL DALY, Presiding Commissioner
DENNIS SMITH, Deputy Commissioner

OTHERS PRESENT:

ELKIN GOMEZ, Inmate
MARY ANN TARDIFF, Attorney for Inmate
PATRICK SEQUEIRA, Deputy District Attorney
JOSE ZAVALA, Interpreter

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____ No         See Review of Hearing
_____ Yes        Transcript Memorandum

Cindy Walker              Capitol Electronic Reporting

ii

## INDEX

| | Page |
|---|---|
| Proceedings ................................. | 1 |
| Case Factors ................................ | 10 |
| Pre-Commitment Factors ...................... | 18 |
| Post-Commitment Factors ..................... | 31 |
| Parole Plans ................................ | 36 |
| Closing Statements .......................... | 55 |
| Recess ..................................... | 64 |
| Decision ................................... | 65 |
| Adjournment ................................. | 75 |
| Transcriber Certification ................... | 76 |

--oOo--

1

1                P R O C E E D I N G S

2          DEPUTY COMMISSIONER SMITH:  We're on the

3     record.

4          PRESIDING COMMISSIONER DALY:  Okay.  This is

5     a Subsequent Parole Consideration Hearing for Elkin

6     Gomez.  CDC number E-44776.  Date of the hearing is

7     2/2 of '05, and it is 12:35 hours.  And we are

8     located at the Correctional Training Facility at

9     Soledad.  Date received was 2/5 of 1990.  Life term

10    starts 2/5 of 1990, out of the County of Los

11    Angeles.  Offense is kidnap for extortion with use

12    of a firearm.  Case number A961451.  One count of

13    209(a) with 12022.5.  Terms are seven years to life

14    plus two years with a minimum eligible parole date

15    of 11/22 of 1995.  This hearing is going to be

16    tape-recorded and so for the purposes of voice

17    identification we will go around the room to my

18    left.  Each person is going to state their name,

19    spell the last name, and then after you have

20    spelled your last name, Mr. Gomez, give your CDC

21    number, okay.  Carl Daly, D-A-L-Y, Commissioner,

22    Board of Prison Terms.

23          DEPUTY COMMISSIONER SMITH:  Dennis Smith,

24    S-M-I-T-H, Deputy Commissioner.

25          DEPUTY DISTRICT ATTORNEY SEQUEIRA:  Patrick

26    Sequeira, S-E-Q-U-E-I-R-A, Deputy District

27    Attorney, County of Los Angeles.

2

1          ATTORNEY TARDIFF:  Mary Ann Tardiff,

2    T-A-R-D-I double F, Attorney for Mr. Gomez.

3          INMATE GOMEZ:  Elkin Gomez, G-O-M-E-Z,

4    E-44776.

5          INTERPRETER ZAVALA:  Jose Zavala,

6    Z-A-V-A-L-A, Spanish Interpreter for Mr. Gomez.

7          PRESIDING COMMISSIONER DALY:  Okay.  And

8    Mr. Zavala, will you raise your right hand so I can

9    swear you in.  Do you promise or swear that you

10   will translate to the best of your ability from

11   English to Spanish and Spanish to English?

12         INTERPRETER ZAVALA:  I do.

13         PRESIDING COMMISSIONER DALY:  And do you

14   have any personal interest in this case?

15         INTERPRETER ZAVALA:  No.

16         PRESIDING COMMISSIONER DALY:  Okay.

17   Mr. Gomez, in front of you on the table is an ADA

18   statement.  Will you read that out loud into the

19   record, please.  Can you -- You can put your

20   glasses on.  That's good.

21         INMATE GOMEZ:  Okay.  "The Americans

22              With Disabilities Act (ADA) is a law

23              to help people with disabilities.

24              Disabilities are problems that make

25              it harder for some people to see,

26              hear, breathe, talk and walk, learn,

27              think, work, or take care of

3

1          themselves that is for others.

2          Nobody can be kept out of public

3          places or activities because of a

4          disability.  If you have a disability

5          you have the right to ask for help to

6          get ready for your BPT hearing, get

7          to the hearing, talk, read forms,

8          papers, and understand the hearing

9          process.  BPT will look at what you

10         ask for to make sure that you have a

11         disability that is covered by ADA and

12         that you have asked them for the

13         right kind of help.  If you do not

14         get help or if you don't think you

15         got the kind of help you need ask for

16         a BPT 1074 Grievance Form.  You can

17         also get help to fill it out."

18         **PRESIDING COMMISSIONER DALY:**  Okay.  Do you

19    understand what the Americans With Disabilities Act

20    is all about?

21         **INMATE GOMEZ:**  Yes.

22         **PRESIDING COMMISSIONER DALY:**  Okay.  On

23    March 10th of '04, you signed Board of Prison Term

24    Form 1073 and that was a form asking you if you had

25    a disability and you indicated you did not have.

26    Is that true?

27         **INMATE GOMEZ:**  Yes.

4

1        PRESIDING COMMISSIONER DALY:  And since

2   March 10th of '04, and the current date has there

3   been any change in your medical status?

4        INMATE GOMEZ:  No.

5        PRESIDING COMMISSIONER DALY:  And it does

6   not say anything -- It says on the form that you do

7   not need help for your Parole Hearing, but we do

8   have an interpreter here to assist you in the event

9   that you are confused about anything that is being

10  said.  Okay.  So if you do need clarification on

11  anything, you know, make sure that you ask for

12  help.

13       INMATE GOMEZ:  Okay.

14       PRESIDING COMMISSIONER DALY:  Okay.  And

15  your Counselor, KL Hinely, when he prepared this

16  report, he indicated under Section Three, Letter A,

17  that no special accommodations were required for

18  you and then on the last page of the report, under

19  Section Six, Letter E, he indicated that no

20  accommodation was required for effective

21  communication, and I didn't see, I believe I saw

22  anything else in the file with regard to any ADA

23  issues.  So let me just ask you some questions.  Do

24  you have any difficulty climbing stairs or walking

25  more than 100 yards?

26       INMATE GOMEZ:  No.

27       PRESIDING COMMISSIONER DALY:  And you got to

5

1   the hearing room on your own okay?

2          INMATE GOMEZ:  Yes.

3          PRESIDING COMMISSIONER DALY:  Okay.  And I

4   need to make sure you speak up good and loud and

5   clear so we can get a good recording of this.

6   Okay.  And I see that you do wear glasses and were

7   your glasses available when you were preparing for

8   your hearing today?

9          INMATE GOMEZ:  Yes.

10         PRESIDING COMMISSIONER DALY:  Okay.  So you

11  were able to read by yourself and prepare.

12         INMATE GOMEZ:  Yes.

13         PRESIDING COMMISSIONER DALY:  And do you

14  have any hearing impairments?

15         INMATE GOMEZ:  No.

16         PRESIDING COMMISSIONER DALY:  And have you

17  ever been included in a Triple CMS or EOP program

18  in prison?

19         INMATE GOMEZ:  No.

20         PRESIDING COMMISSIONER DALY:  Do you know

21  what those programs are?

22         INMATE GOMEZ:  Yes.

23         PRESIDING COMMISSIONER DALY:  And have you

24  taken any psychotropic medication either in prison

25  or on the streets?

26         INMATE GOMEZ:  No.

27         PRESIDING COMMISSIONER DALY:  Okay.  And how

6

1    far did you get in school before coming to prison?

2         INMATE GOMEZ:  Tenth grade.

3         PRESIDING COMMISSIONER DALY:  Tenth grade?

4         INMATE GOMEZ:  Yeah.

5         PRESIDING COMMISSIONER DALY:  Okay.  So when

6    you were going to school did you have to take any

7    special education classes?

8         INMATE GOMEZ:  No.

9         PRESIDING COMMISSIONER DALY:  You didn't

10   have to have any special tutoring or anything?

11        INMATE GOMEZ:  (Inaudible.)

12        PRESIDING COMMISSIONER DALY:  Okay.  So do

13   you suffer from any disability that would prevent

14   you from participating in today's hearing?

15        INMATE GOMEZ:  No.

16        PRESIDING COMMISSIONER DALY:  Okay.  This

17   hearing is being conducted pursuant to Penal Code

18   Section 3041, 3042, and the Rules and Regulations

19   of the Board of Prison Terms governing parole

20   consideration hearings for life inmates.  Now, the

21   purpose of today's hearing is to once again

22   consider your suitability for parole.  In doing so

23   we will consider the number and the nature of the

24   crimes that you were committed for, your prior

25   criminal history, your social history, and your

26   behavior and your programming since your

27   commitment.  Now, we have had an opportunity to

7

1   review your Central File, your prior transcripts
2   are available, and you will be given an opportunity
3   to correct or clarify the record. Now, we will
4   consider your progress since your last hearing,
5   your Psychological Report, and any other
6   information that might have a bearing on your
7   suitability for parole. Any change in Parole Plans
8   needs to be brought to our attention. Now, we will
9   reach a decision today and inform you whether we
10  find you suitable for parole or not and the reasons
11  for our decision. If you are found suitable for
12  parole the length of your confinement will be
13  explained to you. Now, before we recess for
14  deliberations today the District Attorney, your
15  Attorney, and you will be given an opportunity to
16  make a final statement regarding your parole
17  suitability. Your statement will be limited to why
18  you feel you are suitable for parole at this time.
19  Once we have completed, after that we will recess,
20  do our deliberations. Once we have completed our
21  deliberations we will resume the hearing and
22  announce that decision. The California Code of
23  Regulations state that regardless of the amount of
24  time served a life inmate shall be found unsuitable
25  for and denied parole if, in the judgment of the
26  Panel, the prisoner would pose an unreasonable risk
27  to society if released from prison. Now, you have

8

1    certain rights and those rights include the right
2    to a timely notice of this hearing, the right to
3    review your Central File, and the right to present
4    relevant documents.  Counsel, do you feel your
5    client's rights have been met thus far regarding
6    this hearing?

7        ATTORNEY TARDIFF:  Yes.

8        PRESIDING COMMISSIONER DALY:  And you have
9    an additional right to be heard by an impartial
10   Panel.  Looking at the Panel seated before you
11   today, do you have any objection to either member
12   of this Panel?

13       INMATE GOMEZ:  No, I don't.

14       PRESIDING COMMISSIONER DALY:  Okay.  And you
15   will receive a -- Counsel, do you have any
16   objections?

17       ATTORNEY TARDIFF:  No, I don't.

18       PRESIDING COMMISSIONER DALY:  Okay.  You
19   will receive a copy of our written tentative
20   decision today.  The decision becomes effective
21   within 120 days.  During that time you will receive
22   another copy of the decision as well as a
23   transcript of this hearing.  Now, as of May 1st,
24   2004, there are major changes in your former right
25   to appeal Board of Prison Term decisions directly
26   back to the Board.  The old Board regulations have
27   been repealed and the current policy is entitled,

9

1    Administrative Appeals Correspondence and

2    Grievances Concerning Board of Prison Terms

3    Decisions, and you can find it in the prison law

4    library.  Now, you are not required to admit to

5    your offense nor are you required to discuss your

6    offense here today.  However, the Panel does accept

7    as true the findings of the court.  Do you

8    understand what that means?

9        INMATE GOMEZ:  Yes.

10        PRESIDING COMMISSIONER DALY:  Okay.  Do we

11    have any confidential material to be used today?

12        DEPUTY COMMISSIONER SMITH:  No.

13        PRESIDING COMMISSIONER DALY:  Okay.  And I

14    passed the Hearing Checklist.  Counsel, did you

15    have all those documents?

16        ATTORNEY TARDIFF:  Yes, Commissioner.

17        PRESIDING COMMISSIONER DALY:  And District

18    Attorney, do you have all those documents?

19        DEPUTY DISTRICT ATTORNEY SEQUEIRA:  Yes,

20    I've received them all.  Thank you.

21        PRESIDING COMMISSIONER DALY:  Okay.  And do

22    you have any additional documents to be submitted,

23    Counsel?

24        ATTORNEY TARDIFF:  I submitted some and we

25    have some letters of support, Parole Plans that

26    will be interpreted today.

27        PRESIDING COMMISSIONER DALY:  Okay.  Very

10

1  good.  And any preliminary objections?

2      ATTORNEY TARDIFF:  No.

3      PRESIDING COMMISSIONER DALY:  And is

4  Mr. Gomez going to be speaking with us?

5      ATTORNEY TARDIFF:  Yes.

6      PRESIDING COMMISSIONER DALY:  Okay.  Raise

7  your right hand so I can swear you in.  Do you

8  solemnly swear or affirm testimony you give at the

9  hearing today will be the truth, the whole truth,

10  and nothing but the truth?

11      INMATE GOMEZ:  I do.

12      PRESIDING COMMISSIONER DALY:  Okay.  Taking

13  the summary of facts as they're kind of spelled out

14  in the current Board Report.  This crime occurred

15  on December 10th of 1987, at approximately 1830

16  hours.  You and two other defendants met with the

17  victim, a William Mikus, M-I-K-U-S, for the purpose

18  of extorting 82,000 dollars from him relative to a

19  drug-related debt incurred by Mikus approximately a

20  year earlier to a Claudia Baron, B-A-R-O-N.

21  Claudia Baron was a known cocaine smuggler and

22  trafficker.  Mikus was an informant for the Federal

23  Bureau of Investigation.  The prisoner forced Mikus

24  to drive him to his home to obtain the money.

25  Although Gomez made statements showing initiative

26  and freedom of action, he was enlisted primarily

27  for the purpose of interpreting as is reflected per

11

1    transcript from an electronic listening device on
2    the person of Mr. Mikus.  While in route, Mikus
3    escaped and Gomez fled on foot upon being pursued
4    by an FBI agent in a surveillance vehicle.  Gomez
5    was arrested one week later by the West Covina
6    Police Department and charged with kidnapping.
7    Mr. Gomez, in looking at the commitment offense,
8    and I've read the Probation Officer's Report, were
9    you involved with your two crime partners in
10   deciding that you were going to start extorting
11   money from people?
12        INMATE GOMEZ:  No, there's another guy in
13   the crime, Tony Govan.  He testified against us so
14   he make a deal with the DA.  Luis Cardona called
15   Tony Govan.  He came from the, Luis Cardona came
16   from New York to collect some money, drug money, so
17   he called Tony Govan and Tony Govan called me.  And
18   Bill Mikus, he owed some money for drugs and he got
19   to do the collection, Luis Cardona.
20        PRESIDING COMMISSIONER DALY:  So why did you
21   get involved with this?
22        INMATE GOMEZ:  Tony Govan called me and he
23   asked me for, you know, before he asked me for
24   interpreter.  He told me nothing about collect
25   money.  He says he just want to explain to him
26   about the money or the drugs he owed.  In the
27   beginning he never told me about nothing.  After,

12

1  you know, the day we got met with this guy he told
2  me he would give you the money but you got to take
3  this guy to the house so he can get the money from
4  his house.

5          PRESIDING COMMISSIONER DALY:  Okay.  So I
6  guess I'm a little bit confused about how you get
7  involved in all this.  It was simply because your
8  crime partner wanted you to interpret for him?  Did
9  you know they were going to ask him for all this
10 money?

11         INMATE GOMEZ:  Yes, I knew.

12         PRESIDING COMMISSIONER DALY:  Okay.  How
13 many other people were you going to be collecting
14 money from?

15         INMATE GOMEZ:  No, just he had just told me
16 that Bill Mikus.

17         PRESIDING COMMISSIONER DALY:  Was it in --
18 Did they in fact have a whole bunch of people lined
19 up that they were going to take money from or try
20 to collect?

21         INMATE GOMEZ:  That's why they take -- Yes,
22 Tony Govan sent Cora.  She got a few guys
23 (indiscernible) were into drugs.

24         PRESIDING COMMISSIONER DALY:  Okay.  So did
25 you know that before you agreed?

26         INMATE GOMEZ:  No, I don't know about those
27 guys before.

13

1    PRESIDING COMMISSIONER DALY:  You didn't

2  know about them before.

3    INMATE GOMEZ:  No.

4    PRESIDING COMMISSIONER DALY:  Okay.  Did you

5  know that the money was to be collected for illegal

6  drugs?

7    INMATE GOMEZ:  Yes, Ma'am.

8    PRESIDING COMMISSIONER DALY:  And when did

9  you know that?

10    INMATE GOMEZ:  This was day before.

11    PRESIDING COMMISSIONER DALY:  Okay.  So he

12  said that he needed to collect money from somebody.

13    INMATE GOMEZ:  Yeah, he owed 82,000 for

14  selling drugs.

15    PRESIDING COMMISSIONER DALY:  For selling

16  drugs.

17    INMATE GOMEZ:  He buy some drugs for that

18  Claudia Baron.

19    PRESIDING COMMISSIONER DALY:  Okay.  So what

20  did you think was going to happen when you went

21  over there?

22    INMATE GOMEZ:  I think he go get the money.

23  In the beginning when he told me there's nothing

24  wrong.  I just, you know, told this guy get the

25  money.  That's nothing big.  When he came over

26  there he said you know what, we asked you already

27  to get for the money he don't want to give up.  So

14

1  this guy if you don't give us the money there's

2  other things in his house, we can get the money

3  from his house.

4        PRESIDING COMMISSIONER DALY:  Did you

5  realize that was going to be a kidnapping?

6        INMATE GOMEZ:  Yes, Ma'am.

7        PRESIDING COMMISSIONER DALY:  So you knew at

8  the time you were doing it that it was going to be

9  in violation of the law?

10       INMATE GOMEZ:  Yes.

11       PRESIDING COMMISSIONER DALY:  So why did you

12  continue to participate in the crime?

13       INMATE GOMEZ:  Stupid.

14       PRESIDING COMMISSIONER DALY:  How much money

15  were you going to get for it?

16       INMATE GOMEZ:  He never told me he was going

17  to give me some money.  In the beginning he never

18  told me, but he was going to give me some money.

19  He said he'll pay me.

20       PRESIDING COMMISSIONER DALY:  But how much

21  was he going to pay you to interpret?

22       INMATE GOMEZ:  He never told me how much.

23       PRESIDING COMMISSIONER DALY:  He didn't tell

24  you very much?

25       INMATE GOMEZ:  No, he didn't tell me how

26  much.

27       PRESIDING COMMISSIONER DALY:  He did not

15

1    tell you how much money he was going to pay you.

2        INMATE GOMEZ:  No, he don't.

3        PRESIDING COMMISSIONER DALY:  So why did you

4    agree to work for somebody if you didn't know how

5    much money you were going to get?

6        INMATE GOMEZ:  I don't know.  Stupid.

7        PRESIDING COMMISSIONER DALY:  Okay.  So then

8    you get there, and you're fully aware now that

9    they're kidnapping him because they're forcing him

10    to go from one place to another to try to get the

11    money, and so you don't back out at that point,

12    either.

13        INMATE GOMEZ:  No, we was in his car

14    already.  We was in his car.  He's driving, Bill

15    Mikus.  We told him in the car about the money.  He

16    say I got the money in the house.  That's what he

17    said.  So we said, okay, then go to your house.

18    Well, we don't know he working in the DA.  We

19    (indiscernible) at the time.

20        PRESIDING COMMISSIONER DALY:  Okay.  So, did

21    your crime partner make an appointment with him?

22        INMATE GOMEZ:  Yeah, Claudia Baron.  She

23    made an appointment with him.

24        PRESIDING COMMISSIONER DALY:  Janet Varon?

25        INMATE GOMEZ:  Claudia.

26        ATTORNEY TARDIFF:  Claudia.

27        PRESIDING COMMISSIONER DALY:  Claudia Baron.

16

1    Okay, Claudia Janet Baron made the appointment with

2    him to go over there and collect the money.  So he

3    knew you were coming.

4        INMATE GOMEZ:  No, he don't know.  She -- He

5    owed the money to her or to her husband, and she

6    called (indiscernible) Mr. Cardona and told him,

7    you know, that we meet in Woodland Hills.

8        PRESIDING COMMISSIONER DALY:  All right.  So

9    the prearrangement and everything was with all the

10   crime partners but not with Mr. Mikus.  He didn't

11   know you were coming.

12       INMATE GOMEZ:  No, he don't know.  He don't

13   know.  He met with Claudia Baron so he don't know

14   nothing about us.

15       PRESIDING COMMISSIONER DALY:  Okay.  So, how

16   do you get in the car with him?

17       INMATE GOMEZ:  I was in another car.  Me and

18   Mike was in his car with Tony Govan and Mr. Cardona

19   called me, hey, get ready.  So I go inside of his

20   car and I explain to (indiscernible) when he saw,

21   when this guy came for the money he owes to Claudia

22   Baron, and I explained to them that to me what

23   happened about the money.

24       PRESIDING COMMISSIONER DALY:  Okay.  So then

25   what happens?  He doesn't have the money there.

26       INMATE GOMEZ:  No, he said, we drove the car

27   and he say, you know, I don't have the money.

17

1    Somebody else has the money his apartment.   And we

2    asked him where this apartment.   He says in the

3    house.   We says okay, let's go the house to get the

4    money.

5         ATTORNEY TARDIFF:   So how did you -- How did

6    he end up -- When you first met Mikus was in the

7    car.

8         INMATE GOMEZ:   In his car.   He was driving.

9         ATTORNEY TARDIFF:   His car and what were

10   they going to meet at some point like at a --

11        INMATE GOMEZ:   No, he was in a restaurant

12   with Claudia Baron.

13        ATTORNEY TARDIFF:   He was in the restaurant.

14        INMATE GOMEZ:   He drove Claudia Baron to her

15   car and then that's when (indiscernible).

16        ATTORNEY TARDIFF:   Okay.   So and then you

17   were going to go to his house to get the money.

18        INMATE GOMEZ:   Yeah.   He jumped in the car.

19        PRESIDING COMMISSIONER DALY:   Okay.   So then

20   when he gets out of the car why do you run off?

21        INMATE GOMEZ:   No, he jumped and run.

22        PRESIDING COMMISSIONER DALY:   Okay.   He

23   jumps and runs.

24        INMATE GOMEZ:   Yeah, and that time the FBI

25   come behind us and put the light on so we run.

26        PRESIDING COMMISSIONER DALY:   Why did you

27   run?   I mean you were only interpreting.

18

1          INMATE GOMEZ:  Yeah, we know we making, we

2    committing a crime.

3          PRESIDING COMMISSIONER DALY:  Well, you

4    obviously went into it knowing it was going to be a

5    wrong thing to do.

6          INMATE GOMEZ:  Yeah, in the beginning.

7          PRESIDING COMMISSIONER DALY:  Okay.  Is

8    there anything else?  I mean in all the hearings

9    that you've had is there anything else that you

10   think is important to put on the record about the

11   facts?

12         INMATE GOMEZ:  No, Ma'am.

13         PRESIDING COMMISSIONER DALY:  Nothing else?

14         INMATE GOMEZ:  No, no, Ma'am.

15         PRESIDING COMMISSIONER DALY:  All right.

16   Juvenile record.  You have no record as a juvenile.

17         INMATE GOMEZ:  No.

18         PRESIDING COMMISSIONER DALY:  And were you

19   living in Colombia?

20         INMATE GOMEZ:  Yes.

21         PRESIDING COMMISSIONER DALY:  Okay.  When

22   did you come to the United States?

23         INMATE GOMEZ:  In 1979.

24         PRESIDING COMMISSIONER DALY:  So then about

25   a year later you get into trouble and you get

26   arrested.

27         INMATE GOMEZ:  Yes.

19

1          PRESIDING COMMISSIONER DALY:  In Santa Ana

2    for malicious mischief and vandalism.  You got

3    convicted and then you had another petty theft

4    conviction.  What did you vandalize?  What did you

5    do?

6          INMATE GOMEZ:  I broke a window.

7          PRESIDING COMMISSIONER DALY:  For what?

8          INMATE GOMEZ:  An apartment window.

9          PRESIDING COMMISSIONER DALY:  Why did you do

10   that?

11         INMATE GOMEZ:  We was playing soccer outside

12   and I kicked the ball over there.

13         PRESIDING COMMISSIONER DALY:  Okay.  So it

14   wasn't, well, it says vandalism so did you do it on

15   purpose?

16         INMATE GOMEZ:  No, we got everyone, the

17   security guard and they called the police.

18         PRESIDING COMMISSIONER DALY:  All right.

19   Then on your petty theft what did you steal?

20         INMATE GOMEZ:  I don't remember that.

21         PRESIDING COMMISSIONER DALY:  You don't

22   remember.  Okay.  San Francisco Municipal Court,

23   kidnapping for ransom and assault with a deadly

24   weapon and false imprisonment.  Robbery was

25   dismissed and you were convicted on two counts of

26   false imprisonment and you got 44 months state

27   prison and discharged September '85 from parole.

20

1   What was that one about?

2       INMATE GOMEZ:  That's related to drugs too.

3       PRESIDING COMMISSIONER DALY:  Related to

4   drugs too?

5       INMATE GOMEZ:  Yes.

6       PRESIDING COMMISSIONER DALY:  All right.  So

7   tell me, how was it related to drugs?

8       INMATE GOMEZ:  The people owed some money

9   for drugs too.

10      PRESIDING COMMISSIONER DALY:  Are you an

11  enforcer?

12      INMATE GOMEZ:  No, Ma'am.  I let these

13  people use my house in Orange County, and they had

14  two ladies in the house they said they owed some

15  money, so when the police came they take everybody

16  and they're picking up (indiscernible) to false

17  imprisonment.

18      PRESIDING COMMISSIONER DALY:  So they think

19  that you were holding the two ladies against their

20  will?

21      INMATE GOMEZ:  Yeah.

22      PRESIDING COMMISSIONER DALY:  And were you?

23      INMATE GOMEZ:  No, I wasn't in the house.

24  When my house was in my name they went through my

25  name.

26      INMATE GOMEZ:  So where you were at the

27  time?

21

1        INMATE GOMEZ:  I was on my way in another

2   apartment, somewhere else in Orange County.

3        PRESIDING COMMISSIONER DALY:  So why did you

4   get arrested on?

5        INMATE GOMEZ:  I (indiscernible) nothing for

6   extortion.  That's the charge.  But they reduced it

7   to false imprisonment.

8        PRESIDING COMMISSIONER DALY:  I know.  But

9   why were you charged with it?

10       ATTORNEY TARDIFF:  What he wants to know --

11  She -- Why were you picked up on that?

12       INMATE GOMEZ:  Well, because with them, you

13  know, they used my house.  The house in my name.

14  They know I was with them, the police.

15       PRESIDING COMMISSIONER DALY:  Okay.  Were

16  you with them?

17       INMATE GOMEZ:  Yes.

18       PRESIDING COMMISSIONER DALY:  So you were

19  part of?

20       INMATE GOMEZ:  I was part of it.

21       PRESIDING COMMISSIONER DALY:  Did you

22  falsely detain them?  I mean did you keep them from

23  going anywhere, the two women?

24       INMATE GOMEZ:  No.

25       PRESIDING COMMISSIONER DALY:  Okay.  You

26  went to prison over that.

27       INMATE GOMEZ:  Yes, Ma'am.

22

1    PRESIDING COMMISSIONER DALY:  All right.

2    Then we have -- You had a --

3    DEPUTY COMMISSIONER SMITH:  Excuse me.  May

4    I interject with a question?

5    PRESIDING COMMISSIONER DALY:  Yes.

6    DEPUTY COMMISSIONER SMITH:  You said that

7    the apartment was in Orange County?

8    INMATE GOMEZ:  Yes.

9    PRESIDING COMMISSIONER DALY:  He was living

10   in Orange County with his wife when this crime

11   occurred.

12   DEPUTY COMMISSIONER SMITH:  And this

13   occurred in San Francisco.

14   INMATE GOMEZ:  Yeah.

15   PRESIDING COMMISSIONER DALY:  Yeah, in San

16   Francisco.

17   INMATE GOMEZ:  No, the ladies they live in

18   San Francisco and they take us to San Francisco

19   Court from this county.

20   PRESIDING COMMISSIONER DALY:  Okay.  But

21   they were detained at your place in Orange?

22   INMATE GOMEZ:  In a house in Orange County.

23   PRESIDING COMMISSIONER DALY:  In Orange

24   County.  So the original charge was kidnapping so

25   they thought that you had illegally taken them,

26   removed them from San Francisco to -- so the crime

27   initiated in San Francisco.

23

1        INMATE GOMEZ:  In San Francisco, yes.

2        PRESIDING COMMISSIONER DALY:  So who took

3    them from San Francisco?

4        INMATE GOMEZ:  The guys (indiscernible) the

5    house.

6        PRESIDING COMMISSIONER DALY:  Okay.  Were

7    you with them when they took the females from San

8    Francisco?

9        INMATE GOMEZ:  I was in San Francisco with

10   them, but you know, I don't drive the car with

11   them.  I don't come with them.

12       PRESIDING COMMISSIONER DALY:  You're always

13   in the car behind.

14       INMATE GOMEZ:  No, I was in a plane.

15       PRESIDING COMMISSIONER DALY:  Okay.  So were

16   you aware they were going to take these women from

17   San Francisco?

18       INMATE GOMEZ:  No.

19       PRESIDING COMMISSIONER DALY:  Did that

20   clarify it for you?

21       DEPUTY COMMISSIONER SMITH:  Uh—hmm, to an

22   extent.

23       PRESIDING COMMISSIONER DALY:  Okay.  Then

24   you have false identification to a peace officer

25   and that's dismissed and a petty theft.  You were

26   convicted and then we have the current offense,

27   kidnapping with firearm.  Anything else you've been

24

1   arrested for?

2       INMATE GOMEZ:  No, Ma'am.

3       PRESIDING COMMISSIONER DALY:  Okay.  In

4   looking at your social history you have no history

5   of alcohol or drugs?

6       INMATE GOMEZ:  No.

7       PRESIDING COMMISSIONER DALY:  You've never

8   used them.

9       INMATE GOMEZ:  No, Ma'am.

10      PRESIDING COMMISSIONER DALY:  Did the people

11  that you run with, were they using alcohol and

12  drugs?

13      INMATE GOMEZ:  Some, a little bit.

14      PRESIDING COMMISSIONER DALY:  Okay.  You

15  know, I just need to go back to that crime in San

16  Francisco.  Why did those women end up down in LA?

17  What was the purpose for them being down there?

18      INMATE GOMEZ:  I don't know them.  They said

19  they had business in Long Beach.  They live in San

20  Francisco, but they had business in Long Beach.

21      ATTORNEY TARDIFF:  The women?

22      INMATE GOMEZ:  The women, yeah.

23      ATTORNEY TARDIFF:  So they voluntarily left

24  San Francisco?

25      INMATE GOMEZ:  Yeah, they left to Long

26  Beach.

27      ATTORNEY TARDIFF:  With these other guys?

25

1    INMATE GOMEZ:  Yeah, they had business

2    together, drug business.

3    ATTORNEY TARDIFF:  Drug business?

4    INMATE GOMEZ:  Yeah.  (Indiscernible) came

5    from Colombia and I involved him so they had some

6    business.

7    PRESIDING COMMISSIONER DALY:  Okay.  To what

8    extent have you been involved in the drug smuggling

9    or selling or transporting of drugs?

10    INMATE GOMEZ:  Excuse me.

11    PRESIDING COMMISSIONER DALY:  Have you been

12    involved in the transporting or selling of drugs?

13    INMATE GOMEZ:  Not selling, in some way I

14    used to work for the people, yes.

15    PRESIDING COMMISSIONER DALY:  In

16    transporting?

17    INMATE GOMEZ:  Yes.

18    PRESIDING COMMISSIONER DALY:  So explain

19    that to me.  When did you first get involved in

20    transporting or selling drugs?

21    INMATE GOMEZ:  Early '80's.

22    PRESIDING COMMISSIONER DALY:  Was that right

23    after you came to the United States?

24    INMATE GOMEZ:  Yes.

25    PRESIDING COMMISSIONER DALY:  What was your

26    reason for coming to the United States?

27    INMATE GOMEZ:  In the beginning, you know,

26

1   working.

2          PRESIDING COMMISSIONER DALY:   Okay.  So how

3   did you get involved with the drugs?

4          INMATE GOMEZ:  I met some people here and

5   one day they give me a card and told me to drive a

6   car somewhere they pay me some money.

7          PRESIDING COMMISSIONER DALY:  Did you know

8   it was full of drugs?

9          INMATE GOMEZ:  Yes.

10          PRESIDING COMMISSIONER DALY:  Okay.  And you

11   decided to do it anyway.

12          INMATE GOMEZ:  Yes.

13          PRESIDING COMMISSIONER DALY:  So was it good

14   money?

15          INMATE GOMEZ:  Yes.

16          PRESIDING COMMISSIONER DALY:  How much money

17   do you think you were making by transporting drugs?

18          INMATE GOMEZ:  At that time they give me

19   2,000 dollars.

20          PRESIDING COMMISSIONER DALY:  That's pretty

21   good money.

22          INMATE GOMEZ:  Yes.

23          PRESIDING COMMISSIONER DALY:  Taking a risk

24   of driving a car with drugs in it.  You get stopped

25   then you know you're going to go to jail.  How many

26   times did you do that?

27          INMATE GOMEZ:  About four or five times.

.27

1    PRESIDING COMMISSIONER DALY:  Okay.  So you

2  got paid each time.  And you weren't using, but you

3  were transporting it for other people to buy.

4    INMATE GOMEZ:  Yes.

5    PRESIDING COMMISSIONER DALY:  Do you have

6  any idea what drugs do to people's lives?

7    INMATE GOMEZ:  At that time, no.  I know

8  now.

9    PRESIDING COMMISSIONER DALY:  Okay.  So four

10  or five times you actually transported drugs and so

11  you don't think anything about going along on this

12  crime to interpret because you've been involved in

13  part of it all along, right?  You've been doing it.

14    INMATE GOMEZ:  Yes.

15    PRESIDING COMMISSIONER DALY:  Okay.  In

16  looking at your social factors, you grew up in

17  Colombia?

18    INMATE GOMEZ:  Yes.

19    PRESIDING COMMISSIONER DALY:  And it says

20  you completed the sixth grade while you were in

21  Colombia.  Is that equivalent to finishing school

22  there?

23    INMATE GOMEZ:  No.

24    PRESIDING COMMISSIONER DALY:  Okay.  So why

25  did you only go to the sixth grade?

26    INMATE GOMEZ:  I started working for my

27  father, and his business.

28

1    PRESIDING COMMISSIONER DALY:  What were you

2    doing?

3         INMATE GOMEZ:  My father has a business over

4    there vegetables and fruits.

5         INTERPRETER ZAVALA:  Wholesale.

6         INMATE GOMEZ:  Wholesale, yeah.

7         PRESIDING COMMISSIONER DALY:  Wholesale?

8         INMATE GOMEZ:  Yes.

9         PRESIDING COMMISSIONER DALY:  Okay.  So you

10   were working for your father.  So you had worked

11   for him quite a while before you came to the United

12   States.

13        INMATE GOMEZ:  Yes.

14        PRESIDING COMMISSIONER DALY:  How old were

15   you when you came to the United States?

16        INMATE GOMEZ:  I was 18.

17        PRESIDING COMMISSIONER DALY:  Okay.  So you

18   had a good job.  Did you have a fairly good home?

19        INMATE GOMEZ:  Yes, Ma'am.

20        PRESIDING COMMISSIONER DALY:  And so you

21   decide to leave and come to the United States.

22        INMATE GOMEZ:  Yes.

23        PRESIDING COMMISSIONER DALY:  And you're

24   illegal.

25        INMATE GOMEZ:  Yes.

26        PRESIDING COMMISSIONER DALY:  Okay.  So tell

27   me about your family.  Have you been married?

29

1    INMATE GOMEZ:  Yes, I'm married right now.

2    PRESIDING COMMISSIONER DALY:  And you have

3    children?

4    INMATE GOMEZ:  Two.

5    PRESIDING COMMISSIONER DALY:  And where are

6    they?

7    INMATE GOMEZ:  They're here in LA.

8    PRESIDING COMMISSIONER DALY:  Okay.  And how

9    are they doing?

10   INMATE GOMEZ:  They doing all right.  I have

11   a 22-year old and a 13-year old.

12   PRESIDING COMMISSIONER DALY:  Okay.  Are

13   either one of them in trouble with the law or use

14   drugs?

15   INMATE GOMEZ:  No.

16   PRESIDING COMMISSIONER DALY:  Okay.  And do

17   they visit or anything?

18   INMATE GOMEZ:  Yes, they visit.

19   PRESIDING COMMISSIONER DALY:  Okay.  So what

20   kind of support do you have in Colombia?

21   INMATE GOMEZ:  My father he still got the

22   business over there and I have my father's house

23   too.  I got letters over there for support.  And I

24   have some job offers too.

25   PRESIDING COMMISSIONER DALY:  Okay.  You've

26   not ever used alcohol or drugs, and you were

27   working and you came here.  And you must have got

30

1    involved in the transporting of drugs right away

2    after you got into the United States.

3         INMATE GOMEZ:  No, two years after I came.

4    Two years after.

5         PRESIDING COMMISSIONER DALY:  Okay.  Because

6    you were arrested in 1980, so I guess maybe '83,

7    anyway when you pick up this crime in '87 you've

8    been involved in them four or five times.

9         INMATE GOMEZ:  Yes, Ma'am.

10        PRESIDING COMMISSIONER DALY:  Okay.  Were

11   there ever guns involved?

12        INMATE GOMEZ:  In this crime?

13        PRESIDING COMMISSIONER DALY:  Uh-hmm.

14        INMATE GOMEZ:  Yes, Ma'am.

15        PRESIDING COMMISSIONER DALY:  And how about

16   the other crimes when you were transporting?

17        INMATE GOMEZ:  No.

18        PRESIDING COMMISSIONER DALY:  Did you ever

19   carry a gun yourself?

20        INMATE GOMEZ:  No, never.

21        PRESIDING COMMISSIONER DALY:  So you never

22   felt a need to protect yourself?

23        INMATE GOMEZ:  No.

24        PRESIDING COMMISSIONER DALY:  Okay.  Is

25   there anything else that you want to say about the

26   crime or your background or anything that I haven't

27   covered?  Because I know you did a lot more after