# EXHIBIT C
# Part 3 of 4

31

1    you came into prison, so we're going to talk about

2    that now.

3                INMATE GOMEZ:  No.

4                PRESIDING COMMISSIONER DALY:  Okay.  Let's

5    look at Post—Conviction.

6                DEPUTY COMMISSIONER SMITH:  Mr. Gomez, you

7    were received by the Department of Corrections on

8    February the 5th of 1990.  Received here at CTF on

9    May the 8th of 1996.  You have a classification

10   score of 19.  Your last hearing, which was your

11   sixth subsequent hearing was postponed on

12   September 28th of last year.  The prior full

13   hearing that you had was held on July the 31st of

14   2003, and you received a one—year denial at that

15   time.  Since you've been incarcerated you've

16   received two CDC 128(a)s, one in August of '90 for

17   failing to honor a ducket and in December of '93

18   for disobeying orders.  And you've received two CDC

19   115s, one in March of 1990 for manufacturing inmate

20   alcohol.  There was about two gallons.  And the

21   second 115 was in February of 1998 for possession

22   of contraband and that was some TV sets and other

23   electronic materials.  Now, the Board Report that

24   I've referred to is dated February of '04, so it's

25   12—months old today.

26               ATTORNEY TARDIFF:  It's actually August.

27   Signed.  The caption on the bottom says February,

32

1    but the counselor dated it August 17th of '04.

2         PRESIDING COMMISSIONER DALY:  And the top of

3    the Board Report says July of '04.

4         DEPUTY COMMISSIONER SMITH:  So the report is

5    any one of three dates.

6         ATTORNEY TARDIFF:  Take your pick.

7         DEPUTY COMMISSIONER SMITH:  In any case, I'm

8    going to go through and basically refer to the

9    information that we have here and I'll give, I want

10   you to pay, the reason I'm saying this I want you

11   to pay close attention so that anything that I've

12   missed or things that I've, you've done positively

13   since this time whatever this time may be, I want

14   you to be able to fill in for us.  All right.

15        INMATE GOMEZ:  Okay.

16        DEPUTY COMMISSIONER SMITH:  You've received

17   numerous laudatory Chronos for your participation

18   in AA and NA, and you're still participating?

19        INMATE GOMEZ:  Yes, I do.

20        DEPUTY COMMISSIONER SMITH:  Okay.  You

21   received a laudatory Chrono in September of 2004

22   from Correctional Officer Valencia,

23   V-A-L-E-N-C-I-A, regarding your assignment and

24   you're working with her in the Receiving and

25   Release Program.  And that was from 1996 to 2002.

26   And then were you assigned to a porter after that?

27        INMATE GOMEZ:  Yes.

1       DEPUTY COMMISSIONER SMITH:  And currently

2  you're working in the janitorial?

3       INMATE GOMEZ:  Yes.

4       DEPUTY COMMISSIONER SMITH:  And we've got a

5  work report that's dated January of '04, when you

6  were assigned and the period that's addressed is

7  June to September '04, and you received above

8  average marks at that time.  And you're still

9  assigned to that title?

10       INMATE GOMEZ:  Yes, I got a ducket today for

11  Receive and Release, a job change.

12       DEPUTY COMMISSIONER SMITH:  So you're going

13  to be going back to Receiving and Release.

14       INMATE GOMEZ:  Yeah.

15       DEPUTY COMMISSIONER SMITH:  Okay.  You

16  completed the health care course in August of 2004.

17  And indicates that you had participated in

18  vocational data processing.  Are you still

19  participating in that program or have you moved?

20       INMATE GOMEZ:  No, I'm finished.

21       DEPUTY COMMISSIONER SMITH:  You completed

22  it?

23       INMATE GOMEZ:  Yeah, I completed.

24       DEPUTY COMMISSIONER SMITH:  When did you

25  complete it?

26       INMATE GOMEZ:  I think I completed it about

27  a couple of years ago.

34

1          DEPUTY COMMISSIONER SMITH:  Okay.  So around

2   2003, sometime in that.

3          INMATE GOMEZ:  Yeah, 2003.

4          DEPUTY COMMISSIONER SMITH:  Is that

5   completion; is that a full vocational

6   certification?

7          INMATE GOMEZ:  Yeah, I got a certificate

8   (indiscernible).

9          DEPUTY COMMISSIONER SMITH:  Okay.  Now

10  besides the items I've mentioned and I'm going to

11  refer to this informational Chrono that's dated

12  January of 2005, indicates that you successfully

13  completed a series of lectures entitled, How to

14  Become a Father and Not Get Angry.  And that's

15  sponsored by the Muslim Development Center.  Are

16  there any other activities that you've been

17  involved in that I haven't addressed that we should

18  be aware of?

19          INMATE GOMEZ:  No.  That's it.

20          DEPUTY COMMISSIONER SMITH:  Okay.

21          INMATE GOMEZ:  September (indiscernible) I

22  completed 2002.  (Indiscernible.)

23          DEPUTY COMMISSIONER SMITH:  This is a

24  certificate of completion in Information

25  Technologies dated September of 2002.  So was this

26  addressed at your prior hearing?  Do you recall?

27          INMATE GOMEZ:  Yes.

35

1    DEPUTY COMMISSIONER SMITH:  Okay.  And part

2    of the reason I ask that is that there were, you

3    know, some other items that should have been

4    addressed at your prior hearing that I didn't bring

5    up, but I appreciate you bringing that forward.  I

6    referred to the Psychological Evaluation that's

7    dated October the 19th of 2004, and that evaluation

8    was prepared by Dr. Howlin, H-O-W-L-I-N, and in

9    that report the doctor indicates that, you know,

10   this document is identified as an updated

11   Psychological Evaluation that was prepared on

12   October the 19th of '04; however, other than

13   reading primarily like a Board Report it refers us

14   to the Psychological Evaluation prepared by

15   Dr. Reed, R-E-E-D, from 1999.  So going back to

16   that document, which contains the date of 6/28/99,

17   under assessment of dangerousness, Dr. Reed wrote

18   that your violence potential within a controlled

19   setting is considered to be significantly below

20   average relative to the Level Two inmate population

21   and that you're considered to have a significantly

22   below average violence potential, again, relative

23   to that population.  Doctor further wrote that if

24   released to the community your violence potential

25   would be considered to be no more than the average

26   citizen in the community and that there did not

27   appear to be any risk factors that may be

36

1   precursors to violence.  Under observations and
2   recommendations, Dr. Reed wrote that you're
3   competent and responsible through your behavior.
4   You have the capacity to abide by institutional
5   standards and have largely done so by most of your
6   incarceration period.  You do not have a mental
7   disorder, which would necessitate treatment either
8   during a further incarceration period or on parole
9   and that you do not have a history of substance
10  abuse and no further treatment is suggested in this
11  area.  Referring back to the Correctional
12  Counselor's Report with varying dates, under your
13  Parole Plan it indicates that, at least at that
14  time and whatever that time is, you would intend on
15  living with your wife, Gloria Gomez, and your two
16  children, Catherine and Jonathan in Bell Gardens,
17  California.  Is that still current?  Is that still
18  accurate?
19        INMATE GOMEZ:  Yeah, they still live there
20  but I'm going back to Colombia.  Immigration is
21  going to send me back.
22        DEPUTY COMMISSIONER SMITH:  Okay.  Yeah, you
23  have a US INS Hold so you go back to Colombia and
24  this indicates that going back to Colombia that
25  your wife and children would go with you, is that
26  correct?
27        INMATE GOMEZ:  Yes.

37

1        DEPUTY COMMISSIONER SMITH:  And is that

2   still accurate?

3        INMATE GOMEZ:  Yes, that's still the plan,

4   yeah.

5        DEPUTY COMMISSIONER SMITH:  Okay.  And then

6   it indicates that you've been assured of a viable

7   position of employment with your family in the food

8   distribution business, that's the wholesale

9   vegetable business.

10        INMATE GOMEZ:  Yes.

11        DEPUTY COMMISSIONER SMITH:  And that -- And

12   your father has that.  How old is your father?

13        INMATE GOMEZ:  Seventy-eight.

14        DEPUTY COMMISSIONER SMITH:  Okay.  Still

15   active in that business?

16        INMATE GOMEZ:  My brother -- My big

17   brother's, he's (indiscernible) but he's retired

18   now.

19        ATTORNEY TARDIFF:  I think his parents are

20   here now, right?  Your parents live in the United

21   States now don't they?

22        INMATE GOMEZ:  Yeah, they live in Monrovia

23   right now, yeah.

24        ATTORNEY TARDIFF:  And the brother runs the

25   business down in Colombia.

26        DEPUTY COMMISSIONER SMITH:  And that's Marco

27   Regaria?  Your brother's name?

38

1      INMATE GOMEZ:  No, Antonio.  There is --
2  This is another job offer.  (Indiscernible.)
3      DEPUTY COMMISSIONER SMITH:  So that's a
4  different job offer.
5      INMATE GOMEZ:  Yeah, a different job offer.
6      DEPUTY COMMISSIONER SMITH:  Okay.  It also
7  indicates that you've been offered employment at
8  Osaka Imports in Colombia, a dealership for
9  Japanese import vehicles.
10      INMATE GOMEZ:  Yes.  Rivera Osaka, that's
11  the same (indiscernible), my father's friends.
12      DEPUTY COMMISSIONER SMITH:  Okay.  There are
13  a number of letters in the Board packet.  One is
14  dated May of 2004 from Adario Gomez.  Is that a
15  male or a female?
16      INMATE GOMEZ:  It's a male.
17      DEPUTY COMMISSIONER SMITH:  Okay.  And that
18  indicates that -- The letter says that to keep your
19  faith and spirit and that it's unjust that persons
20  who are honest, responsible, hard working, and
21  loyal to waste their lives incarcerated.  Is he
22  aware of your commitment offense?
23      INMATE GOMEZ:  What's that?
24      DEPUTY COMMISSIONER SMITH:  Is he aware of
25  your commitment offense?
26      INMATE GOMEZ:  Yes.
27      DEPUTY COMMISSIONER SMITH:  So it's a

39

1   supportive letter.  There's a letter from Umberto

2   Rosario Rios.  That's May of 2000.  Indicates that

3   they're doing well and sad because they desire you

4   to be in their presence and that when you return

5   they will offer help, support, and friendship.  A

6   letter of April 2004 from Ron Berrio, B—E—R—R—I—O,

7   and this indicates that you had communicated with

8   an AA group in Medellin, Colombia regarding

9   information about their program at that location,

10  so you consider to continue to participate in AA

11  after you parole?

12          INMATE GOMEZ:  Yes.  I write to New York, to

13  AA, and they give me the address of Ron Berrio if

14  he runs a program there in Colombia about AA and

15  NA.

16          DEPUTY COMMISSIONER SMITH:  Okay.  There's

17  also a letter from Juan Berrio.  Is that the same

18  individual?

19          INMATE GOMEZ:  Yes.

20          DEPUTY COMMISSIONER SMITH:  Yeah, same

21  individual.  That letter's dated January of '04,

22  and that letter invites you to work in that

23  company.  What is that company?

24          INMATE GOMEZ:  It's the same as the

25  vegetables (indiscernible).

26          DEPUTY COMMISSIONER SMITH:  Vegetable

27  (indiscernible).  That's different from the company

40

1   that your brother is operating.

2      INMATE GOMEZ:  Yes, no, different company

3   but the same -- they have the same thing.

4      DEPUTY COMMISSIONER SMITH:  They do the same

5   thing it's just a different company.

6      INMATE GOMEZ:  The same thing, yeah.

7      PRESIDING COMMISSIONER DALY:  And that's a

8   letter to re—invite so they've offered you Parole

9   Plans that (indiscernible) to work?

10      INMATE GOMEZ:  Yes.

11      ATTORNEY TARDIFF:  Because he wanted to have

12   letters dated the same as the Board Report.

13   Different months.

14      DEPUTY COMMISSIONER SMITH:  And there's a

15   letter September of 2003 and that's the letter from

16   New York regarding Alcoholics Anonymous.

17      INMATE GOMEZ:  Yeah, I just want to -- I

18   write to them and they write back to me.

19      DEPUTY COMMISSIONER SMITH:  Right.  And

20   there's a copy of the letter that you wrote as

21   well, and also a third letter from Ron Juan Berrio

22   indicating that, once again, you have contacted,

23   communicated the AA group in Medellin, Colombia.

24   We also send out what are known as 3042 Notices and

25   those are letters that go out to the various

26   criminal justice agencies that were involved in

27   your commitment offense.  We didn't receive any

41

1    responses back to those notices.  Of course, we do

2    have a representative from Los Angeles District

3    Attorney's Office who'll be participating in the

4    hearing shortly.  In addition, I understand that

5    you provided a number of other letters that are

6    written in Spanish, so at this time I'll ask

7    Mr. Zavala if he would translate those letters for

8    us.

9          INTERPRETER ZAVALA:  The first one is dated

10   January 24th --

11         DEPUTY COMMISSIONER SMITH:  Mr. Zavala, if I

12   may I'm going to interrupt you and turn the tapes

13   over so I don't interrupt right in the middle.

14         (Thereupon, the tape was turned over.)

15         DEPUTY COMMISSIONER SMITH:  Thank you, sir.

16         INTERPRETER ZAVALA:  The first one is dated

17   January 24th, 2005.  The letterhead is from Hotel

18   Macedonia Plaza.  The letter's addressed to El

19   (indiscernible) Jesus Castro.

20              "Cordial greeting.  I hereby remind

21              you that you have -- that our doors

22              are open for you to carry out work in

23              the perimeters of the hotel.  You

24              have earned this privilege due to

25              your excellent performance, your high

26              sense of responsibility, and honesty

27              that you have shown during your stay

42

1      in this company.  We await your

2      return and be able to count with your

3      services."

4  Signed Carlos Mejias (phonetic).  The other letter

5  is dated December 30th, 2004, addressed to Mr.

6  Elkin De Jesus Gomez Castro.  Letterhead is La Casa

7  Del Ajo (phonetic) means house of garlic.

8      "Received an affectionate Christmas

9      greeting and hoping that next will

10     bring much prosperity and abundance.

11     Let this be the opportunity to again

12     offer you my support and remind you

13     that my doors to my company will

14     always be open.  Firstly, in knowing

15     you from experience and on a

16     commercial and a work level, our

17     relationship has been the best.  We

18     are waiting that you solve your

19     problems so we can receive you here,

20     receive you as a friend with our open

21     arms.  Keep up the good spirit and

22     may God's blessings be with you in

23     your solution.  Remember that there's

24     a helping hand that you can count

25     with."

26  Signed by Dario Ducas (phonetic) Gomez, General

27  Manager.  The third letter is, letterhead is

43

1    (indiscernible) Santa Clara, dated January 22nd,

2    2005, addressed to inmate Elkin Gomez Castro.

3            "First of all received cordial

4            greeting for those who await you here

5            in Colombia.  We would like to remind

6            you that because of your good

7            performance during the time that you

8            worked for our company the doors are

9            open and waiting your arrival so you

10           can continue with the job you had

11           before when you were here.  We hope,

12           as we hope you are, willing to come

13           back to work for our entity because

14           we need people like you to strengthen

15           a good growth."

16    Signed Malisio Antonio Sal Daviera (phonetic),

17    Manager.

18            DEPUTY COMMISSIONER SMITH:  Thank you.

19            PRESIDING COMMISSIONER DALY:  Okay.  Now is

20    the opportunity for Panel members to ask questions.

21    Did you go back and read your prior Board Reports?

22    Have you read the transcripts from your prior Board

23    Reports?

24            INMATE GOMEZ:  No.

25            PRESIDING COMMISSIONER DALY:  You haven't

26    done that.

27            ATTORNEY TARDIFF:  You mean from the

44

1    hearings?

2         PRESIDING COMMISSIONER DALY:  Yes, from the

3    hearings.  The transcripts.  Okay.

4         INMATE GOMEZ:  I really up to when they get

5    it.

6         PRESIDING COMMISSIONER DALY:  We asked you

7    today did you have a gun at all during this last

8    crime that you were arrested for?

9         INMATE GOMEZ:  Not on my body, but we had

10   our guns in the car.

11         PRESIDING COMMISSIONER DALY:  All right.  So

12   were there machine guns?

13         INMATE GOMEZ:  A machine gun, a shotgun, and

14   a pistol.  Three guns.

15         PRESIDING COMMISSIONER DALY:  And it was in

16   the same car you were in?

17         INMATE GOMEZ:  Yeah, it was in a Beamer,

18   yeah, in the car.

19         PRESIDING COMMISSIONER DALY:  Okay.  Because

20   I know that there was questions about that before

21   as to whether or not you, I meant, you had the guns

22   in the car.  What would you have done if you'd had

23   to use a gun?

24         INMATE GOMEZ:  We never talk about using

25   guns.  Those guns was in the van behind.

26         PRESIDING COMMISSIONER DALY:  So what was

27   the purpose of having those guns in the car?

45

1    INMATE GOMEZ: Well, I don't know the driver

2    bring those guns. We never talked about that

3    (indiscernible).

4    PRESIDING COMMISSIONER DALY: Okay.

5    ATTORNEY TARDIFF: So you had no intentions

6    of using any guns.

7    INMATE GOMEZ: No, no. We never talked

8    about using guns. The guns were all the way in the

9    car.

10    PRESIDING COMMISSIONER DALY: But you knew

11    when you went to work for these people that you

12    were going to interpret for drug collections.

13    INMATE GOMEZ: Yes, I know.

14    PRESIDING COMMISSIONER DALY: Okay. Just

15    going back to the 1997, your Parole Board Report

16    and looking on page two, and this is Correctional

17    Officer Tucker, and in summary and I think this is

18    probably that's kind of what we were looking at

19    today, your supervisors are very impressed with

20    your work efforts. You get a lot of good reports.

21    While incarcerated in a confined and controlled

22    environment, he has demonstrated that he can

23    program efficiently. However, when not

24    incarcerated he has demonstrated a consistent life

25    of crime and had been on probation and parole and

26    continued to involve himself in violent crimes. So

27    I guess my question to you, when you went to prison

46

1    for a crime when you get out why did you continue

2    to violate the law?

3              INMATE GOMEZ:  I don't know.  I'm just

4    stupid.  I was young.  I was a youngster.

5              PRESIDING COMMISSIONER DALY:  So what has

6    changed?  I mean why would it be any different, I

7    mean you come in --

8              INMATE GOMEZ:  I have changed.  I'm an old

9    man now.

10             PRESIDING COMMISSIONER DALY:  How old are

11   you?

12             INMATE GOMEZ:  Forty-five.

13             PRESIDING COMMISSIONER DALY:  That's young.

14             INMATE GOMEZ:  I know it's young, not old

15   but.

16             PRESIDING COMMISSIONER DALY:  All right.

17   So, I meant you went to prison once before and you

18   got out and you got involved again.  So you were

19   never in any trouble when you in Colombia?

20             INMATE GOMEZ:  No.

21             PRESIDING COMMISSIONER DALY:  I mean

22   obviously all of these people thought very highly

23   of you.  They've opened their homes and their

24   businesses for you to come back and work for them,

25   so tell me why did you get involved in crime and

26   get arrested and go to jail and go to prison, and

27   then come to prison a second time when you're in

1    the United States?

2          INMATE GOMEZ:  I think money, easy money is

3    (indiscernible).

4          PRESIDING COMMISSIONER DALY:  So what would

5    happen if you got out and you needed easy money?

6          INMATE GOMEZ:  I got a family now.  At that

7    time I really don't have family.  I just -- I was a

8    (indiscernible).  I don't think.

9          PRESIDING COMMISSIONER DALY:  Did you marry

10   after you came into prison?

11         INMATE GOMEZ:  Yes, I married in 1990.

12         PRESIDING COMMISSIONER DALY:  And how did

13   you meet your wife?

14         INMATE GOMEZ:  We met before I go to jail.

15         PRESIDING COMMISSIONER DALY:  Okay.  So she

16   married you after you came to prison and you have

17   your two children.

18         INMATE GOMEZ:  I have one.

19         PRESIDING COMMISSIONER DALY:  Okay.  The 11—

20   year old is yours.

21         INMATE GOMEZ:  Thirteen.

22         PRESIDING COMMISSIONER DALY:  Thirteen now.

23   Okay.  And the older one is hers from a previous

24   marriage?

25         INMATE GOMEZ:  No, no, it's mine too but

26   with another woman.

27         PRESIDING COMMISSIONER DALY:  Okay.  All

48

1   right.  So you'll have a lot of responsibility.

2   And you think having a family would keep you

3   straight?  But you were dating, you know, you were

4   serious about somebody before you came into prison.

5           INMATE GOMEZ:  Yeah, but you know now I got

6   a lot.  My family is waiting for me.  I got all the

7   support all these years.

8           PRESIDING COMMISSIONER DALY:  Why didn't you

9   go back to Colombia after you got arrested and went

10  to prison the first time?  Were you illegal at that

11  time?

12          INMATE GOMEZ:  Yes.

13          PRESIDING COMMISSIONER DALY:  They didn't

14  deport you.

15          INMATE GOMEZ:  Yes, they do.

16          PRESIDING COMMISSIONER DALY:  Why did you

17  come back?

18          INMATE GOMEZ:  I come back.

19  (Indiscernible.)

20          PRESIDING COMMISSIONER DALY:  Okay.  Do you

21  have any questions?

22          DEPUTY COMMISSIONER SMITH:  Yes, just a

23  couple of questions.  You -- When did you come to

24  the United States the first time?

25          INMATE GOMEZ:  In 1978.

26          DEPUTY COMMISSIONER SMITH:  1978.  And then

27  you were deported back.

49

1          INMATE GOMEZ:  Yeah, in '85.

2          DEPUTY COMMISSIONER SMITH:  Okay.  And how

3    long were you in Colombia that time?

4          INMATE GOMEZ:  I think a year.

5          DEPUTY COMMISSIONER SMITH:  About a year.

6          INMATE GOMEZ:  A year, yeah.

7          DEPUTY COMMISSIONER SMITH:  So you came back

8    to the United States in '86 roughly?

9          INMATE GOMEZ:  Yeah.

10          DEPUTY COMMISSIONER SMITH:  So the people

11    that have written you letters haven't had any

12    personal contact with you in nearly 20 years, is

13    that right?

14          INMATE GOMEZ:  Yes, almost 20 years.

15          DEPUTY COMMISSIONER SMITH:  And they're

16    experience with your work ethic is at least that

17    long ago.

18          INMATE GOMEZ:  Not this time, before I came

19    to prison.

20          DEPUTY COMMISSIONER SMITH:  When you were,

21    what, 18 years old?

22          INMATE GOMEZ:  Yeah, I was 18 years.

23          DEPUTY COMMISSIONER SMITH:  If you were

24    paroled how and deported why -- what reasons would

25    we have not to think that you wouldn't come back

26    illegally again?

27          INMATE GOMEZ:  I don't -- I have -- I

50

1  change, I grow up now.  I see life different now.

2  Money is not important to me now.

3      DEPUTY COMMISSIONER SMITH:  But you're going

4  to have your family with you that's going to need

5  to be supported.

6      INMATE GOMEZ:  Yeah, but I got job offers so

7  I can support them.

8      DEPUTY COMMISSIONER SMITH:  Why do we not

9  have a letter from your wife supporting parole?

10      INMATE GOMEZ:  Yeah, it's there.  You read

11  that.

12      DEPUTY COMMISSIONER SMITH:  Is that a letter

13  that I referred to?  Now, this letter is dated, it

14  is from Gloria Gomez and it's dated February of

15  2003.

16      ATTORNEY TARDIFF:  Yes.  And his last

17  hearing was July of '03.  You need new letters

18  every time, you know.  You got a newer one than

19  that?

20      INMATE GOMEZ:  I thought (indiscernible).

21      ATTORNEY TARDIFF:  Yeah, it says 2003 on

22  that letter.

23      DEPUTY COMMISSIONER SMITH:  Counsel, I'll

24  slide this back.

25      INMATE GOMEZ:  Yeah, but she updated it.

26      ATTORNEY TARDIFF:  Updated on 2/5/04.

27      INMATE GOMEZ:  Yeah, that's what's on my BPT

51

1    in July last year.

2         ATTORNEY TARDIFF:  And it's her signature on

3    it.  She just resubmitted the same letter.

4         INMATE GOMEZ:  This was supposed to be on my

5    Board hearing in July last year and we postponed to

6    November.

7         DEPUTY COMMISSIONER SMITH:  Okay.  This

8    letter indicates that she lives in Bell Gardens,

9    that you have numerous verifiable employment offers

10   in Los Angeles although we don't have any of those.

11   She does indicate that her family is planning to

12   relocate to Colombia where your father has a

13   produce distribution business and that's the long—

14   term goal.  And she indicates that she believes

15   that you'd be a model parolee if given the

16   opportunity.  Thank you.  I have no other

17   questions.

18        PRESIDING COMMISSIONER DALY:  District

19   Attorney, questions?

20        DEPUTY DISTRICT ATTORNEY SEQUEIRA:  I have a

21   couple of questions.  First of all, you have a

22   daughter that's already in high school or past high

23   school, is that correct?

24        INTERPRETER ZAVALA:  She's in 11th, but my

25   son's in high school.  He finished high school.

26        DEPUTY DISTRICT ATTORNEY SEQUEIRA:  How old

27   is your daughter?

52

1        INMATE GOMEZ:  Thirteen.

2        DEPUTY DISTRICT ATTORNEY SEQUEIRA:  Don't

3   you have an older daughter?

4        INMATE GOMEZ:  No.  A son, Jonathan.

5        DEPUTY DISTRICT ATTORNEY SEQUEIRA:  And how

6   old is he?

7        INMATE GOMEZ:  Twenty-two.

8        DEPUTY DISTRICT ATTORNEY SEQUEIRA:  So you

9   had the son was how old when you were arrested for

10  this kidnapping?

11       INMATE GOMEZ:  Yeah, I have a son then.

12       DEPUTY DISTRICT ATTORNEY SEQUEIRA:  And how

13  old was he then?

14       INMATE GOMEZ:  Five.

15       DEPUTY DISTRICT ATTORNEY SEQUEIRA:  And did

16  you think about your family back then when you

17  began involved with the drug cartel?

18       INMATE GOMEZ:  No, I (indiscernible).  I

19  just (indiscernible).

20       DEPUTY DISTRICT ATTORNEY SEQUEIRA:  You're

21  saying you didn't work for a drug cartel?

22       INMATE GOMEZ:  No.

23       DEPUTY DISTRICT ATTORNEY SEQUEIRA:  And you

24  were involved in transporting drugs, is that

25  correct?

26       INMATE GOMEZ:  Yes.

27       DEPUTY DISTRICT ATTORNEY SEQUEIRA:  And you

53

1   were also involved in selling drugs too.

2          INMATE GOMEZ:  No, I never sold.

3          DEPUTY DISTRICT ATTORNEY SEQUEIRA:  Back in

4   -- You didn't admit at a prior hearing that you

5   were also involved, and this is back on 1995, at a

6   hearing on that date did you tell the Panel then

7   that you'd worked for a Colombian drug dealer for

8   three years and that you occasionally sold kilos

9   and quantities of cocaine.

10         INMATE GOMEZ:  Selling?

11         DEPUTY DISTRICT ATTORNEY SEQUEIRA:  Yes, and

12  transporting.

13         INMATE GOMEZ:  Transporting, yeah, but not

14  selling.

15         DEPUTY DISTRICT ATTORNEY SEQUEIRA:  You

16  didn't tell the Panel back in '93, that you

17  occasionally once in a while sold kilos of cocaine?

18         INMATE GOMEZ:  No.

19         DEPUTY DISTRICT ATTORNEY SEQUEIRA:  Now this

20  weapon, did you ever tell anyone that you would

21  carry an UZI during the kidnapping?

22         INMATE GOMEZ:  No.

23         DEPUTY DISTRICT ATTORNEY SEQUEIRA:  Did you

24  own an UZI?

25         INMATE GOMEZ:  No, I don't.

26         DEPUTY DISTRICT ATTORNEY SEQUEIRA:  Now you

27  also were going to collect some other debts from a

54

1  few other people too, isn't that correct?

2       INMATE GOMEZ:  We never discuss that about

3  that.  They say in court after that I went to court

4  and there were no more collections.

5       DEPUTY DISTRICT ATTORNEY SEQUEIRA:  But you

6  didn't get a chance to do those other collections

7  because you got arrested in this case.  Is that

8  right?

9       INMATE GOMEZ:  They never said to me nothing

10  about that.

11       DEPUTY DISTRICT ATTORNEY SEQUEIRA:  Okay.

12  Did you ever tell the police that you were going to

13  collect some other debts from a few other people?

14       INMATE GOMEZ:  No.

15       DEPUTY DISTRICT ATTORNEY SEQUEIRA:  After

16  you were deported the first time how did you come

17  back to the United States?

18       INMATE GOMEZ:  Through Mexico.

19       DEPUTY DISTRICT ATTORNEY SEQUEIRA:  You just

20  walked back in?

21       INMATE GOMEZ:  Yes.

22       DEPUTY DISTRICT ATTORNEY SEQUEIRA:  And when

23  you came back you came back to continue working for

24  these drug dealers, is that right?

25       INMATE GOMEZ:  No, when I came back I just

26  started working in one of the things

27  (indiscernible) me to do.

55

1      DEPUTY DISTRICT ATTORNEY SEQUEIRA:  The

2   first kidnapping, it was the same drug dealers that

3   were involved in the first kidnapping as the second

4   one, is that correct?

5      INMATE GOMEZ:  No, a different person,

6   different people.

7      DEPUTY DISTRICT ATTORNEY SEQUEIRA:

8   Different drug dealers?

9      INMATE GOMEZ:  Yeah, different.

10     DEPUTY DISTRICT ATTORNEY SEQUEIRA:  So how

11  many different drug dealers did you work for?

12     INMATE GOMEZ:  Two different people.

13     DEPUTY DISTRICT ATTORNEY SEQUEIRA:  I have

14  no further questions.

15     PRESIDING COMMISSIONER DALY:  Counsel, do

16  you have any questions?

17     ATTORNEY TARDIFF:  No.

18     PRESIDING COMMISSIONER DALY:  District

19  Attorney, go to closing.

20     DEPUTY DISTRICT ATTORNEY SEQUEIRA:  Thank

21  you.  I would ask the Panel to find this inmate

22  unsuitable for parole.  It's quite clear from all

23  the records and also from his statements at this

24  hearing that he was heavily involved in the drug

25  trade not just as lower-level player but actually

26  someone of some substance and significance.  I know

27  that at previous hearings he's admitted to not only

56

1   transporting drugs but also to selling kilos of

2   cocaine occasionally.  He was involved in the early

3   offense, his first kidnapping offense, which was

4   also -- which he also has minimized in terms of his

5   involvement, but clearly he was a major player in

6   that as well.  He was sent to prison for 44 months

7   for that offense.  He immediately was deported to

8   Colombia and eight months later he is back in the

9   United States.  I noticed also in his -- he's used

10   numerous aka's.  I think he has nine different

11   aka's, three different date of births, two

12   different Social Security numbers, all of these

13   indicative of somebody not only is in the country

14   illegally but who is involved in illegal

15   activities.  With regards to whether he was armed

16   during the commission of the second kidnapping he,

17   in fact, admitted himself in the transcripts that

18   he was armed with an UZI, an UZI was found at his

19   residence and there were eyewitnesses plus an FBI

20   agent who all testified at his trial that he was in

21   possession of an UZI.  In fact, he was convicted of

22   personally using a firearm during the commission of

23   the offense, which all clearly points out the fact

24   that this inmate minimizes and continues to

25   minimize over the years and basically to lie about

26   his involvement in the offense.  I also note in the

27   Probation and Sentencing Report on page four, he

57

1    told police officers that this was just one of

2    several collections that he was going to make.

3    Another debt was to, this is on page four, the

4    first collection was from William Mikus, the victim

5    in this case.  Other debts to be included,

6    collected included 26,000 dollars from a Vietnam

7    Veteran known as The Jew, over three million

8    dollars from a black man, approximately 192,000

9    from a Colombian named Javier, and 31,000 from a

10    cousin of Javier's.  Clearly, this puts this inmate

11    and his crime partners in the role of enforcers,

12    and it's somewhat ridiculous to think that no one

13    was going to be harmed if they didn't come up with

14    the money.  And I might also point out that one of

15    his other crime partners in this case was also,

16    Mr. Diegos, was also involved in another kidnapping

17    case with similar facts.  It's not the case that

18    this individual was involved in but it's clear that

19    these are the group of enforcers.  These are the

20    people, this inmate and his companions, are the

21    ones who go out and collect money from drug dealers

22    and drug sellers who don't pay their debts.

23    Clearly, he is unsuitable for parole.  He poses a

24    danger to society.  There's no guarantee that if he

25    is released he will go to Colombia first and then

26    come back and continue his involvement with the

27    drug cartel despite his claims now that he has

58

1   family.  He had a family back in 1987 when this

2   crime occurred and that did not deter him from

3   making the easy money by being involved in the drug

4   trade.  And I would ask the Panel to find him

5   unsuitable for parole at this time.  Thank you.

6          PRESIDING COMMISSIONER DALY:  Counsel,

7   closing.

8          ATTORNEY TARDIFF:  Thank you.  In terms of

9   the commitment offense there is, I guess this was

10  at the preliminary hearing, let me make sure I got

11  that, and it involved testimony by the informant

12  that was the one that set up this whole deal on

13  this particular case.  It says when they asked him

14  what, if anything, did Mr. Gomez say with respect

15  to his initial involvement with an individual known

16  to him as Nacho, and the answer was he had been

17  approached by this individual to act as an

18  interpreter when they were going to attempt to make

19  some collections for Tito Espinoza.  And apparently

20  Mr. Gomez also indicated who the other individuals

21  were that were involved at the, at this kidnapping

22  case.  So apparently he turned in some individuals.

23  The witness said, yes, that he had filled out an

24  FBI form used to reduce to writing any interviews

25  or events that occurred.  And then I believe he may

26  be testifying that Mr., okay, this is the defense

27  attorney, that Mr. Gomez implicated one or both of

59

1   the other co—defendants in this matter.  So

2   apparently Mr. Gomez was cooperative with the

3   police and investigators on this crime and that

4   report indicates to me that he was, in fact, hired

5   to do the interpreting.  In either event, he has

6   been incarcerated on this crime, has served 15

7   years for kidnap for extortion.  His minimum

8   eligible parole date was almost, going to be going

9   on five years ago.  His pre—incarceration history,

10  his criminal is not the best, that's obvious, but

11  it seems as if before he came to the United States

12  he had a good social structure.  He was going to

13  school, working, and once again, coming to the

14  United States, I guess, for this quick money is

15  what draws some of these people, but apparently he

16  was a law—abiding citizen before that.  He has

17  received very favorable Board and Psych Evals.  As

18  was indicated, he's a well—liked inmate.  His most

19  current Board Report gives him a low degree of

20  threat.  He has matured physically and mentally and

21  has displayed responsibility in a controlled

22  environment, programmed in a positive manner, could

23  now complete the third trade in computer data

24  processing, receives positive reports from a long

25  work history within the Department.  He does not

26  have any substance abuse charges in his arrest

27  history.  He shows remorse for his life crime.  He

60

1   has expressed sorrow for his victims.   Gomez is

2   persistent on change and it appears that he is not

3   the same person he was in 1987.   A combination of

4   the above factors as well as support letters from

5   family and friends could point Gomez in the

6   direction of a successful parole.   His '03

7   Counselor's Report also states a low degree of

8   threat, states I have dealt with Gomez quite

9   extensively over the past year, and I believe that

10   Gomez has put forth the necessary effort to

11   increase his probability of a successful parole.

12   He has complied with the Board's recommendation by

13   remaining disciplinary free as well as continuing

14   his participation in AA and NA.   He's matured

15   greatly while taking full responsibility for his

16   crime as well as showing deep remorse.   In speaking

17   with Gomez's work supervisors and unit housing

18   staff, it is apparent that Gomez has developed

19   exceptional work skills while maintaining a good

20   rapport with staff and inmates alike.   This writer

21   believes that Gomez has a good Parole Plan and has

22   built a solid foundation during his incarceration

23   in order to set himself up for successful parole if

24   found suitable by the Board.   And his '02

25   Counselor's Report is also supportive of release.

26   Low to moderate.   That he's programmed in an

27   exceptionally positive manner.   He has minimal

61

1    history with weapons but did demonstrate a somewhat
2    escalating pattern of criminality.  This
3    incarceration may have served to be a timely
4    culmination of his actions and necessary to just
5    stop and cool his heels.  He has related genuine
6    remorse for his life crime and also for his general
7    path that resulted in prison.  He expressed sorrow
8    for all his victims.  His eyes have opened to their
9    plight through personal reflection and attendance
10   at such groups like the Impact Program.  He is
11   totally focused on succeeding upon release and
12   values his family at a greatly enhanced level.  And
13   concludes by saying, one can never change the past
14   but it does not always pave the way for
15   particularly map future.  Gomez is insistent on
16   change and maintains he is not the same person he
17   was in '87 and is in hope of an appropriate release
18   date.  And his Psych Evals from '95 have also been
19   very favorable and supportive.  His '95 Psych Eval
20   states that if he is released violence potential
21   outside a controlled setting, which in the past has
22   been considered to be above average, at present it
23   is estimated to be about average or lower due to
24   his maturation and being in a controlled setting.
25   And his '97 Psych Eval is also supportive stating
26   that again another laudatory Chrono from a
27   correctional officer, or he spoke with the writer,

62

1    Dr. Terrini, T—E—R—R—I—N—I, and he states that this
2    inmate is well adjusted and respectful and one of
3    the few inmates that Officer Valdez has written a
4    positive Chrono for in his 17 years of CDC service.
5    This writer believes this man is ready to be
6    paroled.  His violent potential is estimated to be
7    below average relative to this inmate population.
8    And in '99 he also received a good psych, which is
9    referred to in the most current.  Prognosis is very
10   good especially if he's deported to Colombia.  He
11   has a high GAF score of 90.  And in assessing,
12   well, it says basically that his current level of
13   insight and judgment specifically regarding the
14   commitment offense are good and support a positive
15   prediction of successful adaptation to community
16   living.  He's demonstrated understanding regarding
17   the circumstances leading to the commitment offense
18   and he appears to be repentant for his criminal
19   acts and his empathy for the victims appear to be
20   appropriate.  And then under assessment of
21   dangerousness he goes into the negatives and the
22   positives.  The negatives obviously are as an adult
23   and it goes through his criminal history as well as
24   his two 115s as opposed to the other factors, which
25   are no juvenile crime record.  He has received no
26   disciplinaries for violent behavior.  In light of
27   these factors he is considered to have a

63

1   significant below average violence potential

2   relative to inmate Level Two population and no more

3   than the average citizen out in the community and

4   there are no risk factors.  And that same

5   assessment is incorporated into the most recent one

6   so we have almost 10 years of cleared Psych Evals

7   and his Board Reports are very favorable.  I guess

8   the concern would be, you know, he's been

9   incarcerated before, he's been released, and he's

10  come back.  He's been deported back to Colombia.

11  He's come back.  And I think that the point I guess

12  I'd like to make is when the inmates are asked to

13  participate in all of the self-help and do all this

14  work that's so that they can change their outlook,

15  change the way they deal with things, and that's

16  the whole point of it is that they're not thinking

17  the same way that they were before, and I think in

18  fact his record shows Mr. Gomez has, in fact, taken

19  these self-help courses and programs and it has

20  changed him.  And he's not the same person that was

21  incarcerated before and came back in.  Since then,

22  it's obviously been a much longer incarceration,

23  and I am sure that you do not participate at this

24  level of programming as he has on this commitment

25  offense, and I believe that's why the Board

26  requires that they do these things so that they do

27  change, and so that they're no longer an

64

1  unreasonable risk of danger. So I believe that

2  Mr. Gomez, if he is not found suitable, be only

3  given a one—year denial based on his positive

4  programming. Thank you.

5          PRESIDING COMMISSIONER DALY: Okay.

6  Mr. Gomez, this is your opportunity to make a

7  statement with regard to why you're suitable for

8  parole at this time or you can let it rest with

9  what was just submitted by your Attorney.

10          INMATE GOMEZ: I'll just let it rest.

11          PRESIDING COMMISSIONER DALY: Okay. We're

12  going to recess for deliberations. It's 1350.

13                    R E C E S S

14                    --o0o--

15

16

17

18

19

20

21

22

23

24

25

26

27

65

CALIFORNIA BOARD OF PRISON TERMS

D E C I S I O N

1

2

3    DEPUTY COMMISSIONER SMITH:  We're on the

4    record.  Everyone previously identified is back in

5    the room.

6        PRESIDING COMMISSIONER DALY:  Okay.  The

7    Panel has reviewed all of the information received

8    from the public and relied on the following

9    circumstances in concluding the prisoner is not yet

10   suitable for parole and would pose an unreasonable

11   risk of danger to society or a threat to public

12   safety if released from prison.  You know, the

13   offense was carried out in an extremely callous

14   manner that no thought was given to this victim or

15   the subsequent victims that were targeted for

16   collection of their drugs as to the effect that

17   this was going to have on them, and several victims

18   aside from this one were targeted for collection of

19   drug debts and the prisoner was to be a part of

20   those.  The offense was carried out in a calculated

21   manner in that the prisoner went into this

22   arrangement with the full knowledge that these were

23   drug collections, and the motive for the crime was

24   extremely trivial in relation to the offense in

25   that the sole purpose for the prisoner becoming

26   involved in the collection of these drug debts was

27   ELKIN GOMEZ  E-44776   DECISION PAGE 1   2/2/05

66

1    just to make money.  These conclusions are drawn

2    from the Statement of Facts wherein the prisoner,

3    on 12/10 of '87, along with two other defendants,

4    met with the victim, William Mikus, for the purpose

5    of extorting 82,000 dollars from him relative to a

6    drug-related debt incurred by Mikus approximately a

7    year earlier, and the money was owed to a Claudia

8    Baron who was arranging for this drug collection.

9    She was a known cocaine smuggler and trafficker.

10   And the prisoner forced Mikus to drive them to his

11   home to obtain the money.  There were weapons that

12   were involved in this situation.  It just happened

13   that the victim was able to escape, and the FBI was

14   in hot pursuit and everybody had scattered and the

15   victim was picked up about a week later.  The

16   prisoner has a record of violence because of past

17   crimes.  He has an escalating pattern of criminal

18   conduct, and he failed to profit from society's

19   previous attempts to correct his criminality, and

20   those attempts included a prior prison term and

21   parole.  He has an unstable -- Actually, his

22   background as far as being raised in Colombia would

23   appear to have been stable.  He professes, and it

24   is apparently clear in the record, that he has

25   never used alcohol or drugs, but he does have prior

26   criminal behavior of Santa Ana Municipal Court,

27   ELKIN GOMEZ  E-44776    DECISION PAGE 2    2/2/05

67

1    malicious mischief and vandalism, which he was

2    convicted and then he had a petty theft he was

3    convicted of, and in San Francisco he has a

4    previous kidnapping for ransom, assault with a

5    deadly weapon, false imprisonment. The robbery was

6    dismissed and the final conviction was on two

7    counts of false imprisonment, and he was sentenced

8    to 44 months in state prison, and he was discharged

9    on September 15th of 1985. And then in 1987 he had

10   false identification to a peace officer. That was

11   dismissed. Then a petty theft conviction and then

12   in January of '90, convicted of the current

13   commitment offense, kidnapping with firearms. The

14   prisoner has actually been programming quite well,

15   has not been a disciplinary problem for the

16   institutional staff. It is noted that he has only

17   had two 128(a) counseling Chronos, one in 1990 and

18   one in 1993. And he's had two 115s, one in 1990,

19   inmate manufactured alcohol and one in February of

20   '98, for possession of unauthorized contraband, and

21   he was found guilty of both of those. The

22   Psychiatric/Psychological Report dated 10/19 of

23   '04, by Dr. Howlin, is just sort of an update

24   synopsis of a report. There's nothing negative in

25   the report. It does refer back to the '99 report

26   and that report also was positive. The prisoner's

27   **ELKIN GOMEZ  E-44776    DECISION PAGE 3    2/2/05**

68

1   Parole Plans, I think for both of the Panel members

2   what we want to see from your Parole Plans is that

3   we want very specifically as to what your job is

4   going to be, and how much money you're going to be

5   making at any of those job offers that you have

6   been given because certainly the reason you left

7   before when you had these really good jobs was to

8   come to the United States to make more money.  And

9   they don't really give us an idea at all as to, you

10  know, what your benefits are going to be, whether

11  they're going to be full-time, whether or not it's

12  going to be a livable wage for you, and especially

13  in light of the fact that you were deported before

14  and then you came back to the United States to make

15  money again when all these same job opportunities

16  were available to you.  Hearing Panel notes that

17  responses to 3042 Notices indicate an opposition to

18  a finding of parole suitability specifically from

19  the District Attorney of Los Angeles County who was

20  present at the hearing today.  You know, other

21  information bearing on suitability, I have to tell

22  you, Mr. Gomez, when I was working this up last

23  night I made a lot of notes and I was reading what

24  the counselors had to say and what the doctors had

25  to say, and I thought you are probably looking

26  pretty good for a parole date, and then you came in

27  ELKIN GOMEZ   E—44776    DECISION PAGE 4   2/2/05

69

1    today and I, quite frankly, was so confused by your

2    presentation.  I was dismayed at having to pull

3    information from you.  I do not feel you were

4    forthright.  I don't feel that you've been totally

5    honest with us here today, and when you look back

6    at the other hearing, the hearing Panel in '02,

7    Deputy Commissioner Filangeri said, I'm upset

8    because I don't think you're being completely

9    truthful with us.  And he's the first one that set

10   me off and it put me on not a matter of whether you

11   remember what was said in the hearing, when this

12   Panel and the other members ask you what happened

13   they expect you to be truthful and be truthful with

14   your recollection of what happened during the

15   incident and not to what you testified in court.

16   And then he goes on to say that you fully admitted

17   that you'd been hired to interpret for these

18   collections and they were clearly drug collections

19   and that you were going to be paid handsomely for

20   it, but as I asked you today how much money you

21   were going to get you didn't know.  So you took the

22   job and you didn't know how much money you were

23   going to get, and I'm looking at 1980 when you came

24   to the United States within a year you're involved

25   in collecting and running drugs.  So I don't know

26   whether you had been contacted in Colombia to come

27   ELKIN GOMEZ  E-44776   DECISION PAGE 5   2/2/05

70

1    and do this, but you get over here and you're

2    involved in a whole lot more than you're willing to

3    say to us, and for the type of drugs that these

4    people were collecting for, I mean this is major,

5    major drug dealing.  This isn't the kind of a drug

6    dealing that they just walk in on a street corner

7    and ask somebody to interpret for them.  I mean you

8    had known them from before, but I can only imagine

9    that there had to be a whole more history with

10   these people than what you're admitting to here

11   today.  I have a real difficult time even trying to

12   understand exactly why you got involved in this and

13   then when you said that it was for the money, okay,

14   you're going to go back to Colombia, you're going

15   to work in the same jobs that you worked, and I

16   asked you what would keep you from coming back and

17   you said you had a family now.  You had a five-year

18   old son at the time, the first time you went, and

19   you came back and you gave no thought to your

20   family at that time.  I have no reason to believe

21   that anything would be any different if you were to

22   be paroled at this time.  I do want to commend you

23   for the fact that you have, I have on here three

24   vocations that you've been doing a whole lot in

25   your computer data processing and computer repair,

26   and you do have your voc mill and cabinet.  You

27   ELKIN GOMEZ  E-44776  DECISION PAGE 6  2/2/05

71

1    received your high school diploma in January of

2    '99.  You have been in AA and NA.  You have 14

3    weeks of Impact.  You have a Parenting Program in

4    '98, Infectious Disease Group Training in 2000.

5    Fatherhood Group, 10-week in Entrepreneur

6    Development, and '97 Life Skills Group.  But

7    actually when I look at the fact that you've been

8    down almost 15 years that isn't a whole lot of

9    self-help that you have been doing a lot of

10    vocational stuff.  And I read through the reports

11    and the doctors say glowing things about you, the

12    counselor, and you can read in the Counselor's

13    Report that they very clearly believe that you have

14    a raw deal because you're still in prison.  And I

15    don't know if they've ever just sat down and tried

16    to understand from you your commitment offense.  I

17    don't know if you have an easier time explaining to

18    someone else than you do when you come before the

19    Board, but I know the Panels have not been

20    impressed.  And frankly, I have a tremendous amount

21    of problems.  The fact that, you know, I asked you

22    about the gun and you said, no, you didn't have a

23    gun.  And then all of a sudden there's three guns

24    in the car.  You had an UZI and you were seen with

25    an UZI.  I mean there are just so many conflicting

26    things so --

27    ELKIN GOMEZ    E-44776    DECISION PAGE 7    2/2/05

72

1    DEPUTY COMMISSIONER SMITH: Commissioner,

2    excuse me, I need to do the tape.

3    PRESIDING COMMISSIONER DALY: All right.

4    (Thereupon, the tape was turned over.)

5    DEPUTY COMMISSIONER SMITH: We're on the

6    record.

7    PRESIDING COMMISSIONER DALY: So in a

8    separate decision the hearing Panel finds that it

9    is not reasonable to expect that parole would be

10   granted at a hearing during the following two

11   years. And I know because of this the counselor

12   and everybody's going to say, you know, they're

13   looking at what you've been doing while you've been

14   in here and to me I need to look at the facts of

15   the crime. I need to look at your frankness with

16   us here. I meant, you have so much difficulty and

17   it shouldn't be that difficult to simply come in

18   and tell us what was it you did and own up to your

19   responsibility. And so I'm going to ask that when

20   you come for your next hearing in two years that

21   both the doctor and your counselor read through

22   this 2005 Board Report to understand where it is

23   we're coming in at and where it is that we want

24   them to look. The prisoner committed the offense

25   in a very selfish, calculated, and who knows what

26   would have happened if things went wrong manner

27   ELKIN GOMEZ   E-44776   DECISION PAGE 8   2/2/05

73

1   when he agreed to be a part of drug collections and

2   act as an interpreter, but the prisoner has

3   admitted to a number of times he was running drugs

4   in his car, indication of a prior record that he

5   admitted to selling drugs and so there's just a

6   whole lot of inconsistent information that would

7   never make it probably past a Board review if he

8   were to be given consideration at this time.  The

9   prisoner does have a prior record of violent

10  behavior.  Because of the prior kidnapping and

11  assault with a deadly weapon and false imprisonment

12  and the robbery, even though they were dismissed

13  the crimes were there.  And the prisoner has a

14  history of criminality and that's for malicious

15  mischief, petty theft, the kidnapping, assault with

16  a deadly weapon, false imprisonment, robbery, false

17  imprisonment, prior prison term, discharged on

18  parole in '85 and '87 he picks up a false

19  identification to a peace officer, which was

20  dismissed, and petty theft and the current

21  commitment offense.  And I think that it was very

22  telling also when the District Attorney noted you

23  aren't just an interpreter picked up off the

24  streets to help for this with all of the aliases,

25  the different birth dates, and the different Social

26  Security numbers.  You were very involved in a

27  **ELKIN GOMEZ  E-44776    DECISION PAGE 9   2/2/05**

74

1   criminal lifestyle.  And I don't think that you

2   were honest with us at all here today.  The Panel

3   then finds that a longer period of observation and

4   evaluation of the prisoner is required before the

5   Board should find the prisoner suitable for parole.

6   We're just asking that you remain disciplinary

7   free.  If available, continue with whatever

8   vocational training that you have, whatever self-

9   help groups that are available, and we're asking

10  that you cooperate with clinicians in the

11  completion of a full clinical evaluation and asking

12  that both the doctor and your counselor review this

13  Board Report so they understand what our concerns

14  are and it can be addressed.  Quite frankly I was

15  very disappointed and it really all has to come

16  down with your believability, your honesty here in

17  the hearing.

18       INMATE GOMEZ:  Maybe it was my English.

19       PRESIDING COMMISSIONER DALY:  No, it isn't

20  your English.  It's your answers.  And so anyway, I

21  wish you luck.  We'll see you in two years.  Do you

22  have any comments?

23       DEPUTY COMMISSIONER SMITH:  Yeah, Mr. Gomez,

24  certainly it's not your English.  You speak very

25  well.  But you want us to believe that a friend

26  asked you to go with him and another person so that

27  ELKIN GOMEZ  E-44776  DECISION PAGE 10  2/2/05

75

1    you could translate between you and this fourth

2    party.  And you and the other two take a person

3    from a parking lot, force them into their own car,

4    all three of you are armed, you're there to collect

5    a drug debt of 82,000 dollars and there are other

6    debts to collect upwards of three million dollars.

7    I'm not -- I've never been involved in the cartel

8    but I've got to think that nobody is going to put

9    that kind of responsibility on anyone who just

10   happens to be bilingual.  I don't buy it and

11   neither does Commissioner Daly.  It has nothing to

12   do with your English, which is very, very good.  It

13   has to do with your truthfulness.  It has to do

14   with your reality.  And until you can address that,

15   whether it be the two of us or some other Panel,

16   you're not going to get a date.  It's just that

17   simple.  Good luck, sir.

18        PRESIDING COMMISSIONER DALY:  Okay.  That

19   concludes the hearing.  It is 1450 hours.

20                    --oOo--

21

22

23   PAROLE DENIED TWO YEARS

24   THIS DECISION WILL BE FINAL ON:_____ JUN - 2 2005

25   YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT

26   DATE, THE DECISION IS MODIFIED.

27   ELKIN GOMEZ   E-44776   DECISION PAGE 11   2/2/05

76

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, CINDY WALKER, a duly designated transcriber, CAPITOL ELECTRONIC REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total two in number and cover a total of pages numbered 1 through 75, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY at SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of ELKIN GOMEZ, CDC No. E—44776, on FEBRUARY 2, 2005, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated February 15, 2005, at Sacramento County, California.

_Cindy Walker_
Cindy Walker
Transcriber
CAPITOL ELECTRONIC REPORTING

EXHIBIT    D

44

1      CALIFORNIA BOARD OF PRISON TERMS

2              D E C I S I O N

3          DEPUTY COMMISSIONER BACHLOR:  We're on the

4      record, Sir.

5          PRESIDING COMMISSIONER MOORE:  Thank you.

6      Let the record show that all interested parties

7      have returned to the room.  Elkin Gomez, CDC number

8      E- as in Edward 44776.  The Panel's reviewed all

9      information received from the public and relied on

10     the following circumstances in concluding that the

11     prisoner is not suitable for parole.  Mr. Gomez,

12     this is another one-year denial, sir -- and that

13     you would pose an unreasonable risk of danger to

14     society or a threat to public safety if released

15     from prison at this time.  The timing and the

16     gravity of the committing offense would be

17     paramount.  The offense was carried out in a manner

18     which demonstrates an exceptionally insensitive

19     disregard for human sufferings.  The prisoner and

20     his crime partners, along with his crime partners,

21     were hired to kidnap an individual, the victim,

22     Mr. William Mikus, spell capital-M-I-K-U-S, an

23     individual who owed some 82-thousand dollars worth

24     of drug debt.  However, the individual that was

25     kidnapped, Mr. Mikus, happened to be an informant

26     for the federal drug agents.  He was wired at the

27     ELKIN GOMEZ     E-44776    DECISION PAGE 1    7/31/03

45

1    time.  He was able or managed to escape from the

2    vehicle.  The vehicle was pursued by these federal

3    agents.  One of the individuals was apprehended and

4    identified the remainder of the crime partners.

5    The victim was not hurt.  Now, these conclusions

6    are drawn from the Statement of Facts, that the

7    prisoner and his crime partners kidnapped for

8    extortion the victim.  The prisoner has a previous

9    record, an escalating pattern of criminal conduct.

10   He's failed to profit from society's previous

11   attempts to correct his criminality, including

12   attempts -- or adult probation, parole, a prior

13   prison term which was quite interesting in that it

14   started out as a kidnap but ended up being two

15   counts of (indiscernible), two counts of false

16   imprisonment that the prisoner had his prior prison

17   term for.  Institutional behavior -- The prisoner

18   has not sufficiently participated at this time in

19   beneficial self-help.  Psychosocial report was

20   adequate.  Parole plans are adequate in his home

21   country of Columbia, of origin.  He has a US INS

22   hold.  3042 notices indicate opposition to a

23   finding of suitability, specifically the District

24   Attorney's office of Los Angeles County were

25   represented here today, was in opposition to a

26   finding of suitability.  Remarks, excuse me --

27   ELKIN GOMEZ     E-44776    DECISION PAGE 2    7/31/03

46

1  Remarks to the prisoner -- The Panel makes the

2  following findings.  That the prisoner should be

3  commended.  He's received two 115s in his entire --

4  the last of those was in 1988 -- or 1998, excuse

5  me, and he's done some positive work in terms of AA

6  and NA since about '93, I believe, Parenting

7  classes, Path to Peace, the Life Skills group,

8  Impact, Inmate Peer Education Program.  He's got

9  about three different marketable skills: Carpentry,

10  Mill and Cabinet, just recently completed the

11  Electronic Data Processing.  He's taken some

12  college courses.  He educated himself in terms of

13  got his high school diploma while he was

14  incarcerated, and taken some business classes,

15  Business Marketing, Accounting one, two, and three,

16  as well as the Principles of Business.  However,

17  these positive aspects of his behavior don't

18  outweigh the factors of unsuitability.  As I said,

19  this is a one-year denial; another one, Mr. Gomez.

20  Recommendations to you are to continue to remain

21  disciplinary-free, if it's available to you to

22  participate in beneficial self-help programming,

23  whatever may be -- to better understand the

24  causative factors, whatever would cause you to have

25  somewhat of a lifestyle of cooperating and

26  participating in the kidnapping of others.

27  ELKIN GOMEZ    E-44776    DECISION PAGE 3    7/31/03

47

1    Commissioner, comments to the prisoner?

2            DEPUTY COMMISSIONER BACHLOR:  Good luck,

3    sir.

4            PRESIDING COMMISSIONER MOORE:  Good luck to

5    you there, Mr. Gomez.  Continue on the path that

6    you're on.  You're doing the right kinds of things.

7            INMATE GOMEZ:  Thank you.

8            PRESIDING COMMISSIONER MOORE:  The time is

9    1545 hours.

10                       --o0o--

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   PAROLE DENIED ONE YEAR
                                    OCT 2 9 2003
26   FINAL DATE OF DECISION _____

27   ELKIN GOMEZ    E-44776    DECISION PAGE 4    7/31/03

EXHIBIT   E

BOARD OF PRISON TERMS
LIFE PRISONER HEARING DECIS    FACE SHEET

[ ] PAROLE GRANTED - (YES)
    CDC:  Do not release prisoner before
        Governor's review

[ ] PAROLE DENIED - (NO)

| Records Use Only | | |
|---|---|---|
| Parole Release Date | | |
| | YR  MO  DAY | |
| Attach Prison Calculation Sheet | | |

[ ] AGREED UNSUITABLE (Attach 1001A Form) FOR:_____YEAR(S)
[X] HEARING POSTPONED/REASON: _Request new psych eval_
_place on 9-28-04 calendar_

### PANEL RECOMMENDATIONS AND REQUESTS

**The Board Recommends:**

[ ] No more 115's or 128A's    [ ] Stay discipline free    [ ] Earn positive chronos
[ ] Work to reduce custody level    [ ] Learn a trade*    [ ] Get a GED*
[ ] Get self-help*    [ ] Get therapy*

[ ] Recommend transfer to_____
[ ] Other_____
    *These programs are recommended if they are offered at your prison and you are eligible/able to participate.

| **Penal Code 3042 Notices** | [ X ] Sent  Date: *08/16/04* |
|---|---|

| Commitment Offense(s) | PC 209 (A) W/ 12022.5 | *KIDNAP FOR EXTORTION W/ USE F'ARM* |
|---|---|---|
| | Code(s) | Crime(s) |
| | *A961451* | *1* |
| | Case #(s) | Count #(s) |

| Date Inmate Came to CDC *2/5/90* | Date Life Term Began *SAME* | Minimum Eligible Parole Date *11/22/95* |
|---|---|---|
| [ ] Initial Hearing | [X] Subsequent (Hearing No.) 6 | Date of Last Hearing *7/31/03* |

CDC Representative _____
Attorney for Prisoner _____ Address _____
D.A. Representative _____ County    LOS ANGELES

This form and the Board's decision at the end of the hearing is only <u>proposed</u> and NOT FINAL. <u>It will not become</u>
<u>final until it is reviewed.</u>

Chair _____ Date _____ 9-28-04
Panel Member _____ Date _____
Panel Member _____ Date _____

| NAME | CDC # | PRISON *CTF* | CALENDAR | DATE |
|---|---|---|---|---|
| GOMEZ, ELKIN | E44776 | | OCT. 04 | 10/1/04 |

BPT 1001 (REV. 08/03)

BOARD OF PRISON TERMS
LIFE PRISONER HEARING – EXT. ORDINARY ACTION AND DECISION

STATE OF CALIFORNIA
BPT 1001A (Rev. 10/89)

☐ I certify to the best of my knowledge and information, the foregoing reasons as stated by the prisoner are accurate, and that the prisoner was capable of making a knowledgeable decision regarding his/her hearing.

The following information is submitted for the Board's consideration in making their decision:

_____

_____

_____

| C&PR Signature | Date |
|---|---|

FOR BOARD OF PRISON TERMS USE ONLY

## DECISION / ORDER

### WAIVER OF RIGHT TO ATTEND HEARING

1. ☐ Request is denied.

   ☐ Request is granted. Hearing will be conducted in absence of prisoner.

### POSTPONEMENT

2. ☐ Request is denied.

   ☒ Request is granted. Grant based on a finding of good cause. Place on ___Next Avail___ calendar.

### WAIVER OF HEARING AND STIPULATION TO UNSUITABILITY

3. ☐ Request is denied.

   ☐ Request is granted. The Board agrees to enter into the stipulation, on a finding of good cause, offered by the prisoner on the waiver of his/her Life Parole Consideration Hearing and orders a:

   ☐ One-year denial    ☐ Two-year denial*    ☐ Three-year denial**

   \* The Board must find it unreasonable to expect that the prisoner would be eligible for parole during the second, or second and third year, and the Board must state the reasons for its finding.

   \** In addition to the above (*), the prisoner must have been convicted of more than one offense which involves the taking of a life.

(The basis of the finding of good cause for postponement or multiple-year denial must be stated below.)

   ☐ Good cause based on the reasons given by the prisoner.

Other comments (if applicable):

_____

_____

_____

Signature of BPT Commissioners
1. _____    Date _____
2. _____    Date _____

BPT Action Taken At:    ☐ BPT Headquarters    ☒ Institution

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| GOMEZ, ELKIN | E44776 | CTF – SOLEDAD | 7/2004 | |

LIFE PRISONER EVALUATION REPORT
SUBSEQUENT PAROLE CONSIDERATION HEARING
JULY 2004

GOMEZ, ELKIN                                                    E44776

15 yrs.

**I.    COMMITMENT FACTORS:**

A.    **LIFE CRIME**: Kidnapping for extortion with Use of Firearm PC 209(a), PC 12022.5, Life with the possibility of parole, plus two years, case No. LA-A961451. Victim: William Mikus, age unknown. Arrived in CDC on 2-5-90. MEPD: 11/25/95. Weapon: UZI (Machine Gun).

1.    Summary of Crime: On 12-10-87, at approximately 1830 hours, Gomez and two other defendants met with the victim, William Mikus, for the purpose of extorting $82,000.00 from him relative to a drug related debt incurred by Mikus approximately a year earlier to Claudia Baron. Claudia Baron was a known cocaine smuggler and trafficker. Mikus was an informant for the Federal Bureau of Investigation. The defendant forced Mikus to drive them to his home to obtain the money. Although Gomez made statements showing initiative and freedom of action, he was enlisted primarily for the purpose of interpreting, as is reflected per transcripts from an electronic listening device on the person of Mr. Mikus. While enroute, Mikus escaped and Gomez fled on foot upon being pursued by an FBI agent in a surveillance vehicle. Gomez was arrested one week later by West Covina Police Department and charged with kidnapping.

2.    Prisoner's Version: Gomez stated that the events concerning himself and the kidnapping of William Mikus are accurately worded in the Probation Officer's Report and has no information to add except to clarify that he was not in possession of a weapon and his role was to interpret.

3.    Aggravating/Mitigating Circumstances:

a.    Aggravating Factors:

-    During the commission of the crime, the inmate had a clear opportunity to cease, but instead continued.

-    Use of weapon (UZI).

b.    Mitigating Factors: The inmate had no apparent predisposition to commit the crime but was induced by others to participate in its commission.

COPY TO INMATE ON 8.31.04

LIFE PRISONER EVALUATON REP,
PAROLE CONSIDERATION HEARI
JULY/2004 CALENDAR

B.　　**MULTIPLE CRIME(S):** None

　　　　Summary of Crime: N/A

　　　　Prisoner's Version: N/A


## II.　PRECONVICTION FACTORS:

A.　　Juvenile Record:　　None.

B.　　**Adult Convictions:**　10-10-80- Santa Ana Municipal Court, Case No. 80CM08199, PC 591(A), Malicious Mischief/Vandalism- Convicted.　11-12-80- Santa Ana Municipal Court, Case No. 80CM09290, PC 484 Petty Theft- Convicted.

　　6-15-83- San Francisco Municipal Court, Case No. 591162, PC 209(a), Kidnapping for Ransom, PC 245(A), Assault with Deadly Weapon, PC 236, False Imprisonment, PC 211, Robbery- Dismissed.　7-13-83, San Francisco Superior Court, Case No. 591162- Convicted on two counts False Imprisonment PC 236- sentenced to 44 months state prison. Discharged 9-15-85 from parole.

　　10-26-87- West Minister Municipal Court Case No. 1519030PO, PC 148.9(A), False I.D. to Peace Officer- Dismissed.　PC 488, Petty Theft- Convicted, non-retainable offense.　1-16-90- convicted of current commitment offense, PC 209(a), Kidnapping with Firearms.

C.　　**Personal Factors:** Mr. Gomez is the youngest of six (6) children born to his mother, Clarisa Gomez, and father, Juan Gomez, both of Colombia. Gomez relates that he completed sixth grade in Colombia and obtained his High School diploma while incarcerated.　Mr. Gomez stated he had prior employment as a mortgage loan representative and a dry cleaner. He indicated that as a child, his life was normal and stable.　His family is very supportive and he maintains regular visitation and correspondence with them.


## III.　POSTCONVICTION FACTORS:

A.　　Special Accommodations/Disability: None required.

B.　　**Custody History:** Gomez was received into the California Department of Corrections on 2-5-90 and was transferred to Correctional Training Facility. His custody was established at Close B. On 6-7-93, his custody was reduced to Medium A. On 12-14-93, he was transferred to Centinella State Prison and his custody was raised to Close and on 9-1-94 his custody was reduced to Medium A. On 05-08-96,

he was transferred to Correctional Training Facility, where he remains and retains Medium Close A with a WG/PG at A1A since 4-18-90.

C.   <u>Therapy & Self-Help Activities:</u>   Gomez has participated in as many self-help groups as possible including, IMPACT, AA/NA, parenting, infectious disease program and fatherhood groups.

D.   <u>Disciplinary History:</u>

<u>CDC 128As Counseling Chronos</u>

8-16-90- Failure to Honor a Ducat.

12-10-93 - Disobeying an Order.-

<u>CDC 115s Rules Violation Report</u>

3-24-90- Possession of Alcohol- Guilty/Assessed 90 days loss of credit.

2-2-98- Unauthorized Contraband- Guilty/Assessed 30 days forfeiture of credits.

E.   <u>Other:</u>   Gomez attended his #5 Subsequent Parole Consideration Hearing on 07-31-03.  Parole was denied for one year.  The Board recommended that Gomez remain disciplinary free and continue to participate in self-help programs.  Gomez has complied with the Board's recommendation.

## IV.   <u>FUTURE PLANS:</u>

A.   <u>Residence:</u>   Upon release, Mr. Gomez intends to live with his wife, Gloria Gomez and his two (2) children, Catherine (11) and Jonathan (20), currently at 6358 E. Gage Ave., Apt. 10, Bell Gardens, CA  90021.  Telephone No. (562) 927-4683, Work No. (323) 773-3256.  Gomez will be deported upon release.  Therefore, he and his family plan to relocate to Columbia to reside with his brother, Juan M. Gomez.

B.   <u>Employment:</u> If paroled, Gomez has been assured a viable position of employment with his family in the food distribution business.  As indicated in a support letter written by Marco Vergaria of Carnera 51D No. 67U-13, Telephone No. 233-8785, Gomez has been offered employment at OSAKA Imports in Colombia, a dealership for Japanese import vehicles.  Upon completion of his current data processing program, Gomez will have three (3) certified trades to utilize in the job market.

C.   <u>Assessment:</u>  In review of Gomez' parole plans, this counselor does not foresee any problems provided support letters are submitted prior to his hearing.

## V.   <u>USINS STATUS:</u>  Active Immigration Hold No. A2637201 from Colombia.

## VI.   SUMMARY:

**A.**   Considering the commitment offense, prior prison record, and prison adjustment this writer believes Gomez would pose a low degree of risk to the public if released. Gomez has been incarcerated for over 15 years and during this time he has matured physically and mentally and has displayed responsibility in a controlled environment. Gomez has programmed in a positive manner and has kept himself in group sessions on a consistent basis.   He has now completed a third trade in computer data processing.   Having various trade abilities will assist Gomez in future jobs, if paroled.   He received positive reports from a long work history within the department and continuous to maintain a good rapport with staff and peers. He does not have any substance abuse charges in his arrest history, which would help contribute to his ability to rehabilitate. He shows remorse for his life crime, which resulted in his incarceration and has expressed sorrow for his victims. Gomez is persistent on change and it appears he is not the same person he was in 1987. A combination of the above-factors as well as support letters from family and friends, point Gomez in the direction of a successful parole.

**B.**   Prior to release Gomez would benefit from:

1.   Continuing to be disciplinary free.

2.   Continuing to participate in therapy and self-help activities.

**C.**   This Board Report is based on a thorough review of Gomez' Central File and a one (1) hour interview with Gomez.

**D.**   Gomez was afforded an opportunity to review his Central File per the Olson Decision. (refer to the CDC-128-B located in the General Chrono Section)

**E.**   No accommodation was required per the Armstrong vs. Davis BPT Parole Proceedings Remedial Plan for effective communication.

GOMEZ, ELKIN                                    E44776                              CTF- Soledad          FEB/2004

LIFE PRISONER EVALUATON REP
PAROLE CONSIDERATION HEARI
JULY/2004 CALENDAR

8-17-04

K. L. HEINLY,
Correctional Counselor I (A)

D. PHERIGO,
Correctional Counselor II

I. GUERRA,
Facility Captain

8-24-04

D.S. LEVORSE,
Classification and Parole Representative

GOMEZ, ELKIN                    E44776              CTF- Soledad        FEB/2004

LIFE PRISONER: POSTCONVICTION PROGRESS REPORT    STATE OF CALIFORNIA

- [ ] DOCUMENTATION HEARING
- [x] PAROLE CONSIDERATION HEARING
- [ ] PROGRESS HEARING

INSTRUCTIONS

TO CDC STAFF:  DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT

TO BPT STAFF:  FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY ESTABLISHED, ie., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 02-02-03 to 03-02-04 | | | **PLACEMENT:** Remained at CTF. **CUSTODY:** Remained Medium A. **VOC. TRAINING:** Continued in the Vocation Data Processing at Satisfactory with positive comments. **ACADEMICS:** None noted during this period. **WORK RECORD:** Assigned to F-Wing as a Porter. **GROUP ACTIVITIES:** Gomez continues his Alcoholic Anonymous participation and received Laudatory chronos dated 5-3-03 and 9-30-03. **PSYCH. TREATMENT:** None noted during this period. **PRISON BEHAVIOR:** Gomez continues to remain disciplinary free and has a good rapport with both staff and inmates. **OTHER:** None. |

CORRECTIONAL COUNSELOR'S SIGNATURE

GOMEZ                E-44776                CTF-SOLEDAD

DATE  8-5-04

JULY/2004

BOARD OF PRISON TERMS    STATE OF CALIFORNIA

BPT 1004 (REV 7/86)        Page _1_

# PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
## (REVISED AUGUST 1998)
### PAROLE CONSIDERATION HEARING
### NOVEMBER 2004 LIFER CALENDAR

## CORRECTIONAL TRAINING FACILITY, SOLEDAD
### OCTOBER 19, 2004

This is an updated psychological evaluation for the Board of Prison Terms on inmate Elkin Gomez, CDC# E-44776. This report is based on a personal interview of this inmate on 10/19/04. Additionally, in preparation for this update, the central file, unit health record, and previous BPT reports were reviewed. The reader is specifically referred to the last complete and thorough psychological evaluation, completed in June 1999 by Dr. Reed. Today's clinical interview and the review of all pertinent documents were for the express purpose of preparing this report.

Inmate Gomez was informed of the nature and the purpose of the interview, and the lack of confidentiality inherent in the present assessment. He was also informed that a report for the Board of Prison Terms would be prepared. He understood this and agreed to participate.

Inmate Gomez speaks Spanish and English, with Spanish being his primary language. He was offered the use of a Spanish-speaking interpreter, which he declined. His English-speaking skills appeared to be adequate for the purposes of this evaluation.

Inmate Gomez is a 44-year-old, married, Hispanic/Colombian male. His date of birth is 02/27/60. He explained that he is a Colombian citizen. He reported that his religious affiliation is Catholic. He presented with no unusual physical characteristics, and denied the use of nicknames or aliases.

During the clinical interview, inmate Gomez discussed the circumstances surrounding the commitment offense. His description was similar to that in his central file and in past psychological reports. He accepted full responsibility for his actions. He is serving a life-with-possibility-of-parole sentence for kidnapping with extortion, he stated, and has been incarcerated within CDC since 1990 (for about 14 years).

The reader is referred to the 1999 psychological evaluation for a complete social history. There have been several minor changes since his last psychological evaluation.

Inmate Gomez explained that his parents moved from Colombia to Monrovia, by Los Angeles, about five years ago. He explained that his father developed prostate cancer, for which he had surgery, but is now doing okay. Inmate Gomez continues to communicate with his family on a regular basis, and described a close relationship with family members. He explained that his wife and children "are still waiting," and explained the frustrations that go along with his family waiting for him to parole one day.

Inmate Gomez's parole plans remain essentially unchanged. He expects to be deported to Colombia. He has job offers there. His father had a family business, which his brother now runs, dealing with the selling of fruits and vegetables. Ideally, he would like to work in this business, and would return with his wife and children. If paroled to Colombia, it

GOMEZ, ELKIN
CDC NUMBER: E-44776
BPT PSYCHOLOGICAL EVALUATION
PAGE TWO

appears that he has good plans in place, as well as family support. His prognosis for community living, therefore, is very good.

Since his last psychological evaluation in 1999, he has had several jobs, in which he has received laudatory chronos. He worked in R&R as a porter and clerk until 2001. After that, he stated he worked in the kitchen as a clerk. This was followed by completing a vocation in data processing. Currently, he is working as a porter in his wing.

Inmate Gomez denies a history of the abuse of drugs or alcohol. There is no documentation to support such a history. However, he has been involved, and continues to be involved, in Alcoholics Anonymous and Narcotics Anonymous, and said about these programs, "They are the only therapy we have here, and it has been helpful." He has also, since his last psychological evaluation, completed the Entrepreneur Development Class through the Muslim chapel, and is currently enrolled in an anger management program, also through the chapel.

Inmate Gomez has had no CDC-115s or CDC-128s since 1998. None of his disciplinary history is of a violent nature.

In summary, there are no mental health, alcohol, or drug issues, and inmate Gomez has a strong family support system and job opportunities upon release. During his years of incarceration, he has sought to improve self through involvement in self-help opportunities, as well as to make the best of opportunities such as AA and NA, even though he does not have a history of the abuse of substances.

For conclusions about the assessment of dangerousness and recommendations, the reader is referred to Dr. Reed's 1999 psychological evaluation.

Jeff Howlin, Ed.D.
Staff Psychologist
Correctional Training Facility, Soledad

B. Zika, Ph.D.
Senior Supervising Psychologist
Correctional Training Facility, Soledad

JH/gmj

D: 10/19/04
T: 10/27/04

*D:\Word Files\BPT - 2004\GOMEZ, ELKIN  E-44776  11-04  HOWLIN.doc*

GOMEZ        E-44776        CTF-CENTRAL        10/19/04        gmj

EXHIBIT    F

CALIFORNIA STATE ARCHIVES
SECRETARY OF STATE



# CALIFORNIA VOTERS PAMPHLET



# GENERAL ELECTION NOVEMBER 7, 1978

COMPILED BY MARCH FONG EU · SECRETARY OF STATE

ANALYSES BY WILLIAM G. HAMM · LEGISLATIVE ANALYST

**AVISO**

Una traducción al español de este folleto del votante puede obtenerse si completa y nos envía la tarjeta con porte pagado que encontrará entre las páginas 24 y 25. Escriba su nombre y dirección en la tarjeta en LETRA DE MOLDE y regrésela a más tardar el 27 de octubre de 1978.

**NOTICE**

A Spanish translation of this ballot pamphlet may be obtained by completing and returning the postage-paid card which you will find between pages 24 and 25. Please PRINT your name and mailing address on the card and return it no later than October 27, 1978.

Ex A

# TABLE OF CONTENTS

Proposition                                                                                          Page

### BOND ACT

1    Veterans Bond Act of 1978................................................................ 8–11, 38

### LEGISLATIVE CONSTITUTIONAL AMENDMENTS

2    Public Utilities Commission................................................... 12–15

3    State Surplus Coastal Property .................................................. 16–19

### LEGISLATIVE INITIATIVE AMENDMENT

4    Chiropractic School Accreditation and
     License Revocation .................................................... 20–23, 38–39

### INITIATIVE STATUTES

5    Regulation of Smoking ............................................... 24–27, 39–41

6    School Employees—Homosexuality .......................................... 28–31, 41

7    Murder—Penalty ..................................................... 32–35, 41–46

### LEGISLATIVE CONSTITUTIONAL AMENDMENT

8    Property Taxation.................................................................. 36–37

Ex-A



## Secretary of State

### SACRAMENTO 95814

Dear Californians:

This is the English version of the California ballot
pamphlet for the November, 1978, General Election.
It contains the ballot title, short summary, the
Legislative Analyst's analysis, the pro and con
arguments and rebuttals, and the complete text of
each proposition; also it contains the legislative
vote cast for and against any measure proposed by
the Legislature.

If you wish to receive a Spanish language ballot
pamphlet simply fill out and mail the card enclosed
between pages 24 and 25.   No postage is needed.

Read carefully each of the measures and the infor-
mation about them contained in this pamphlet.
Legislative propositions and citizen-sponsored
initiatives are designed specifically to give you,
the electorate, the opportunity to influence the
laws which regulate us all.

Take advantage of this opportunity and vote on
November 7, 1978.

                                    SECRETARY OF STATE

Ex-A

 # Murder. Penalty—Initiative Statute

## Argument in Favor of Proposition 7

CHARLES MANSON, SIRHAN SIRHAN, THE ZODIAC KILLER, THE SKID-ROW SLASHER, THE HILLSIDE STRANGLER.

These infamous names have become far too familiar to every Californian. They represent only a small portion of the deadly plague of violent crime which terrorizes law-abiding citizens.

Since 1972, the people have been demanding a tough, effective death penalty law to protect our families from ruthless killers. But, every effort to enact such a law has been thwarted by powerful anti-death penalty politicians in the State Legislature.

In August of 1977, when the public outcry for a capital punishment law became too loud to ignore, the anti-death penalty politicians used their influence to make sure that the death penalty law passed by the State Legislature was as weak and ineffective as possible.

That is why 470,000 concerned citizens signed petitions to give you the opportunity to vote on this new, tough death penalty law.

Even if the President of the United States were assassinated in California, his killer would not receive the death penalty in some circumstances. Why? Because the Legislature's weak death penalty law does not apply. Proposition 7 would.

If Charles Manson were to order his family of drug-crazed killers to slaughter your family, Manson would not receive the death penalty. Why? Because the Legislature's death penalty law does not apply to the master mind of a murder such as Manson. Proposition 7 would.

And, if you were to be killed on your way home tonight simply because the murderer was high on dope and wanted the thrill, that criminal would not receive the death penalty. Why? Because the Legislature's weak death penalty law does not apply to every murderer. Proposition 7 would.

Proposition 7 would also apply to the killer of a judge, a prosecutor, or a fireman. It would apply to a killer who murders a citizen in cold blood because of his race or religion or nationality. And, it would apply to all situations which are covered by our current death penalty law.

In short, your YES vote on Proposition 7 will give every Californian the protection of the nation's toughest, most effective death penalty law.

A long and distinguished list of judges and law enforcement officials have agreed that Proposition 7 will provide them with a powerful weapon of deterrence in their war on violent crime.

Your YES vote on Proposition 7 will help law enforcement officials to stop violent crime—NOW.

**JOHN V. BRIGGS**
*Senator, State of California*
*35th District*

**DONALD H. HELLER**
*Attorney at Law*
*Former Federal Prosecutor*

**DUANE LOWE**
*President, California Sheriffs' Association*
*Sheriff of Sacramento County*

## Rebuttal to Argument in Favor of Proposition 7

The argument for Proposition 7 is strictly false advertising.

- It would not affect the Charles Manson and Sirhan Sirhan cases. They were sentenced under an old law, thrown out by the courts because it was improperly written.
- As for the "zodiac killer", "hillside strangler" and "skid-row slasher", *they were never caught.* Even the nation's "toughest" death penalty law cannot substitute for the law enforcement work necessary to apprehend suspects still on the loose.

But you already know that.

Regardless of the proponents' claim, no death penalty law—neither Proposition 7 nor the current California law—can guarantee the *automatic* execution of all convicted murderers, let alone suspects not yet apprehended.

California has a strong death penalty law. Two-thirds of the Legislature approved it in August, 1977, after months of careful drafting and persuasive lobbying by law enforcement officials and other death penalty advocates.

The present law is *not* "weak and ineffective" as claimed by Proposition 7 proponents. It applies to murder cases like the ones cited.

Whether or not you believe that a death penalty law is necessary to our system of justice, you should vote NO on Proposition 7. It is so confusing that the courts may well throw it out. Your vote on the murder penalty initiative will not be a vote on the death penalty; it will be a vote on a carelessly drafted, dangerously vague and possibly invalid statute.

Don't be fooled by false advertising. READ Proposition 7. VOTE NO.

**MAXINE SINGER**
*President, California Probation, Parole and Correctional Association*

**NATHANIEL S. COLLEY**
*Board Member, National Association for the Advancement of Colored People*

**JOHN FAIRMAN BROWN**
*Board Member, California Church Council*

Arguments printed on this page are the opinions of the authors and have not been

Ex - A

# Murder. Penalty—Initiative Statute



## Argument Against Proposition 7

DON'T BE FOOLED BY FALSE ADVERTISING. The question you are voting on is NOT whether California should have the death penalty. California ALREADY has the death penalty.

The question is NOT whether California should have a tough, effective death penalty. California ALREADY has the death penalty for more different kinds of crimes than any other State in the country.

The question you are voting on is whether to repeal California's present death-penalty law and replace it with a new one. Don't be fooled by false advertising. If somebody tried to sell you a new car, you'd compare it with your present automobile before paying a higher price for a worse machine.

Whether or not you agree with California's present law, it was written carefully by people who believed in the death penalty and wanted to see it used effectively. It was supported by law enforcement officials familiar with criminal law.

The new law proposed by Proposition 7 is written carelessly and creates problems instead of solving them. For example, it does not even say what happens to people charged with murder under the present law if the new one goes into effect.

As another example, it first says that "aggravating circumstances" must outweigh "mitigating circumstances" to support a death sentence. Then it says that mitigating circumstances" must outweigh "aggravating circumstances" to support a life sentence. This leaves the burden of proof unclear. As a result, court processes would become even more complicated.

Proposition 7 does allow the death penalty in more cases than present law. But what cases?

Under Proposition 7, a man or woman could be sentenced to die for lending another person a screwdriver to use in a burglary, if the other person accidentally killed someone during the burglary. Even if the man or woman was not present during the burglary, had no intention that anyone be killed or hurt, in fact urged the burglar not to take a weapon along, they could still be sentenced to die.

This is the kind of law that wastes taxpayers' money by putting counties to the expense of capital trials in many cases where the death penalty is completely inappropriate. To add to the waste, Proposition 7 requires two or more jury trials in some cases where present law requires only one.

Don't let yourself be fooled by claims that Proposition 7 will give California a more effective penalty for murder. It won't. DON'T BE FOOLED BY FALSE ADVERTISING. Vote NO on Proposition 7.

**MAXINE SINGER**
*President, California Probation, Parole and Correctional Association*

**NATHANIEL S. COLLEY**
*Board Member, National Association for the Advancement of Colored People*

**JOHN PAIRMAN BROWN**
*Board Member, California Church Council*

## Rebuttal to Argument Against Proposition 7

ALRIGHT, LET'S TALK ABOUT FALSE ADVERTISING.

The opposition maintains if someone were to lend a screwdriver to his neighbor and the neighbor used it to commit a murder, the poor lender could get the death penalty, even though "he had NO INTENTION that anyone be killed."

Please turn back and read Section 6b of the Proposition 7. It says that the person must have INTENTIONALLY aided in the commission of a murder to be subject to the death penalty under this initiative.

They say that Proposition 7 doesn't specify what happens to those who have been charged with murder under the old law. Any first-year law student could have told them Proposition 7 will not be applied retroactively. Anyone arrested under an old law will be tried and sentenced under the old law.

The opposition can't understand why we included the aggravating vs. mitigating circumstances provision in Proposition 7. Well, that same first-year law student

could have told them this provision is required by the U.S. Supreme Court. The old law does not meet this requirement and might be declared unconstitutional, leaving us with no death penalty at all!

If we are to turn back the rising tide of violent crime that threatens each and every one of us, we must act NOW.

This citizen's initiative will give your family the protection of the strongest, most effective death penalty law in the nation.

**JOHN V. BRIGGS**
*Senator, State of California*
*35th District*

**DONALD H. HELLER**
*Attorney at Law*
*Former Federal Prosecutor*

**DUANE LOWE**
*President, California Sheriffs' Association*
*Sheriff of Sacramento County*

EX-A

# 7  Murder. Penalty—Initiative Statute  § 900 l

---

## Official Title and Summary Prepared by the Attorney General

§ 900 2 —                                                                 900 4

**MURDER. PENALTY. INITIATIVE STATUTE.** Changes and expands categories of first degree murder for which penalties of death or confinement without possibility of parole may be imposed. Changes minimum sentence for first degree murder from life to 25 years to life. Increases penalty for second degree murder. Prohibits parole of convicted murderers before service of 25 or 15 year terms, subject to good-time credit. During punishment stage of cases in which death penalty is authorized: permits consideration of all felony convictions of defendant; requires court to impanel new jury if first jury is unable to reach a unanimous verdict on punishment. Financial impact: Indeterminable future increase in state costs.

---

## Analysis by Legislative Analyst

**Background:**

Under existing law, a person convicted of *first degree murder* can be punished in one of three ways: (1) by death, (2) by a sentence of life in prison without the possibility of parole, or (3) by a life sentence with the possibility of parole, in which case the individual would become eligible for parole after serving seven years. A person convicted of *second degree murder* can be sentenced to 5, 6, or 7 years in prison. Up to one-third of a prison sentence may be reduced through good behavior. Thus, a person sentenced to 6 years in prison may be eligible for parole after serving 4 years.

Generally speaking, the law requires a sentence of death *or* life without the possibility of parole when an individual is convicted of first degree murder under one or more of the following special circumstances: (1) the murderer was hired to commit the murder; (2) the murder was committed with explosive devices; (3) the murder involved the killing of a specified peace officer or witness; (4) the murder was committed during the commission or attempted commission of a robbery, kidnapping, forceable rape, a lewd or lascivious act with a child, or first degree burglary; (5) the murder involved the torture of the victim; or (6) the murderer has been convicted of more than one offense of murder in the first or second degree. If any of these special circumstances is found to exist, the judge or jury must "take into account and be guided by" aggravating or mitigating factors in sentencing the convicted person to either death or life in prison without the possibility of parole. "Aggravating" factors which might warrant a death sentence include brutal treatment of the murder victim. "Mitigating" factors, which might warrant life imprisonment, include extreme mental or emotional disturbance when the murder occurred.

**Proposal:**

This proposition would: (1) increase the penalties for first and second degree murder; (2) expand the list of special circumstances requiring a sentence of either death or life imprisonment without the possibility of parole, and (3) revise existing law relating to mitigating or aggravating circumstances.

The measure provides that individuals convicted of first degree murder and sentenced to life imprison-

ment shall serve a minimum of 25 years, less whatever credit for good behavior they have earned, before they can be eligible for parole. Accordingly, anyone sentenced to life imprisonment would have to serve at least 16 years and eight months. The penalty for second degree murder would be increased to 15 years to life imprisonment. A person sentenced to 15 years would have to serve at least 10 years before becoming eligible for parole.

The proposition would also expand and modify the list of special circumstances which require either the death penalty or life without the possibility of parole. As revised by the measure, the list of special circumstances would, generally speaking, include the following: (1) murder for any financial gain; (2) murder involving concealed explosives or explosives that are mailed or delivered; (3) murder committed for purposes of preventing arrest or aiding escape from custody; (4) murder of any peace officer, federal law enforcement officer, fireman, witness, prosecutor, judge, or elected or appointed official with respect to the performance of such person's duties; (5) murder involving particularly heinous, atrocious, or cruel actions; (6) killing a victim while lying in wait; (7) murder committed during or while fleeing from the commission or attempted commission of robbery, kidnapping, specified sex crimes (including those sex crimes that now represent "special circumstances"), burglary, arson, and trainwrecking; (8) murder in which the victim is tortured or poisoned; (9) murder based on the victim's race, religion, nationality, or country of origin; or (10) the murderer has been convicted of more than one offense of murder in the first or second degree.

Also, this proposition would specifically make persons involved in the crime other than the actual murderer subject to the death penalty or life imprisonment without possibility of parole under specified circumstances.

Finally, the proposition would make the death sentence *mandatory* if the judge or jury determines that the aggravating circumstances surrounding the crime *outweigh* the mitigating circumstances. If aggravating circumstances are found *not* to outweigh mitigating circumstances, the proposition would require a life sentence without the possibility of parole. Prior to weighing the aggravating and mitigating factors, the jury

Ex-A

would have to be informed that life without the possibility of parole might at a later date be subject to commutation or modification, thereby allowing parole.

Fiscal Effect:    *[handwritten: 900 Gov. Code § 12172]*

We estimate that, over time, this measure would increase the number of persons in California prisons, and thereby increase the cost to the state of operating the prison system.

The increase in the prison population would result from:

- the longer prison sentences required for first degree murder (a minimum period of imprisonment equal to 16 years, eight months, rather than seven years);
- the longer prison sentences required for second degree murder (a minimum of ten years, rather than four years); and

- an increase in the number of persons sentenced to life without the possibility of parole.

There could also be an increase in the number of executions as a result of this proposition, offsetting part of the increase in the prison population. However, the number of persons executed as a result of this measure would be significantly less than the number required to serve longer terms.

The Department of Corrections states that a small number of inmates can be added to the prison system at a cost of $2,575 per inmate per year. The additional costs resulting from this measure would not begin until 1983. This is because the longer terms would only apply to crimes committed after the proposition became effective, and it would be four years before any person served the minimum period of imprisonment required of second degree murderers under existing law.

## Text of Proposed Law

This initiative measure proposes to repeal and add sections of the Penal Code; therefore, existing provisions proposed to be deleted are printed in ~~strikeout type~~ and new provisions proposed to be added are printed in *italic type* to indicate that they are new.

### PROPOSED LAW

Section 1.   Section 190 of the Penal Code is repealed.

~~190.   Every person guilty of murder in the first degree shall suffer death, confinement in state prison for life without possibility of parole, or confinement in state prison for life. The penalty to be applied shall be determined as provided in Sections 190.1, 190.2, 190.3, 190.4, and 190.5. Every person guilty of murder in the second degree is punishable by imprisonment in the state prison for five, six, or seven years.~~

Sec. 2.   Section 190 is added to the Penal Code, to read:

*190.   Every person guilty of murder in the first degree shall suffer death, confinement in state prison for life without possibility of parole, or confinement in the state prison for a term of 25 years to life. The penalty to be applied shall be determined as provided in Sections 190.1, 190.2, 190.3, 190.4, and 190.5.*

*Every person guilty of murder in the second degree shall suffer confinement in the state prison for a term of 15 years to life.*

*The provisions of Article 2.5 (commencing with Section 2930) of Chapter 7 of Title 1 of Part 3 of the Penal Code shall apply to reduce any minimum term of 25 or 15 years in a state prison imposed pursuant to this section, but such person shall not otherwise be released on parole prior to such time.*

Sec. 3.   Section 190.1 of the Penal Code is repealed.

~~190.1.   A case in which the death penalty may be imposed pursuant to this chapter shall be tried in separate phases as follows:~~

~~(a)   The defendant's guilt shall first be determined. If the trier of fact finds the defendant guilty of first degree murder, it shall at the same time determine the truth of all special circumstances charged as enumerated in Section 190.2, except or a special circumstance charged pursuant to paragraph (5) of subdivision (c) of Section 190.2 where it is alleged that the defendant had been convicted in a prior proceeding of the offense of murder of the first or second degree.~~

~~(b)   If the defendant is found guilty of first degree murder and one of the special circumstances is charged pursuant to paragraph (5) of subdivision (c) of Section 190.2 which charges that the defendant had been convicted in a prior proceeding of the offense of murder of the first or second degree, there shall thereupon be further proceedings on the question of the truth of such special circumstance.~~

~~(c)   If the defendant is found guilty of first degree murder and one or more special circumstances as enumerated in Section 190.2 has been charged and found to be true, his sanity on any plea of not guilty by reason of insanity under Section 1026 shall be determined as provided in Section 190.4. If he is found to be sane, there shall thereupon be further proceedings on the question of the penalty to be imposed. Such proceedings shall be conducted in accordance with the provisions of Sections 190.3 and 190.4.~~

Sec. 4.   Section 190.1 is added to the Penal Code, to read:

*190.1.   A case in which the death penalty may be imposed pursuant to this chapter shall be tried in separate phases as follows:*

*(a)   The question of the defendant's guilt shall be first determined. If the trier of fact finds the defendant guilty of first degree murder, it shall at the same time determine the truth of all special circumstances charged as enumerated in Section 190.2 except for a special circumstance charged pursuant to paragraph (2) of subdivision (a) of Section 190.2 where it is alleged that the defendant had been convicted in a prior proceeding of the offense of murder in the first or second degree.*

*(b)   If the defendant is found guilty of first degree murder and one of the special circumstances is charged pursuant to paragraph (2) of subdivision (a) of Section 190.2 which charges that the defendant had been convicted in a prior proceeding of the offense of murder of the first or second degree, there shall thereupon be further proceedings on the question of the truth of such special circumstance.*

*(c)   If the defendant is found guilty of first degree murder and one or more special circumstances as enumerated in Section 190.2 has been charged and found to be true, his sanity on any plea of not guilty by reason of insanity under Section 1026 shall be determined as provided in Section 190.4. If he is*

*Ex-A*

Continued on page 41

~~cally aided or committed such act or acts causing death, and the murder was willful, deliberate, and premeditated, and was perpetrated by means of a destructive device or explosive;~~

~~(c) The defendant was personally present during the commission of the act or acts causing death, and with intent to cause death physically aided or committed such act or acts causing death and any of the following additional circumstances exists:~~

~~(1) The victim is a peace officer as defined in Section 830.1, subdivision (a) or (b) of Section 830.2, subdivision (a) or (b) of Section 830.3, or subdivision (b) of Section 830.5, who, while engaged in the performance of his duty was intentionally killed, and the defendant knew or reasonably should have known that such victim was a peace officer engaged in the performance of his duties.~~

~~(2) The murder was willful, deliberate, and premeditated, the victim was a witness to a crime who was intentionally killed for the purpose of preventing his testimony in any criminal proceeding, and the killing was not committed during the commission or attempted commission of the crime to which he was a witness.~~

~~(3) The murder was willful, deliberate, and premeditated and was committed during the commission or attempted commission of any of the following crimes:~~

~~(i) Robbery in violation of Section 211;~~

~~(ii) Kidnapping in violation of Section 207 or 209. Brief movements of a victim which are merely incidental to the commission of another offense and which do not substantially increase the victim's risk of harm over that necessarily inherent in the other offense do not constitute a violation of Section 209 within the meaning of this paragraph.~~

~~(iii) Rape by force or violence in violation of subdivision (2) of Section 261, or by threat of great and immediate bodily harm in violation of subdivision (3) of Section 261;~~

~~(iv) The performance of a lewd or lascivious act upon the person of a child under the age of 14 years in violation of Section 288;~~

~~(v) Burglary in violation of subdivision (1) of Section 460 of an inhabited dwelling house with an intent to commit grand or petit larceny or rape.~~

~~(4) The murder was willful, deliberate, and premeditated, and involved the infliction of torture. For purposes of this section, torture requires proof of an intent to inflict extreme and prolonged pain.~~

~~(5) The defendant has in this proceeding been convicted of more than one offense of murder of the first or second degree, or has been convicted in a prior proceeding of the offense of murder of the first or second degree. For the purpose of this paragraph an offense committed in another jurisdiction which if committed in California would be punishable as first or second degree murder shall be deemed to be murder in the first or second degree.~~

~~(d) For the purposes of subdivision (c), the defendant shall be deemed to have physically aided in the act or acts causing death only if it is proved beyond a reasonable doubt that his conduct constitutes an assault or a battery upon the victim or if by word or conduct he orders, initiates, or coerces the actual killing of the victim.~~

Sec. 6.  Section 190.2 is added to the Penal Code, to read:

190.2.  (a)  The penalty for a defendant found guilty of murder in the first degree shall be death or confinement in state prison for a term of life without the possibility of parole in any case in which one or more of the following special circumstances has been charged and specially found under Section 190.4, to be true:

(1)  The murder was intentional and carried out for financial gain.

(2)  The defendant was previously convicted of murder in the first degree or second degree. For the purpose of this paragraph an offense committed in another jurisdiction which if committed in California would be punishable as first or second degree murder shall be deemed murder in the first or second degree.

(3)  The defendant has in this proceeding been convicted of more than one offense of murder in the first or second degree.

(4)  The murder was committed by means of a destructive device, bomb, or explosive planted, hidden or concealed in any place, area, dwelling, building or structure, and the defendant knew or reasonably should have known that his act or acts would create a great risk of death to a human being or human beings.

(5)  The murder was committed for the purpose of avoiding or preventing a lawful arrest or to perfect, or attempt to perfect, an escape from lawful custody.

(6)  The murder was committed by means of a destructive device, bomb, or explosive that the defendant mailed or delivered, attempted to mail or deliver, or cause to be mailed or delivered and the defendant knew or reasonably should have known that his act or acts would create a great risk of death to a human being or human beings.

(7)  The victim was a peace officer as defined in Section 830.1, 830.2, 830.3, 830.31, 830.35, 830.36, 830.4, 830.5, 830.5a, 830.6, 830.10, 830.11 or 830.12, who, while engaged in the course of the performance of his duties was intentionally killed, and such defendant knew or reasonably should have known that such victim was a peace officer engaged in the performance of his duties; or the victim was a peace officer as defined in the above enumerated sections of the Penal Code, or a former peace officer under any of such sections, and was intentionally killed in retaliation for the performance of his official duties.

(8)  The victim was a federal law enforcement officer or agent, who, while engaged in the course of the performance of his duties was intentionally killed, and such defendant knew or reasonably should have known that such victim was a federal law enforcement officer or agent, engaged in the performance of his duties; or the victim was a federal law enforcement officer or agent, and was intentionally killed in retaliation for the performance of his official duties.

(9)  The victim was a fireman as defined in Section 245.1, who while engaged in the course of the performance of his duties was intentionally killed, and such defendant knew or reasonably should have known that such victim was a fireman engaged in the performance of his duties.

(10)  The victim was a witness to a crime who was intentionally killed for the purpose of preventing his testimony in any criminal proceeding, and the killing was not committed during the commission, or attempted commission of the crime to which he was a witness; or the victim was a witness to a crime and was intentionally killed in retaliation for his testimony in any criminal proceeding.

(11)  The victim was a prosecutor or assistant prosecutor or a former prosecutor or assistant prosecutor of any local or state prosecutor's office in this state or any other state, or a federal prosecutor's office and the murder was carried out in retaliation for or to prevent the performance of the victim's official duties.

(12)  The victim was a judge or former judge of any court of record in the local, state or federal system in the State of California or in any other state of the United States and the murder was carried out in retaliation for or to prevent the performance of the victim's official duties.

(13)  The victim was an elected or appointed official or former official of the Federal Government, or a local or State government of California, or of any local or state government of any other state in the United States and the killing was

12

EX-A

intentionally carried out in retaliation for or to prevent the performance of the victim's official duties.

(14) The murder was especially heinous, atrocious, or cruel, manifesting exceptional depravity, as utilized in this section, the phrase especially heinous, atrocious or cruel manifesting exceptional depravity means a conscienceless, or pitiless crime which is unnecessarily torturous to the victim.

(15) The defendant intentionally killed the victim while lying in wait.

(16) The victim was intentionally killed because of his race, color, religion, nationality or country of origin.

(17) The murder was committed while the defendant was engaged in or was an accomplice in the commission of, attempted commission of, or the immediate flight after committing or attempting to commit the following felonies:

(i) Robbery in violation of Section 211. *Added 212.*

(ii) Kidnapping in violation of Sections 207 and 209.

(iii) Rape in violation of Section 261.

(iv) Sodomy in violation of Section 286.

(v) The performance of a lewd or lascivious act upon person of a child under the age of 14 in violation of Section 288.

(vi) Oral copulation in violation of Section 288a.

(vii) Burglary in the first or second degree in violation of Section 460. *subdivision (b)*

(viii) Arson in violation of Section ~~457~~. *451*

(ix) Train wrecking in violation of Section 219.

(18) The murder was intentional and involved the infliction of torture. For the purpose of this section torture requires proof of the infliction of extreme physical pain no matter how long its duration.

(19) The defendant intentionally killed the victim by the administration of poison.

(b) Every person whether or not the actual killer found guilty of intentionally aiding, abetting, counseling, commanding, inducing, soliciting, requesting, or assisting any actor in ..e commission of murder in the first degree shall suffer death ..r confinement in state prison for a term of life without the possibility of parole, in any case in which one or more of the special circumstances enumerated in paragraphs (1), (3), (4), (5), (6), (7), (8), (9), (10), (11), (12), (13), (14), (15), (16), (17), (18), or (19) of subdivision (a) of this section has been charged and specially found under Section 190.4 to be true.

The penalty shall be determined as provided in Sections 190.1, 190.2, 190.3, 190.4, and 190.5.

Sec. 7.   Section 190.3 of the Penal Code is repealed.

~~190.3.   If the defendant has been found guilty of murder in the first degree, and a special circumstance has been charged and found to be true, or if the defendant may be subject to the death penalty after having been found guilty of violating subdivision (a) of Section 1672 of the Military and Veterans Code, or Section 37, 128, 219 or 4500 of this code, the trier of fact shall determine whether the penalty shall be death or life imprisonment without possibility of parole. In the proceedings on the question of penalty, evidence may be presented by both the people and the defendant as to any matter relevant to aggravation, mitigation and sentence, including, but not limited to, the nature and circumstances of the present offense, the presence or absence of other criminal activity by the defendant which involved the use or attempted use of force or violence or which involved the expressed or implied threat to use force or violence, and the defendant's character, background, history, mental condition and physical condition.~~

~~However, no evidence shall be admitted regarding other criminal activity by the defendant which did not involve the use or attempted use of force or violence or which did not involve the expressed or implied threat to use force or violence. As used in this section, criminal activity does not require a conviction.~~

~~However, in no event shall evidence of prior criminal activi-~~

~~ity be admitted for an offense for which the defendant was prosecuted and was acquitted. The restriction on the use of this evidence is intended to apply only to proceedings conducted pursuant to this section and is not intended to affect statutory or decisional law allowing such evidence to be used in other proceedings.~~

~~Except for evidence in proof of the offense or special circumstances which subject a defendant to the death penalty, no evidence may be presented by the prosecution in aggravation unless notice of the evidence to be introduced has been given to the defendant within a reasonable period of time, as determined by the court, prior to the trial. Evidence may be introduced without such notice in rebuttal to evidence introduced by the defendant in mitigation.~~

~~In determining the penalty the trier of fact shall take into account any of the following factors if relevant:~~

~~(a) The circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true pursuant to Section 190.1.~~

~~(b) The presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the expressed or implied threat to use force or violence.~~

~~(c) Whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance.~~

~~(d) Whether or not the victim was a participant in the defendant's homicidal conduct or consented to the homicidal act.~~

~~(e) Whether or not the offense was committed under circumstances which the defendant reasonably believed to be a moral justification or extenuation for his conduct.~~

~~(f) Whether or not the defendant acted under extreme duress or under the substantial domination of another person.~~

~~(g) Whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or the affects of intoxication.~~

~~(h) The age of the defendant at the time of the crime.~~

~~(i) Whether or not the defendant was an accomplice to the offense and his participation in the commission of the offense was relatively minor.~~

~~(j) Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime.~~

~~After having heard and received all of the evidence, the trier of fact shall consider, take into account and be guided by the aggravating and mitigating circumstances referred to in this section, and shall determine whether the penalty shall be death or life imprisonment without the possibility of parole.~~

Sec. 8.   Section 190.3 is added to the Penal Code, to read:

190.3.   If the defendant has been found guilty of murder in the first degree, and a special circumstance has been charged and found to be true, or if the defendant may be subject to the death penalty after having been found guilty of violating subdivision (a) of Section 1672 of the Military and Veterans Code or Sections 37, 128, 219, or 4500 of this code, the trier of fact shall determine whether the penalty shall be death or confinement in state prison for a term of life without the possibility of parole. In the proceedings on the question of penalty, evidence may be presented by both the people and the defendant as to any matter relevant to aggravation, mitigation, and sentence including, but not limited to, the nature and circumstances of the present offense, any prior felony conviction or convictions whether or not such conviction or convictions involved a crime of violence, the presence or absence of other criminal activity by the defendant which involved the use or attempted use of force or violence or which involved

*Ex. A*

the express or implied threat to use force or violence, and the defendant's character, background, history, mental condition and physical condition.

However, no evidence shall be admitted regarding other criminal activity by the defendant which did not involve the use or attempted use of force or violence or which did not involve the express or implied threat to use force or violence. As used in this section, criminal activity does not require a conviction.

However, in no event shall evidence of prior criminal activity be admitted for an offense for which the defendant was prosecuted and acquitted. The restriction on the use of this evidence is intended to apply only to proceedings pursuant to this section and is not intended to affect statutory or decisional law allowing such evidence to be used in any other proceedings.

Except for evidence in proof of the offense or special circumstances which subject a defendant to the death penalty, no evidence may be presented by the prosecution in aggravation unless notice of the evidence to be introduced has been given to the defendant within a reasonable period of time as determined by the court, prior to trial. Evidence may be introduced without such notice in rebuttal to evidence introduced by the defendant in mitigation.

The trier of fact shall be instructed that a sentence of confinement to state prison for a term of life without the possibility of parole may in future after sentence is imposed, be commuted or modified to a sentence that includes the possibility of parole by the Governor of the State of California.

In determining the penalty, the trier of fact shall take into account any of the following factors if relevant:

(a) The circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true pursuant to Section 190.1.

(b) The presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence.

(c) The presence or absence of any prior felony conviction.

(d) Whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance.

(e) Whether or not the victim was a participant in the defendant's homicidal conduct or consented to the homicidal act.

(f) Whether or not the offense was committed under circumstances which the defendant reasonably believed to be a moral justification or extenuation for his conduct.

(g) Whether or not defendant acted under extreme duress or under the substantial domination of another person.

(h) Whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect, or the effects of intoxication.

(i) The age of the defendant at the time of the crime.

(j) Whether or not the defendant was an accomplice to the offense and his participation in the commission of the offense was relatively minor.

(k) Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime.

After having heard and received all of the evidence, and after having heard and considered the arguments of counsel, the trier of fact shall consider, take into account and be guided by the aggravating and mitigating circumstances referred to in this section, and shall impose a sentence of death if the trier of fact concludes that the aggravating circumstances outweigh the mitigating circumstances. If the trier of fact deter-

mines that the mitigating circumstances outweigh the aggravating circumstances the trier of fact shall impose a sentence of confinement in state prison for a term of life without the possibility of parole.

Sec. 9. Section 190.4 of the Penal Code is repealed.

~~190.4. (a) Whenever special circumstances as enumerated in Section 190.2 are alleged and the trier of fact finds the defendant guilty of first degree murder, the trier of fact shall also make a special finding on the truth of each alleged special circumstance. The determination of the truth of any or all of the special circumstances shall be made by the trier of fact on the evidence presented at the trial or at the hearing held pursuant to subdivision (b) of Section 190.1.~~

~~In case of a reasonable doubt as to whether a special circumstance is true, the defendant is entitled to a finding that it is not true. The trier of fact shall make a special finding that each special circumstance charged is either true or not true. Whenever a special circumstance requires proof of the commission or attempted commission of a crime, such crime shall be charged and proved pursuant to the general law applying to the trial and conviction of the crime.~~

~~If the defendant was convicted by the court sitting without a jury, the trier of fact shall be a jury unless a jury is waived by the defendant and by the people, in which case the trier of fact shall be the court. If the defendant was convicted by a plea of guilty the trier of fact shall be a jury unless a jury is waived by the defendant and by the people.~~

~~If the trier of fact finds that any one or more of the special circumstances enumerated in Section 190.2 as charged is true, there shall be a separate penalty hearing, and neither the finding that any of the remaining special circumstances charged is not true, nor if the trier of fact is a jury, the inability of the jury to agree on the issue of the truth or untruth of any of the remaining special circumstances charged, shall prevent the holding of the separate penalty hearing.~~

~~In any case in which the defendant has been found guilty by a jury, and the jury has been unable to reach a unanimous verdict that one or more of the special circumstances charged are true, and does not reach a unanimous verdict that all special circumstances charged are not true, the court shall dismiss the jury and shall order a new jury impaneled to try the issues, but the issue of guilt shall not be tried by such jury, nor shall such jury retry the issue of the truth of any of special circumstances which were found by a unanimous verdict of the previous jury to be untrue. If such new jury is unable to reach the unanimous verdict that one or more of the special circumstances it is trying are true, the court shall dismiss the jury and impose a punishment of confinement in state prison for life.~~

~~(b) If defendant was convicted by the court sitting without a jury, the trier of fact at the penalty hearing shall be a jury unless a jury is waived by the defendant and the people, in which case the trier of fact shall be the court. If the defendant was convicted by a plea of guilty, the trier of fact shall be a jury unless a jury is waived by the defendant and the people.~~

~~If the trier of fact is a jury and has been unable to reach a unanimous verdict as to what the penalty shall be, the court shall dismiss the jury and impose a punishment of confinement in state prison for life without possibility of parole.~~

~~(c) If the trier of fact which convicted the defendant of a crime for which he may be subjected to the death penalty was a jury, the same jury shall consider any plea of not guilty by reason of insanity pursuant to Section 1026, the truth of any special circumstances which may be alleged, and the penalty to be applied, unless for good cause shown the court dismisses that jury in which case a new jury shall be drawn. The court shall state facts in support of the finding of good cause upon the record and cause them to be entered into the minutes.~~

44

*Ex. A*

(d) ~~In any case in which the~~ ~~dant may be subjected to the death penalty, evidence presented at any prior phase of the trial, including any proceeding upon a plea of not guilty by reason of insanity pursuant to Section 1026, shall be consid~~ ~~ered at any subsequent phase of the trial, if the trier of fact~~ ~~the prior phase is the same trier of fact at the subsequent phase.~~

~~(e) In every case in which the trier of fact has returned a verdict or finding imposing the death penalty, the defendant shall be deemed to have made an application for modification of such verdict or finding pursuant to subdivision (7) of Section 1181. In ruling on the application the judge shall review the evidence, consider, take into account, and be guided by the aggravating and mitigating circumstances referred to in Section 190.3, and shall make an independent determination as to whether the weight of the evidence supports the jury's findings and verdicts. He shall state on the record the reason for his findings.~~

~~The judge shall set forth the reasons for his ruling on the application and direct that they be entered on the Clerk's minutes.~~

~~The denial of the modification of a death penalty verdict pursuant to subdivision (7) of Section 1181 shall be reviewed on the defendant's automatic appeal pursuant to subdivision (b) of Section 1239. The granting of the application shall be reviewed on the people's appeal pursuant to paragraph (6) of subdivision (a) of Section 1238.~~

~~The proceedings provided for in this subdivision are in addition to any other proceedings on a defendant's application for a new trial.~~

Sec. 10.   Section 190.4 is added to the Penal Code, to read:

190.4. (a)  *Whenever special circumstances as enumerated in Section 190.2 are alleged and the trier of fact finds the defendant guilty of first degree murder, the trier of fact shall also make a special finding on the truth of each alleged special circumstance. The determination of the truth of any or all of the special circumstances shall be made by the trier of fact on the evidence presented at the trial or at the hearing held pursuant to Subdivision (b) of Section 190.1.*

*In case of a reasonable doubt as to whether a special circumstance is true, the defendant is entitled to a finding that it is not true. The trier of fact shall make a special finding that each special circumstance charged is either true or not true. Whenever a special circumstance requires proof of the commission or attempted commission of a crime, such crime shall be charged and proved pursuant to the general law applying to the trial and conviction of the crime.*

*If the defendant was convicted by the court sitting without a jury, the trier of fact shall be a jury unless a jury is waived by the defendant and by the people, in which case the trier of fact shall be the court. If the defendant was convicted by a plea of guilty, the trier of fact shall be a jury unless a jury is waived by the defendant and by the people.*

*If the trier of fact finds that any one or more of the special circumstances enumerated in Section 190.2 as charged is true, there shall be a separate penalty hearing, and neither the finding that any of the remaining special circumstances charged is not true, nor if the trier of fact is a jury, the inability of the jury to agree on the issue of the truth or untruth of any of the remaining special circumstances charged, shall prevent the holding of a separate penalty hearing.*

*In any case in which the defendant has been found guilty by a jury, and the jury has been unable to reach an unanimous verdict that one or more of the special circumstances charged are true, and does not reach a unanimous verdict that all the special circumstances charged are not true, the court shall dismiss the jury and shall order a new jury impaneled to try the issues, but the issue of guilt shall not be tried by such jury; nor shall such jury retry the issue of the truth of any of the*

*special circumstances which were found by an unanimous verdict of the previous jury to be untrue. If such new jury is unable to reach the unanimous verdict that one or more of the special circumstances it is trying are true, the court shall dismiss the jury and in the court's discretion shall either order a new jury impaneled to try the issues the previous jury was unable to reach the unanimous verdict on, or impose a punishment of confinement in state prison for a term of 25 years.*

*(b) If defendant was convicted by the court sitting without a jury the trier of fact at the penalty hearing shall be a jury unless a jury is waived by the defendant and the people, in which case the trier of fact shall be the court. If the defendant was convicted by a plea of guilty, the trier of fact shall be a jury unless a jury is waived by the defendant and the people.*

*If the trier of fact is a jury and has been unable to reach a unanimous verdict as to what the penalty shall be, the court shall dismiss the jury and shall order a new jury impaneled to try the issue as to what the penalty shall be. If such new jury is unable to reach a unanimous verdict as to what the penalty shall be, the court in its discretion shall either order a new jury or impose a punishment of confinement in state prison for a term of life without the possibility of parole.*

*(c) If the trier of fact which convicted the defendant of a crime for which he may be subject to the death penalty was a jury, the same jury shall consider any plea of not guilty by reason of insanity pursuant to Section 1026, the truth of any special circumstances which may be alleged, and the penalty to be applied, unless for good cause shown the court discharges that jury in which case a new jury shall be drawn. The court shall state facts in support of the finding of good cause upon the record and cause them to be entered into the minutes.*

*(d) In any case in which the defendant may be subject to the death penalty, evidence presented at any prior phase of the trial, including any proceeding under a plea of not guilty by reason of insanity pursuant to Section 1026 shall be considered in any subsequent phase of the trial, if the trier of fact of the prior phase is the same trier of fact at the subsequent phase.*

*(e) In every case in which the trier of fact has returned a verdict or finding imposing the death penalty, the defendant shall be deemed to have made an application for modification of such verdict or finding pursuant to Subdivision 7 of Section 11. In ruling on the application, the judge shall review the evidence, consider, take into account, and be guided by the aggravating and mitigating circumstances referred to in Section 190.3, and shall make a determination as to whether the jury's findings and verdicts that the aggravating circumstances outweigh the mitigating circumstances are contrary to law or the evidence presented. The judge shall state on the record the reasons for his findings.*

*The judge shall set forth the reasons for his ruling on the application and direct that they be entered on the Clerk's minutes. The denial of the modification of the death penalty verdict pursuant to subdivision (7) of Section 1181 shall be reviewed on the defendant's automatic appeal pursuant to subdivision (b) of Section 1239. The granting of the application shall be reviewed on the People's appeal pursuant to paragraph (6).*

Sec. 11.   Section 190.5 of the Penal Code is repealed.

190.5. (a) ~~Notwithstanding any other provision of law, the death penalty shall not be imposed upon any person who is under the age of 18 years at the time of commission of the crime. The burden of proof as to the age of such person shall be upon the defendant.~~

~~(b) Except when the trier of fact finds that a murder was committed pursuant to an agreement as defined in subdivision (a) of Section 190.2, or when a person is convicted of a violation of subdivision (a) of Section 1672 of the Military and~~

~~Veterans Code, or Section 37, 128, 1500, e.  .bdivision (b) of Section 100.2 of this code, the death penalty shall not be imposed upon any person who was a principal in the commission of a capital offense unless he was personally present during the commission of the act or acts causing death, and intentionally physically aided or committed such act or acts causing death.~~

~~(e)  For the purposes of subdivision (b), the defendant shall be deemed to have physically aided in the act or acts causing death only if it is proved beyond a reasonable doubt that his conduct constitutes an assault or a battery upon the victim or if by word or conduct he orders, initiates, or coerces the actual killing of the victim.~~

Sec. 12.  Section 190.5 is added to the Penal Code, to read:

190.5.  *Notwithstanding any other provision of law, the death penalty shall not be imposed upon any person who is under the age of 18 at the time of the commission of the crime. The burden of proof as to the age of such person shall be upon the defendant.*

Sec. 13.  If any word, phrase, clause, or sentence in any section amended or added by this initiative, or any section or provision of this initiative, or application thereof to any person or circumstance, is held invalid, such invalidity shall not affect any other word, phrase, clause, or sentence in any section amended or added by this initiative, or any other section, provisions or application of this initiative, which can be given effect without the invalid word, phrase, clause, sentence, section, provision or application and to this end the provisions this initiative are declared to be severable.

Sec. 14.  If any word, phrase, clause, or sentence in any section amended or added by this initiative or any section or provision of this initiative, or application thereof to any person or circumstance is held invalid, and a result thereof, a defendant who has been sentenced to death under the provisions of this initiative will instead be sentenced to life imprisonment shall be without the possibility of parole.

If any word, phrase, clause, or sentence in any section amended or added by this initiative or any section or provision of this initiative, or application thereof to any person or circumstance is held invalid, and a result thereof, a defendant who has been sentenced to confinement in the state prison for life without the possibility of parole under the provisions of this initiative shall instead be sentenced to a term of 25 years to life in a state prison.

*Ex. A*

EXHIBIT   G

All Criminal Deputies

Date: August 22, 1979

File No.:

Telephone: ATSS ( )
( )

Office of the Attorney General

Recent (Relatively) Sentencing
Law Changes

Proposition 7 (effective 11/7/78) and SB 709 (effective 1/1/79) have worked some substantial changes in the sentencing consequences of murder convictions.

Specifically, we have taken the position that the new 15 years to life and 25 years to life sentences under new Penal Code section 190 are "life" sentences with 15 and 25 year minimum eligible parole dates. This conclusion has side effects relating to eligibility for CYA under Welfare and Institutions Code section 173.5 and the number of peremptory challenges under Penal Code section 1070. This conclusion (as it effects CYA eligibility) is at issue in the Fifth District Court of Appeal in In re Dewester (5 Crim. 4543).

Furthermore, the venerable concept of merger of life sentences (Pen. Code, § 669) passed into history, seemingly allowing for consecutive 25 to life sentences limited only by the number of victims.

The attached memo reflects the Morrissey 8's conclusions on these (and many more) topics. It has been approved by Arnie Overoye and Bob Philibosian and more fully sets out the Attorney General's position statewide.

Michael D. Wellington
Deputy Attorney General

MDW:nl
Attachment

Ex
E 1

Arnold Overoye                                   Date:    July 26, 1979
Assistant Attorney General
Sacramento                                       File No.:

                                                 Telephone: ATSS ( 631 ) 7666
                                                           (     )


Office of the Attorney General

Michael D. Wellington – San Diego

Morrissey 8
Meeting of July 9, 1979


On July 9, 1979, the Morrissey 8 met at our office in
Sacramento. The progress of the CRB's disparate sentence
review project was discussed in detail, as was People v.
Herrera, the CRB's first motion for recall under the dis-
parate sentence review mandate of Penal Code section 1170,
subdivision (f). The group also discussed the status of
pending litigation concerning the DSL. Finally, there was
an extensive discussion and analysis of the legal nature of
prison sentences for first and second degree murder under
Penal Code section 190 as amended by Proposition 7. A number
of legal conclusions were reached on this point, which conclu-
sions will be outlined in this memo.

                    "Life" Sentences Under New
                     Penal Code Section 190

Penal Code section 190 provides punishment of death, life
without possibility of parole, or "confinement in the state
prison for a term of 25 years to life" for first degree
murder. The prescribed punishment for second degree murder
is "confinement in the state prison for a term of 15 years
to life." Our discussion focused only on the 15 or 25
years to life sentences. It was our conclusion that these
sentences are not directly comparable to either the "indeter-
minate life" or "express life" sentences that existed under
the Indeterminate Sentence Law prior to July 1, 1977.
Rather, we concluded that these sentences should be administered
in the same fashion all "life" sentences are currently admin-
istered under the Determinate Sentence Law except that they
feature 15 or 25 year minimum eligible parole dates, instead
of the general 7 year MEPD prescribed by Penal Code section
3046.

"Indeterminate Life" sentences under the old Indeterminate
Sentence Law (for example five to life for robbery) contemplated

EX
E-2

Arnold Overoye                      -2-                    July 26, 1979

the parole board setting a "term" somewhere between five
years and life. In addition, the parole board was obligated
to consider a parole release date sometime prior to the
expiration of the "term." The paroling decision was, by its
nature, a tentative one with the prisoner subject to revoca-
tion and the service of the remainder of his term. The
primary features of this whole scheme passed into history.
on July 1, 1977, with the coming of DSL. The parole board's
power to fix terms was withdrawn by the repeal of Penal Code
section 3940 et seq., and nothing in the current Penal Code
evidences an intent to reestablish those powers for first
or second degree murder. Although the parole board currently
does have the power to grant parole (Pen. Code, § 3040 et
seq.) that power too is substantially different since July 1,
1977. Not only is the length of parole statutorily set
(Pen. Code, § 3000 et seq.) but reincarceration on revocation
of parole is statutorily limited to one year (Pen. Code, §
3057).

"Express life" sentences under the ISL precluded the
establishment of a "term" since the prisoner was never to
be discharged. Although such prisoners could be paroled, they
could at any time be retaken to serve the remainder of their
life sentences. Under the DSL, however, all life prisoners
discharge automatically within a few years of their release
on parole no matter what their conduct during the parole.
(Pen. Code, § 3000 et seq.) As indicated above, any confine-
ment on revocation of parole is limited to one year.

Thus, since much of the administrative power underlying
the old concepts of "indeterminate life" and "express life"
have been abolished, it was concluded that the new prison.
sentences under Proposition 7 were not intended to fit
either of these old models. The language of new Penal Code
section 190 (15 years to life, 25 years to life) implies
that someone must make a choice where the prisoner falls
between the two ends of the spectrum. Since the sentence
is clearly one under Penal Code section 1168, subdivision
(b), the trial judge cannot make the choice. This leaves
the Community Release Board. Since the Community Release
Board's only remaining power in this regard is the power to
grant parole (Pen. Code, § 3040) it was concluded that the
new sentences require the CRB to fix a parole date somewhere
within the appropriate range. As a result, the new sentences
appear to be "life" sentences which are analogous to all other
"life" sentences under the DSL except that Penal Code section
190 provides specific (15 or 25 years) minimum eligible
parole dates which prevail over the general "life" MEPD of
seven years found in Penal Code section 3046. The "life"
sentences of Penal Code section 190 appear slightly different

EX

E 3

from other life sentences under the DSL in the additional
respect that good time credits (Pen. Code, § 2930 et seq.)
are made expressly applicable to the MEPD. Such credits
are not otherwise applicable to anyone sentenced under
Penal Code section 1168, subdivision (b). (Pen. Code, §
2930, subd. (a).)

Two consequences of characterizing section 190 sentences as
"life" sentences are both significant and consistent with
the thrust of Proposition 7. First, "life" cases entitle
both parties to the trial to 26 peremptory challenges.
(Pen. Code, § 1070.) Second, a "life" sentence precludes
commitment to the Youth Authority following a superior court
trial.

## In re Rodriguez

In re Rodriguez (1975) 14 Cal 3d 639, also appears to have
been rendered obsolete by the changed structure of life
sentences. In Rodriguez, the California Supreme Court
placed the burden on the parole board to set a prisoner's
"primary term" quickly and without regard to any post-
conviction behavior. This "primary term" established
the outer limit of the prison system's jurisdiction over the
prisoner. The basis for the Rodriguez decision lay in the
judicial branch's obligation to examine terms, as fixed by
the parole board, to determine whether they were cruel
or unusual. In light of the fact the CRB has no term fixing
power, it was the unanimous conclusion of all members present
that Rodriguez is no longer applicable.

## Merger of New Life Sentences

Merger of life sentences was also discussed at the meeting.
Penal Code sections 669 and 3046 were both amended as of
January 1, 1979, to expressly provide that determinate enhance-
ments may run consecutively to life sentences, and that multiple
life sentences can run consecutively to each other. In the
case of consecutive life sentences, section 3046 requires
the defendant be imprisoned "until he has served at least seven
calendar years on each of the life sentences . . . ." The
question was raised whether the apparent 15 to 25 year MEPDs
under Penal Code section 190 is inconsistent with the language
of section 3046. The conclusion was that there is no inconsistence
It was noted that section 3046 is a generalized section provid-
ing MEPDs for all life terms, while section 190 is a much
more specific section which applies directly to first and
second degree murders. Furthermore, section 3046 merely
requires the service of "at least" seven years for each
sentence. Thus the 15 and the 25 year designation in section
190 are not at all inconsistent with the specific language
of section 3046. It was noted that Penal Code section
4500 has for years provided just such a specific exception
to section 3046 by providing a nine year MEPD for certain
kinds of assaults by life prisoners. Finally, it should

*Art. H, § 0(c)*

*EX*

*E-4*

be noted that SB 709 which effectuated the amendment to
sections 669 and 3046 was filed September 6, 1978, while the
more specific language of Penal Code section 190 was added
by initiative on November 7, 1978. Thus, the specific
MEPDs in section 190 appear to be the latest expression of
the sovereign.

Another merger problem revolves around the fact that although
SB 709 was filed in September 1978, it did not become
effective until January 1, 1979. Thus, its abolition of the
merger doctrine did not go into effect until approximately
seven weeks after the November 7, 1978, effective date of
Proposition 7. (Pen. Code, § 190 et seq.) In light of this,
the group concluded that any first or second degree murders
committed between November 7, 1978, and January 1, 1979,
would be subject to the 15 or 25 year MEPDs but that no
consecutive sentencing would be possible. The abolishing of
the merger doctrine clearly works to increase punishment.
Therefore, imposition of consecutive life sentences for
crimes committed before January 1, 1979, would seem to be
unavoidably ex post facto.

> ## Retroactive Calculation of ISL
> ## Second Degree Murder Cases

The final question addressed was what term the CRB is to be
guided by when retroactively calculating an ISL prisoner's
second degree murder sentence under Penal Code section 1170.2
Subdivision (a) of that section requires the CRB to determine
whether a prisoner would have been sentenced under Penal
Code section 1170 had his crime been committed after July 1,
1977, and if so, what his sentence would have been. The
difficulty is that for second degree murder the sentence has
seemed to be many things at many different times after
July 1, 1977. The initial DSL "price tag" for second degree
murder was five, six or seven years. In September of 1978,
the Legislature passed SB 709 which (effective January 1, 1979)
changed this to five, seven or eleven years. However, before
that could ever take effect, on November 7, 1978, Proposition 7
was passed changing second degree murder from a determinate
term (to be sentenced under Penal Code section 1170) to a
'life' term (to be sentenced under Penal Code section 1168,
subdivision (b)). We concluded that SB 709 need not be
considered since its second degree murder penalty was
superseded before it ever went to effect by Proposition 7.
The CRB could not retroactively apply Proposition 7's 15
to life for two reasons. First, it would be an ex post
facto increase from the five to life sentence in effect

EX

E-5

EXHIBIT H

2/15/80

CDC CLASSIFICATION REVIEW SCORE SHEET

NUMBER: (end in Col. 6) INMATE'S    NAME: (start in Col. 7)    INITIALS:

| C | - | 9 | 9 | 7 | 3 | 7 | M | C | A | F | E | E | - | - | - |  | T | B |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 |

CURRENT INSTITUTION:

DATE RECEIVED CURRENT INSTITUTION: mo day yr

LAST PREVIOUS INSTITUTION (current incar.):

MINIMUM RELEASE DATE: mo day yr

CURRENT CUSTODY LEVEL:

| D | V | I | - | - |  | 0 | 9 | 1 | 3 | 7 | 8 |  | R | C | C | - | - |  | L | I | F | E |  |  | M | E | D | A | - |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 20 | 21 | 22 | 23 | 24 |  | 25 | 26 | 27 | 28 | 29 | 30 |  | 31 | 32 | 33 | 34 | 35 |  | 36 | 37 | 38 | 39 | 40 | 41 | 42 | 43 | 44 | 45 | 46 |

INCARCERATION BEHAVIOR FOR CURRENT SENTENCE

1. Unfavorable Behavior During Current Term

   a) # serious or major CDC 115's   1   X 4 =  [0 4]  47-8

   b) # escapes during current CDC term   0   X 8 =  [0 0]  49-50

   c) # physical assaults on staff   ___   X 8 =  [0 0]  51-2

   d) # assaults on inmates   ___   X 4 =  [0 0]  53-4

   e) # smuggling/trafficking in drugs   ___   X 4 =  [0 0]  55-6

   f) # possessing deadly weapons   ___   X 4 =  [0 0]  57-8

   g) # inciting disturbance   ___   X 4 =  [0 0]  59-60

   Total Unfavorable Points  = +  [0 4]  8

2. Favorable Behavior During Current Term    # of 6 mo. Periods.

   a) Continuous minimum custody   ___   X 4 =  [0 0]  61-2

   b) Continuous dorm living   ___   X 2 =  [0 0]  63-4

   c) No serious 115's   1   X 2 =  [0 2]  65-6

   d) Above average, full time work/voc/school prog.   ___   X 2 =  [0 0]  67-8

   Total Favorable Credits  = -  [0 2]

   Net Incarceration Score = Unfavorable less Favorable = + or -  [0 2]

   Prior Classification Score  =  [1 0 6]  69-71

   Adjusted Classification Score  =  [1 0 8]  72-74

---

A. Is the adjusted score the same as the inmate's current institutional placement?

   1 = Yes, the same as current placement.
   2 = No, score indicates lower custody.
   3 = No, score indicates higher custody.    [1]  75

B. If the score is different, are there overriding reasons why the inmate could not be transferred?

   1 = No apparent reason.
   2 = Yes, medical/psychiatric reasons.
   3 = Yes, other special housing needs.
   4 = Yes, special program needs.
   5 = Yes, current behavior okay, no increase needed.
   Other: _____    [ ]  76

   Counselor's signature: McC_____

   Supervisor's signature: _____    [3]  80

CDC CLASSIFICATION SCORE SHEET

2/26/80

CDC NUMBER: (end in Col. 6)    'S LAST NAME: (start in Col. 7)    INITIALS:

| B | 9 | 5 | 7 | 3 | 7 | M | C | - | A | F | E | E | | | | | | | | | | T | B |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 |

DATE LAST RECEIVED CDC:

| mo | | day | | year | |
|----|----|----|----|----|----|
| 0 | 8 | 0 | 3 | 7 | 2 |
| 25 | 26 | 27 | 28 | 29 | 30 |

STATUS (code one):
1=New Commitment
2=PV-WNT
3=PV-TFT    [ 1 ] 31

YEAR OF BIRTH: 19 [ 5 8 ]   32 33

RECEPTION CENTER:
RCC   NRC
CRC   CCC
KCW   SQ    [ R C C ]   34 35 36
CIW

RACE/ETHNIC STATUS
(code one):
1-White          6-Japanese
2-Mexican descent 7-Filipino
3-Black          8-Hawaiian
4-Indian         9-Other
5-Chinese        [ 3 ]  37

BASE OFFENSE: Murder 1
(name)

BASE OFFENSE CODE: NUMBER:

| P | - | | - | 1 | 8 | 7 | - |
|---|---|---|---|---|---|---|---|
| 38 | 39 | 40 | 41 | 42 | 43 | 44 | |

CALCULATION OF SCORE

BACKGROUND FACTORS

1. Time to Serve
   a) DSL Total Term ( 2.5 )
   b) Minus 1 year  = 24  X 4 = [ 9 6 ]  45-6

2. Stability
   a) Under 26 yrs. at reception  +2 = [ 2 ]  47
   b) Never married or marriage not intact  +2 = [ 2 ]  48
   c) Not high school graduate or GED  +2 = [ 0 ]  49
   d) Not more than 6 months with one employer  +2 = [ 2 ]  50
   e) No military or not honorable discharge  +2 = [ 2 ]  51

3. Prior Escapes
   a) # walkaways  X 4 = [ 0 ]  52-3
   b) # breached perimeter or escape is committing crime  X 8 = [ 0 ]  54-5
   c) # escapes with force  X 16 = [ 0 ]  56-7

4. Holds and Detainers
   a) # holds where new prison sentence, deportation likely  X 6 = [   ]  58-9

5. Prior Sentences Served
   a) # jail or county juvenile of 31+ days (limit to 3)  X 2 = [ 0 2 ]  60-1
   b) # CYA, state level juvenile (limit to 3)  X 2 = [ 0 0 ]  62-3
   c) # CDC, CRC, adult state-federal level (limit to 3)  X 4 = [ 0 0 ]  64-5

Total Factors Score  [ 1 0 6 ]  66-8

Counselor's signature: _____

Supervisor's signature: _____

PRIOR INCARCERATION BEHAVIOR

6. Unfavorable Prior Behavior
   a) # serious or major disciplinaries last incarcerated year  X 4 = [ 0 0 ]  69-70
   b) Escape in last incarceration  + 8 = [ 0 0 ]  71-2
   c) # assaults on officer  X 8 = [ 0 0 ]  73-4
   d) # assaults on inmates  X 4 = [ 0 0 ]  75-6
   e) # smuggling/trafficking drugs  X 4 = [ 0 0 ]  77-8   Card 2 [ 1 ] 80
   f) # possessing deadly weapons  X 4 = [ 0 0 ]  7-8
   g) # inciting disturbance  X 4 = [ 0 0 ]  9-10

   Total Unfavorable Behavior  = ( 0 )

7. Favorable Prior Behavior
   a) Successfully completed last four months in any minimum custody or successful dorm living last incarceration  -4
      or successful minimum custody last year  or = [ 0 ]  11
      -8
   b) No serious or major 115's last year of incarceration  -4 = [ 0 ]  12
   c) Full time work/school-voc, above average program last incarcerated year  -4 = [ 0 ]  13

   Total Favorable Behavior  = ( 0 )

   Total Unfavorable Behavior  =

   Minus Total Favorable Behavior  -

   = Net Incarceration Behavior Score  = ( 0 )

TOTAL COMBINED BACKGROUND FACTOR/
INCARCERATION SCORE  [ 1 0 6 ]  14-1

CSP ACTION

INSTITUTION APPROVED: CSP LAST NAME: P.I.

| D | V | H | - | - | F | R | I | C | K | E | R |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 |

EXCEPTIONAL DATE OF ACTION:
HOUSING*    mo    day    yr

| 0 | | 0 | 9 | 0 | 7 | 8 | |
|---|---|---|---|---|---|---|---|
| 29 | | 30 | 31 | 32 | 33 | 34 | 35 |

*Exceptional housing code: 0=No 1=TIPS 2=Medical 3=Psychiatric 4=PHU 5=Other
Explain if exception to 1-5: _____

# EXHIBIT I

SENATE Bill 709
Stats. 1978
Chapter 579

996f795

C-1

# STATUTES OF CALIFORNIA

AND DIGESTS OF MEASURES

1978

Constitution of 1879 as Amended

Measures Submitted to Vote of Electors,
Primary Election, June 6, 1978
and General Election, November 7, 1978

General Laws, Amendments to the Codes, Resolutions,
and Constitutional Amendments passed by the
California Legislature

1977–78 Regular Session
1977–78 First Extraordinary Session

Volume 2



Compiled by
BION M. GREGORY

have a substantial and rapid effect in reducing local crime incidence.

An act to amend Sections 182, 190, 193, 204, 208, 211a, 213, 215, 217, 217.1, 219.1, 220, 246, 264, 264.1, 286, 288, 288a, 447a, 448a, 454, 459, 460, 461, 464, 650½, 664, 669, 1170, 1170.2, 3046, 4501, 4501.5, 4502, 4503, 4500, 4530, 4574, 12022.7, 12303, 12303.3, 12303.6, 12308, 12309, and 12312 of the Penal Code, relating to imprisonment.

[Approved by Governor September 5, 1978. Filed with Secretary of State September 6, 1978.]

## CHAPTER 579

The people of the State of California do enact as follows:

SECTION 1. Section 182 of the Penal Code is amended to read:

182. If two or more persons conspire:

1. To commit any crime.

2. Falsely and maliciously to indict another for any crime, or to procure another to be charged or arrested for any crime.

3. Falsely to move or maintain any suit, action or proceeding.

4. To cheat and defraud any person of any property, by any means which are in themselves criminal, or to obtain money or property by false pretenses or by false promises with fraudulent intent not to perform such promises.

5. To commit any act injurious to the public health, to public morals, or to pervert or obstruct justice, or the due administration of the laws.

6. To commit any crime against the person of the President or Vice President of the United States, the Governor of any state or territory, any United States justice or judge, or the secretary of any of the executive departments of the United States.

They are punishable as follows:

When they conspire to commit any crime against the person of any official specified in subdivision 6, they are guilty of a felony and are punishable by imprisonment in the state prison for five, seven, or nine years.

When they conspire to commit any other felony, they shall be punishable in the same manner and to the same extent as is provided for the punishment of the said felony. If the felony is one for which different punishments are prescribed for different degrees, the jury or court which finds the defendant guilty thereof shall determine the degree of the felony defendant conspired to commit. If the degree is not so determined, the punishment for conspiracy to commit such felony shall be that prescribed for the lesser degree, except in the case of conspiracy to commit murder, in which case the punishment shall be that prescribed for murder in the first degree.

have different punishments and the commission of such felonies constitute but one offense of conspiracy, the penalty shall be that prescribed for the felony which has the greater maximum term.

When they conspire to do an act described in subdivision 4 of this section, they shall be punishable by imprisonment in the county jail for not more than one year, or by a fine not exceeding five thousand dollars ($5,000), or both.

When they conspire to do any of the other acts described in this section they shall be punishable by imprisonment in the county jail for not more than one year, or in the state prison, or by a fine not exceeding five thousand dollars ($5,000) or both.

All cases of conspiracy may be prosecuted and tried in the superior court of any county in which any overt act tending to effect such conspiracy shall be done.

SEC. 2. Section 190 of the Penal Code is amended to read:

190. Every person guilty of murder in the first degree shall suffer death, confinement in state prison for life without possibility of parole, or confinement in state prison for life. The penalty to be applied shall be determined as provided in Sections 190.1, 190.2, 190.3, 190.4, and 190.5. Every person guilty of murder in the second degree is punishable by imprisonment in the state prison for fifteen, or 17 years.

SEC. 3. Section 193 of the Penal Code is amended to read:

193. (a) Voluntary manslaughter is punishable by imprisonment in the state prison for two, four, or six years.

(b) Involuntary manslaughter is punishable by imprisonment in the state prison for two, three or four years.

(c) A violation of subsection 3 of Section 192 of this code punishable as follows: In the case of a violation of subdivision (a) said subsection 3 the punishment shall be either by imprisonment in the county jail for not more than one year in the state prison, in such case the jury may recommend by their verdict that the punishment shall be by imprisonment in the county jail. in the case of a violation of subdivision (b) of said subdivision 3, the punishment shall be by imprisonment in the county jail for not more than one year. In cases where, as authorized in this section, the jury recommends by their verdict that the punishment shall be imprisonment in the county jail, the court shall not have authority to sentence the defendant to imprisonment in the state prison, but may nevertheless place the defendant on probation as provided in this code.

SEC. 4. Section 204 of the Penal Code is amended to read:

204. Mayhem is punishable by imprisonment in the state prison for two, four, or six years.

SEC. 5. Section 208 of the Penal Code is amended to read:

208. Kidnapping is punishable by imprisonment in the state prison for three, five, or seven years.

SEC. 6. Section 211a of the Penal Code is amended to read:

211a. The robbery of any person who is performing his duties

two, four, or six years.

(c) Burglary in the second degree: by imprisonment in the county jail not exceeding one year or in the state prison.

SEC. 25.    Section 464 of the Penal Code is amended to read:

464.    Any person who, with intent to commit crime, enters, either by day or by night, any building, whether inhabited or not, and opens or attempts to open any vault, safe, or other secure place by use of acetylene torch or electric arc, burning bar, thermal lance, oxygen lance, or any other similar device capable of burning through steel, concrete, or any other solid substance, or by use of nitroglycerine, dynamite, gunpowder, or any other explosives, is guilty of a felony and, upon conviction, shall be punished by imprisonment in the state prison for a term of three, five, or seven years.

SEC. 26.    Section 653f of the Penal Code is amended to read:

653f.    Every person who solicits another to offer or accept or join in the offer or acceptance of a bribe, or to commit or join in the commission of robbery, burglary, grand theft, receiving stolen property, extortion, rape by force and violence, perjury, subornation of perjury, forgery, kidnapping, arson or assault with a deadly weapon or instrument or by means of force likely to produce great bodily injury, is punishable by imprisonment in the county jail not more than one year or in the state prison, or by fine of not more than five thousand dollars ($5,000), or the amount which could have been assessed for commission of the offense itself, whichever is greater, or by both such fine and imprisonment.

(d) Every person who solicits another to commit or join in the commission of murder is punishable by imprisonment in the state prison for two, four, or six years.

(c) An offense charged in violation of subdivision (a) or (b) must be proved by the testimony of two witnesses, or of one witness and corroborating circumstances.

SEC. 27.    Section 664 of the Penal Code is amended to read:

664.    Every person who attempts to commit any crime, but fails, or is prevented or intercepted in the perpetration thereof, is punishable, where no provision is made by law for the punishment of such attempts, as follows:

If the offense so attempted is punishable by imprisonment in the state prison, the person guilty of such attempt is punishable by imprisonment in the state prison for one-half the term of imprisonment prescribed upon a conviction of the offense so attempted; provided, however, that if the crime attempted is one in which the maximum sentence is life imprisonment or death the person guilty of such attempt shall be punishable by imprisonment in the state prison for a term of five, seven, or nine years.

2. If the offense so attempted is punishable by imprisonment in a county jail, the person guilty of such attempt is punishable by imprisonment in a county jail for a term not exceeding one-half the term of imprisonment prescribed upon a conviction of the offense so

attempted.

3. If the offense so attempted is punishable by a fine, the offender convicted of such attempt is punishable by a fine not exceeding one-half the largest fine which may be imposed upon a conviction of the offense so attempted.

SEC. 28.    Section 669 of the Penal Code is amended to read:

669.    When any person is convicted of two or more crimes, whether in the same proceeding or court or in different proceedings or courts, and whether by judgment rendered by the same judge or by different judges, the second or other subsequent judgment upon which sentence is ordered to be executed shall direct whether the terms of imprisonment or any of them to which he is sentenced shall run concurrently or consecutively, and whether with or without the possibility of parole, life sentences, whether with or consecutively with one another, or with any other term of imprisonment for a felony conviction. Whenever a person is committed to prison on a life sentence which is ordered to run consecutive to any determinate term of imprisonment imposed pursuant to Sections 1170, 1170.1, 667.5, 12022, 12022.5, 12022.6, and 12022.7, the determinate term of imprisonment shall be served first and no part thereof shall be credited toward the person's eligibility for parole as calculated pursuant to Section 3046.

In the event that the court at the time of pronouncing the second or other judgment upon such person had no knowledge of a prior existing judgment or judgments, or having knowledge, fails to determine how the terms of imprisonment shall run in relation to each other, then, upon such failure so to determine, or upon such prior judgment or judgments being brought to the attention of the court at any time prior to the expiration of 60 days from and after the actual commencement of imprisonment upon the second or other subsequent judgment, the court shall, in the absence of the defendant and within 60 days of such notice, determine how the term of imprisonment upon said second or other subsequent judgment shall run with reference to the prior incompleted term or terms of imprisonment. Upon the failure of the court so to determine how the terms of imprisonment on the second or subsequent judgment shall run, the term of imprisonment on the second or subsequent judgment shall run concurrently.

The Department of Corrections shall advise the court pronouncing the second or other subsequent judgment of the existence of all prior judgments against the defendant, the terms of imprisonment upon which have not been completely served.

SEC. 29.    Section 1170 of the Penal Code is amended to read:

1170.    (a) (1) The Legislature finds and declares that the purposes of imprisonment for crime is punishment. This purpose is best served by terms proportionate to the seriousness of the offense with provision for uniformity in the sentences of offenders committing the same offense under similar circumstances. The Legislature further finds and declares that the elimination of